**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE REMICADE ANTITRUST | : | CIVIL ACTION |
| LITIGATION | : | |
| | : | |
| | : | |
| This document relates to: | : | |
| | : | |
| Indirect Purchaser Actions | : | No. 17-cv-04326 |
| (consolidated) | : | |
| | : | |
| Direct Purchaser Actions | : | No. 18-cv-00303 |

**<u>MEMORANDUM</u>**

**Joyner, J.**                                        **December     4, 2018**

Before the Court are Defendants' Johnson & Johnson and

Janssen Biotech, Inc. (collectively "Janssen") ("J&J") Motion to

Dismiss for failure to state a claim under Fed. R. Civ. P.

12(b)(6) (Doc. No. 67-1), Indirect and Direct Purchaser

Plaintiffs' Joint Opposition thereto (Doc. No. 73), and

Defendants' Reply in Support thereof (Doc. No. 75).

**I. Background**

This case arises from an antitrust action brought by Direct

and Indirect Purchasers of Defendants' drug Remicade, against

Johnson & Johnson, along with its wholly owned subsidiary,

Janssen Biotech, Inc. (collectively, "J&J"), alleging

artificially inflated prices and monopolization of the

pharmaceutical market for biologic infliximab drugs.  The Direct

and Indirect Purchasers' principle claim is that J&J undertook

an anticompetitive scheme, consisting of exclusive agreements and coercive bundled rebates, to foreclose competition posed by biosimilar versions of Remicade, specifically Pfizer's Inflectra and Merck's Renflexis. The scheme allegedly caused providers and insurers to pay overcharges for infliximab products that they would not have paid absent J&J's anticompetitive conduct.

Under consideration is J&J's Motion to Dismiss the Indirect Purchasers' Consolidated Amended Complaint and to Dismiss the Amended Direct Purchaser Class Action Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) (Doc. No. 67-1). This Motion is fully briefed and ripe for the Court's adjudication. The Court has considered the parties' submissions and decides this matter without oral argument. Fed. R. Civ. P. 78; Loc. R. Civ. P. 7.1(f).

## II. Alleged Facts

This case arises from essentially the same facts that have been described in detail in this Court's related decision denying Defendants J&J's motion to dismiss Pfizer's complaint alleging federal antitrust violations. Pfizer Inc. v. Johnson & Johnson, No. 17-cv-4180, 2018 U.S. Dist. LEXIS 135261 (E.D. Pa. Aug. 8, 2018); Doc. No. 58). For the purposes of considering

Defendants' motion, we will summarize facts relevant to Indirect

and Direct Purchaser Plaintiffs' claims.[1]

The medications at the center of this litigation are biologic

infliximab products, used as treatment for maintaining chronic

auto-immune inflammatory conditions.  Dir. AC ¶2, ¶41.

Infliximab products cannot be taken orally and are only

administered intravenously, generally by an in-office health

care provider.  Id. at ¶5.  J&J's drug Remicade was the first

biologic infliximab to enter the market in 1998.  Ind. CAC ¶21.

In 2009, Congress enacted the Biologic Price Competition and

Innovation Act (BPCIA), an analog to the shortcut for FDA

approval that the Hatch-Waxman amendments provide for chemically

synthesized medications.  Dir. AC ¶8-9.  To attain approval as a

"biosimilar" under the BPCIA, a manufacturer must demonstrate

that "there are no clinically meaningful differences between the

biological product and the reference product in terms of safety,

purity and potency."  Ind. CAC ¶38.  Once J&J's patent on

Remicade expired in 2016, the FDA approved three other

medications including Pfizer's Inflectra and Merck's Renflexis.

---

[1] Unless otherwise noted, the following facts are taken from the Direct
Purchaser's Amended Complaint (Dir. AC, Doc. No. 12) and the Indirect
Purchasers' Consolidated Amended Complaint (Ind. CAC, Doc. No. 53).  On
consideration of a Rule 12(b)(6) motion to dismiss, the allegations in the
plaintiff's complaint are generally taken as true and all reasonable
inferences are drawn in favor of the claimant. See Phillips v. Cty. of
Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

Dir. AC ¶16-19, Ind. CAC ¶4.  Competition from the introduction of biosimilars into the infliximab market was expected to lower prices for potentially lifesaving biologic medications that otherwise might have been unaffordable for some patients.[2]  Dir. AC ¶14, ¶20.

The Direct and Indirect Purchaser Plaintiffs argue that insurance coverage is key to biologic infusion products like infliximab because treatment is so expensive that most patients will not be able to pay out of pocket.  Id. at ¶54.  Therefore, infliximab products are either reimbursed by insurance companies, or they are paid for by health care providers who administer the drug through a "buy and bill" system where they pay upfront for the drug then bill an insurer or third-party payor for reimbursement.  Id. at ¶57.  Plaintiffs argue that this system incentivizes providers to choose a biologic that is "widely covered by insurance" to avoid the risk that their reimbursement claim could be denied.  Id. at ¶58, ¶60.

*Defendants' Biosimilar Readiness Plan*

1. Exclusive agreements

Plaintiffs allege that Defendants' exclusive contracts with insurers block biosimilar competition in more than one way.

---

[2] Biologics can cost from $15,000 to $150,000 to administer to one patient. Dir. AC ¶15.  A single treatment of Remicade can cost approximately $4,000, totaling approximately $26,000 for a full year of infusion treatment.  Ind. CAC at ¶3.

Ind. CAC ¶47, 48.  Some contracts require insurers to deny
coverage for biosimilars altogether.  Other contractual
preconditions effectively preclude biosimilar competition.  For
example, the "fail first" exception, under which providers
cannot choose a biosimilar unless a patient has first failed to
respond to treatment with Remicade.  Dir. AC ¶23.

    2. Bundled rebates

    J&J allegedly uses bundled rebates as leverage over
insurers by threatening a rebate penalty in "many millions of
dollar[s] annually" if insurers do not enter contracts that
foreclose them from reimbursing competitor biosimilars.  Dir. AC
¶76.  First, J&J engages in multi-product bundling, linking
rebates for Remicade to other J&J drugs and medical devices that
their competitors do not offer.  Through this "portfolio
approach," "insurers and providers that refuse to grant
exclusivity to Remicade would be forced to pay higher prices or
forego enhanced rebates on multiple J&J products."  Id. at ¶84.

    Second, J&J also bundles demand from "contestable" patients
(new users of infliximab or those who have switched to a
biosimilar product) and "incontestable" patients (those "already
controlling their chronic conditions with Remicade are less
likely to switch to a lower-priced biosimilar.").  Id. at ¶77.
J&J's contracts threaten to deny rebates "on *all* Remicade
prescriptions if *any* infliximab biosimilar prescriptions are

reimbursed." Id. at ¶79. Plaintiffs call this the "rebate trap." Id. at ¶80, ¶139.

### 3. Anticompetitive Effects

Pricing data, insurance coverage, and overpayment are among the anticompetitive effects of Defendants' plan. Although Pfizer's Inflectra and Merck's Renflexis entered the market with WAC's (Wholesale Acquisition Cost or list price) at up to a 35% discount to Remicade, Remicade's WAC has increased since Pfizer and Renflexis entered the market in 2016 and 2017. Notably, J&J "still has over a 90% market share." Id. at ¶102.

Additionally, Plaintiffs show evidence that "between 2007 and 2017, Remicade's Average Sales Price ("ASP") increased more than 62 percent. Despite Remicade's price hikes, unit sales of Remicade have actually grown 15 percent. . .from 2012 to 2016." Ind. CAC. ¶109. Providers, seeking to avoid rebate penalties, allegedly choose not to stock Inflectra even when it is covered by Medicare and other government programs, id. at ¶105, shifting costs to the government, which is "forced to continue reimbursing for Remicade, the more expensive product." Id. Both Direct and Indirect Purchaser Plaintiffs allege they have paid artificially inflated prices that are "substantially greater than the prices they would have paid absent the unlawful conduct alleged." Id. at ¶146; Ind. CAC ¶¶131-132, 137.

### III. Legal Standard

6

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs are required only to plead "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests, and . . . this standard does not require detailed factual allegations." Phillips v. Cty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). To survive a motion to dismiss, a complaint "must 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). We must accept well-pleaded allegations in the complaints as true and construe them in the light most favorable to Plaintiffs, drawing all reasonable inferences in Plaintiffs' favor. Hartig Drug Co. Inc. v. Senju Pharm. Co., 836 F.3d 261, 268 (3d Cir. 2016); Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice'" to defeat a Rule 12(b)(6) motion to dismiss. UniStrip Technologies, LLC v. LifeScan, Inc. 153 F.Supp.3d 728, 735-6 (E.D. Pa. 2015) (quoting Iqbal, 556 U.S. at 663).

The plausibility standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Twombly, 550 U.S. at 556. We also consider

Plaintiffs' allegations "about [Defendants'] anti-competitive conduct as a whole, and [our] legal analysis must not 'tightly compartmentaliz[e] the various factual components' of [Plaintiffs'] allegations, 'wiping the slate clean after scrutiny of each.'" In re Thalomid and Revlimid Antitrust Litig., No. 14-6997 (KSH)(CLW), 2015 WL 9589217, at *16 (D.N.J. Oct. 29, 2015). "Antitrust complaints, in particular, are to be liberally construed at this stage of the proceeding," id. because "inherent in such an action is the fact that all details and specific facts relied upon cannot properly be set forth as part of the pleadings." In re Neurontin Antitrust Litig., No. 1479, 2009 U.S. Dist. LEXIS 77475 at *36 (D.N.J. Aug. 27, 2009) (citing Lucas Indus. v. Kendiesel, Inc., No. 93-4480, 1995 U.S. Dist. LEXIS 7979, 1995 WL 350050, at *2 (D.N.J. June 9, 1995)).

**IV. Discussion**

    1. Direct and Indirect Purchaser Plaintiffs' Joint Sherman Antitrust Act Claims

    Plaintiffs have asserted claims under Section 1 and 2 of the Sherman Act and Section 3 of the Clayton Act.[3] Ind. ¶¶138-144, ¶¶147 -152, ¶155, ¶¶159 – 162; Dir. AC ¶¶182-186, ¶174-177. As it applies to J&J's motion to dismiss Plaintiffs' federal

---

[3] Plaintiffs and Defendants agree that Indirect Purchasers' claims under Section 3 of the Clayton Act, and Direct Purchaser's Claim under Section 1 and 2 of the Sherman Act are "effectively the same." (J&J Mot. at 11, Pls' Opp. at 28).

antitrust claims, Eisai, Inc. v. Sanofi Aventis U.S., LLC, 821
F.3d 394, 402 n.11 (3d Cir. 2016) controls.  To sufficiently
plead an actionable federal antitrust violation, Plaintiffs must
allege facts establishing that J&J engaged in anticompetitive
conduct and that as a result, Plaintiffs suffered antitrust
injury.  Id.

J&J attacks Plaintiffs' federal antitrust allegations in
two primary ways.  First, J&J argues Plaintiffs have failed to
sufficiently plead antitrust injury.  Second, they argue
Plaintiffs have failed to sufficiently plead anticompetitive
conduct by Defendants.

*A. General Antitrust Injury*

"It is only anticompetitive conduct, or 'a competition-
reducing aspect or effect of the defendant's behavior,' that
antitrust laws seek to curtail."  Philadelphia Taxi Ass'n, Inc.
v. Uber Techs., Inc., 886 F.3d 332, 338 (3d Cir. 2018) (quoting
Alt. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344
(1990)).  To establish antitrust injury, Plaintiffs "must show
both that [Defendants] engaged in anticompetitive conduct and
that [they] suffered antitrust injury as a result."  Eisai, Inc.
v. Sanofi Aventis U.S., LLC, 821 F.3d 394, 402 (3d Cir. 2016).
Antitrust injury is "'injury of the type the antitrust laws were
intended to prevent and that flows from that which makes
defendants' acts unlawful.'"  Atl. Richfield Co., 495 U.S. at 334

(quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977). "This standard, on a motion to dismiss, requires an antitrust plaintiff to allege facts capable of supporting a finding or inference that the purported anticompetitive conduct produced increased prices, reduced output, or otherwise affected the quantity or quality of the product." *In re EpePen ((Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.,* No. 2785, 2017 U.S. Dist. LEXIS 209710, at *64, 65 (D. Kan. Dec. 21, 2017) (citing *National Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. 85, 113 (1984); *Cohlmia v. St. John Medical Center,* 693 F.3d 1269, 1281 (10th Cir. 2012); *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 641 (3d Cir. 1996)).

"The existence of antitrust injury is not typically resolved through motions to dismiss" but rather "after discovery, either on summary judgment or after trial." *Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 876 (3d Cir. 1995); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.,* No. 13-md-2445, 2017 WL 4910673, at *14 (E.D. Pa. Oct. 30, 2017) ("Suboxone II") (following "the Third Circuit's caution that the existence of antitrust injury is not typically resolved through motions to dismiss.").

"[A plaintiff] need not allege proximate cause or antitrust injury separately for each component of the alleged scheme. . .

[rather] [t]he injuries inflicted by [the defendant's] allegedly anticompetitive activities should, instead, be viewed as a whole.'" In re Gabapentin Patent Litig., 649 F. Supp. 2d 340, 355-56 (D.N.J. 2009).

We find that Direct and Indirect Purchaser Plaintiffs' Amended Complaints sufficiently allege antitrust injury because they show facts that make it plausible that J&J's Biosimilar Readiness Plan "prevent[ed] competition in the relevant product market within the relevant geographic [and pharmaceutical] market." Brader, 64 F.3d 869. See Fuentes, 946 F.2d 196, 202 (3rd Cir. 1991) (finding sufficient to survive a motion to dismiss where plaintiff pled that defendants' actions excluded him from access to the relevant medical care market and "by eliminating him as a competitor. . . successfully reduced competition for the defendants' cardiological services."). In this Court's decision denying J&J's motion to dismiss Pfizer's complaint, we found sufficient allegations of antitrust injury:

> J&J's efforts to foreclose Pfizer from the market, as Pfizer has alleged, have led to increased prices for consumers and limited competitive options for end payors, providers, and patients. Pfizer provides detailed allegations regarding J&J's exclusionary terms with many of the nation's largest insurers, the incentive structure that forces end payors and providers into accepting those terms, Pfizer's efforts to compete, including its guarantees that Inflectra would cost less than Remicade, and showed how market participants on many levels are injured from J&J's ability to sell Remicade without having to compete with Inflectra and other biosimilars.

11

<u>Pfizer Inc. v. Johnson & Johnson and Janssen Biotech, Inc.</u>, 17-cv-04180 at 14, Doc. No. 58.  Applying the same reasoning here, since Plaintiffs allege antitrust injury based on the same anticompetitive scheme at the heart of Pfizer's complaint, they have sufficiently pled antitrust injury.

    *B. Anticompetitive Conduct*

"Anticompetitive conduct is the hallmark of an antitrust claim.  An allegation of anticompetitive conduct is necessary both to: (1) state a claim for attempted monopolization; and (2) aver that a private plaintiff has suffered an antitrust injury." <u>Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.</u>, 886 F.3d 332, 338 (3d Cir. 2018).  "Allegations of purportedly anticompetitive conduct are meritless if those acts would cause no deleterious effect on competition." <u>Id.</u> at 339.  In assessing whether Plaintiffs have stated a plausible claim that J&J's conduct is anticompetitive, we follow the Third Circuit's approach and consider J&J's alleged conduct "as a whole rather than considering each aspect in isolation." <u>LePage's Inc. v. 3M</u>, 324 F.3d 141, 162 (3d Cir. 2003) (en banc).

J&J poses three arguments for why Direct and Indirect Purchaser Plaintiffs fail to sufficiently allege anticompetitive conduct.  First, they argue that Plaintiffs "benefitted from" "millions of dollars in rebates" and therefore made a free choice in their own economic interest to purchase or reimburse

12

Remicade. (J&J Mot. at 24). Yet it is the coercive threat of losing these rebates, under J&J's contract terms, that is the basis for Plaintiffs' allegations of anticompetitive conduct.

Plaintiffs argue that regardless of discounts and rebates attached to their purchases of Remicade, as in Castro I, "[it is that] because of [J&J's] anticompetitive behavior which reduced competition, they paid more for the [infliximab products] than they would have absent [J&J's] anticompetitive behavior," Castro v. Sanofi Pasteur Inc., No. 11-cv-7178 (JLL), 2012 WL 12516572 at *6 (D.N.J. Aug. 6, 2012). Eisai acknowledged that since exclusive dealing arrangements have the potential to confer "economic benefits" on consumers, "such as assuring them the availability of supply and price stability," this kind of exclusive agreement "does not constitute a *per se* violation of the antitrust laws." Eisai, 821 F.3d 394, 403. A Plaintiff must go further and show that "'the "probable effect" of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals.'" Id. (quoting ZF Meritor, LLC v. Easton Corp., 696 F.3d 254, 271 (3d Cir. 2012)).

We find that Plaintiffs have cleared this hurdle by alleging that J&J's exclusive contracts and rebate bundles make it impossible for competitors like Pfizer's Inflectra to compete. Plaintiffs alleged that Pfizer could never effectively offset J&J's rebates because the rebates are linked to such a wide

proportion of the patient market (the incontestable demand for

Remicade, comprised of patients unlikely to switch treatment),

and also linked, through J&J's rebate bundles, to other J&J

products that Pfizer and Merck cannot offer.  Dir. AC ¶138.

Therefore, Plaintiffs have pled facts that make it plausible

that the "probable effect" of the Biosimilar Readiness Plan is

to "substantially lessen competition."

   Compare Philadelphia Taxi Association, 886 F.3d 332, 340 (3d

Cir. 2018) (noting "it is well established that lower prices, as

long as they are not predatory, benefit consumers – 'regardless

of how those prices are set;'" where the inundation of the taxi

market with Uber vehicles "bolstered competition by offering

customers lower prices, more available taxicabs") with LePage's

Inc. v. 3M, 324 F.3d 141, 163 (3d Cir.  2003)(finding price

increases following defendant's rebate program "'did not benefit

the ultimate consumer.'").  The "benefit" Plaintiffs receive

through coercive rebates does not extinguish the plausibility of

their claim that they would have paid less for infliximab

products absent J&J's anticompetitive scheme.  Dir. AC, ¶¶21-24,

102, 146.  See Hanover Shoe v. United Shoe Mach. Corp., 392 U.S.

481, 489 (1968); Castro I, 2012 WL 12516572, at *5-*8; In re

Hypodermic Prods. Antitrust Litig., MDL No. 1730, 2007 WL

1959225 at *7-*9 (D.N.J. June 29, 2007).

Along the same lines, Defendants argue that Direct Purchaser Plaintiff Rochester is "free to purchase Inflectra and Renflexis whenever it likes, at prices it alleges to be lower than Remicade's." (J&J Mot. at 25). Yet Rochester has alleged that it's decision to purchase Remicade at supracompetitive prices is a response to demand from providers who will not buy biosimilars due to fear that they will not be widely reimbursed as a result of exclusive agreements and rebate penalties faced by insurers.

When Plaintiffs allege Defendants have monopolized a relevant market, the Third Circuit inquires into whether a monopolist's anticompetitive conduct has "deprive[d] customers of the ability to make a meaningful choice [between products]." Eisai, 821 F.3d at 404 (quoting ZF Meritor, 696 F.3d at 285). In the context of federal antitrust violations where Plaintiffs' allegations "of exclusive dealing are not centered on pricing practices alone," "the 'rule of reason' test applies to determine if the arrangement will 'foreclose on competition in such a substantial share of the relevant market so as to adversely affect competition.' In applying this test, the court can consider 'a showing of significant market power by the defendant ..., substantial foreclosure [of the market] ..., contracts of sufficient duration to prevent meaningful competition by rivals ..., and whether there is evidence that the dominant firm engaged in coercive behavior.'" UniStrip

Technologies, LLC v. LifeScan, Inc. 153 F. Supp. 3d 728, 736

(E.D. Pa. 2015) (quoting Brooke Grp. Ltd. v. Brown & Williamson

Tobacco Corp., 509 U.S. 209 (1993) (citations omitted)).

Here, as in UniStrip, Plaintiffs have "[pled] that . . . . the

exclusivity of the arrangements that [Defendant] has imposed on

[purchasers] of its products prevents competitors from entering

the market, not price competition," UniStrip, 153 F. Supp. 3d at

736; Dir. AC ¶27; Ind. CAC ¶131.  So, we find that what

Defendants describe as "preference" for Remicade is plausibly

the effect of their coercive agreements.

Third, Defendants attack Plaintiffs' allegations of

anticompetitive conduct by arguing that biosimilar manufacturers

have failed to compete using multi-product bundles.  (Mot. at

28).  We addressed this same argument in denying J&J's motion to

dismiss Pfizer's claims.  Although bundling can be

anticompetitive when it "forecloses portions of the market to a

potential competitor who does not manufacture an equally diverse

group of products and who therefore cannot make a comparable

offer," Eisai, 821 F.3d at 405, Pfizer is a multi-product

manufacturer and it did not allege that J&J hindered its ability

to compete on a bundle-to-bundle basis. "J&J's multi-product

bundles, on their own, therefore do not present antitrust

concern." (17-cv-04180 at 19, Doc. No. 58).

See also LePage's, 324 F.3d at 144 (focusing on whether
alleged monopolist's bundling of its "Scotch brand transparent
tape with other products enabled it to unlawfully maintain its
monopoly power," not on whether competitor was able to offer
competitive bundles.). See also SmithKline Corp. v. Eli Lilly &
Co., 575 F.2d 1056 (3d Cir. 1978) (although a competitor
manufacturer could have offered a competing bundle of products,
the Third Circuit did not require SmithKline to allege an
inability to compete using multi-product bundles).

In addition to multi-product bundling, Plaintiffs argue that
Defendants' bundling of demand has anticompetitive effects.
Dir. AC ¶79. The threat of losing rebates on all Remicade
prescriptions (including incontestable demand) is similar to the
effect of defendants' anticompetitive conduct in Dentsply, where
"the threat to cut off supply ultimately provided customers with
no choice but to continue purchasing from the defendants."
Eisai, 821 F.3d at 406 (quoting United States v. Dentsply Int'l,
Inc., 399 F.3d 181, 189–96 (3d Cir. 2005)).

Here, Plaintiffs allege that Defendants' exclusive
agreements pose precisely that kind of threat. First, through
"fail first" provisions that function effectively as exclusive
agreements (Plaintiffs allege it is highly unlikely a physician
would prescribe a biosimilar that has "no clinically meaningful
difference" to Remicade once a patient has not responded to

17

treatment with the reference drug).  Dir. AC ¶73.  Second,

through the "rebate trap" in which J&J threatens "a financial

penalty of withholding rebate payments if insurers reimburse for

any infliximab product other than Remicade."  Dir. AC ¶77.

Unlike in Eisai, where plaintiff "customers did not risk

penalties . . . for terminating the [defendant's program] or

violating its terms," 821 F.3d at 406, here, Plaintiff

purchasers allege the risk of rebate penalties forecloses

competition by biosimilars who cannot financially offset the

losses posed to purchasers through J&J's rebate threats. See

LePage's, 324 F.3d at 160 (finding actionable Sherman Act claims

where plaintiff showed evidence that defendant's rebates coerced

distributors to "forego purchasing from [plaintiff competitor

tape manufacturer] if they wished to obtain rebates on 3M's

products," and to "either drop any non-Scotch products, or lose

the maximum rebate.").

Assessing anticompetitive conduct, we look to whether

Defendants' alleged conduct "as a whole, caused or was likely to

cause anticompetitive effects in the relevant market." Eisai at

408.  See LePage's, 324 F.3d 141 ("The relevant inquiry is the

anticompetitive effect of [Defendant manufacturer's]

exclusionary practices considered together.  As the Supreme

Court recognized in Cont'l Ore Co. v. Union Carbide & Carbon

Corp., 370 U.S. 690, 699 (1962), the courts must look to the

18

monopolist's conduct taken as a whole rather than considering
each aspect in isolation.  Plaintiffs' allegations of bundled
rebates make it plausible that Defendants' conduct had the
effect of foreclosing competition in the infliximab market,
resulting in Plaintiffs paying supracompetitive prices for
infliximab products.

   *C. Allegations Supporting Competitors' Efforts to Compete*

   Last, Defendants argue that Plaintiffs have failed to
allege specific facts showing that biosimilar manufacturers were
unable to offer competitive prices, rather than simply unwilling
to engage in price competition.  (J&J Mot. at 12).  See J&J Mot.
at 33-34 (suggesting that "[t]he fact that Pfizer and Merck's
list prices were lower does not establish an actual effort to
compete," and arguing that Average Sales Price is not an
accurate measure of whether prices paid by purchasers are
increasing or decreasing since it factors in rebates and
discounts.).  Defendants also argue that Remicade's ASP has
declined since Plaintiffs' pleadings, invalidating Plaintiffs'
allegations of competitive harm.  Plaintiffs argue that
competitive pricing is not a pleading requirement and that
nevertheless they have so alleged.  See Direct AC, ¶102.

   We agree with Plaintiffs that the accuracy of ASP pricing
data cannot be resolved on a motion to dismiss.  See In re
Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d

Cir. 1997) ("[A] district court ruling on a motion to dismiss
may not consider matters extraneous to the pleadings.") <u>See</u> <u>In
re Propranolol Antitrust Litig.</u>, 249 F. Supp. 3d 712, 720
(S.D.N.Y. 2017) ("While discovery may ultimately prove
plaintiffs' pricing data less than accurate, on a motion to
dismiss the Court takes all well-plead allegations as true[.]").
Essentially, what makes Plaintiffs' complaints plausible is not
the allegation that competitors have priced their biosimilars
lower than Remicade, but that J&J has maintained dominance over
the infliximab market, despite the entry of biosimilars, "not
through price competition, but through its exclusionary
contracting scheme." (Pls' Opp. at 41). Discovery will help
determine "whether [J&J] foreclosed a substantial share of the
market such that competition has been harmed." <u>ZF Meritor</u>, 696
F.3d at 283 (citing <u>Tampa Elec. Co. v. Nashville Coal Co.</u>, 365
U.S. 320, 326-28 (1961)). For the foregoing reasons, we deny
J&J's Motion to Dismiss Direct and Indirect Purchaser
Plaintiffs' federal antitrust claims.

  2. Indirect Purchasers' Additional Arguments

  *A. Sham Litigation and <u>Walker Process</u> Patent Fraud*

  Indirect Purchaser Plaintiffs additionally allege that J&J
aimed to delay the entry of biosimilars through sham patent
litigation and a Citizen's Petition to the FDA. Ind. CAC ¶¶,
100-102, 193-194. Defendants argue they are immune from patent

suit where Plaintiffs fail to sufficiently plead that the patent litigation was meritless when filed or that it delayed the entry of competitor biosimilars into the infliximab market. (J&J Mot. at 35).

Under the Noerr-Pennington doctrine, "'[t]hose who petition [the] government for redress are generally immune from antitrust liability.'" Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., 508 U.S. 49, 56 (1993) ("PRE"). Noerr-Pennington immunity, however, is not absolute. "[A]ctivity 'ostensibly directed toward influencing governmental action' does not qualify for [first amendment] immunity if it 'is a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor.'" Id. at 51 (quoting E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144 (1961)).

To establish that a lawsuit qualifies as a "sham," and will not be immune from suit under Noerr-Pennington, a two-part test is applied. First, we assess whether the lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and we apply a "probable cause" standard, assessing whether the litigant at the time of filing, has a "reasonable belief that there is a chance that a claim may be held valid upon adjudication." Id. (quoting PRE, 508 U.S. at 62). Second, "[o]nly if challenged

litigation is objectively meritless may a court examine the litigant's subjective motivation." Then, "the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." In re Wellbutrin XL Antitrust Litig., 868 F.3d 132, 148 (3d Cir. 2017) (quoting PRE, 508 U.S. at 60-61). To establish that Noerr immunity should not apply, the plaintiff must then prove "the challenged lawsuit is 'causally linked' to an antitrust injury." Id. at 149.

We first ask "whether [J&J] could have perceived 'some likelihood of success' in their case at the time of filing." Id. at 150, (quoting PRE, 508 U.S. at 65; Rohm & Haas Co. v. Brotech Corp., 127 F.3d 1089, 1093 (Fed. Cir. 1997). Plaintiffs argue that Janssen's patent lawsuit against Celltrion and Hospira (later acquired by Defendants' competitor Pfizer) lacked a legitimate basis and was intended to forestall competition, Ind. CAC ¶102-106, based on three allegations: first, that the patent was held invalid by the U.S. District Court for the District of Massachusetts because the antibodies they were claiming protection for "had been disclosed and claimed in an earlier patent," id. at ¶102; second that the U.S. Court of Appeals for the Federal Circuit affirmed the U.S. Patent and

22

Trial Appeal Board's ruling that the same patent was invalid;
and third, after filing a patent infringement suit against
Samsung (manufacturer of the competitor biosimilar, Renflexis)
Defendants' eventually voluntarily dismissed their remaining
infringement claims against Celltrion and Hospira.  Id. at ¶105.

Plaintiffs try to imply that if Defendants already had
patent protection for an antibody in Remicade, filing a
subsequent patent suit for the same antibody makes it plausible
that they knew the suit was meritless.  Yet, the Third Circuit
warned against using the outcome of a patent case as evidence
that the defendants knew the litigation was a sham at the time
of filing.  See In re Wellbutrin XL Antitrust Litig. 868 F.3d at
149 (directing that a court should "resist the . . . temptation
to engage in post hoc reasoning by concluding that an ultimately
unsuccessful action must have been unreasonable or without
foundation" just because an antitrust defendant "has lost the
underlying [patent] litigation.").

In lieu of Noerr-Pennington's test for sham litigation,
Plaintiffs argue that under Hanover's "more flexible
standard[,]. . . appropriate when dealing with a pattern of
petitioning," we should apply a "holistic review that may
include looking at the defendant's filing success – i.e., win-
loss percentage – as circumstantial evidence of the defendants'
subjective motivations."  Hanover 3201 Realty, LLC v. Vill.

23

<u>Supermarkets, Inc.</u>, 806 F.3d 162, 180-81 (3d Cir. 2015).  We are unpersuaded.  The cases Plaintiffs cite are distinguishable because the "series of legal proceedings" that trigger holistic review under <u>Cal. Motor Transp. Co. v. Trucking Unlimited</u>, 404 U.S. 508 (1972) involve instances where defendants filed "fourteen state and administrative lawsuits."  <u>Waugh Chapel S., LLC v. United Food & Commer. Workers Union Local 27</u>, 728 F.3d 354, 365 (4th Cir. 2013).  Even recognizing that as few as "'four lawsuits and a [Citizen's] petition'" could satisfy <u>Noerr-Pennington</u>, <u>In re Wellbutrin</u>, 868 F.3d at 157, here, by contrast, Plaintiffs allege only two proceedings against competitors, not the plaintiffs themselves.  <u>See</u> <u>Id.</u> ("When the Appellants' serial petitioning claim is reduced to only the lawsuits against Anchen and Abrika, both of which GSK withdrew from, it must fail. . . .two proceedings — each against an independent defendant — does not constitute a pattern.").  Here, Plaintiffs' allegations do not show "a pattern of baseless, repetitive claims," <u>Cal. Motor</u>, 404 U.S. at 513, that are part of Defendants' alleged scheme of monopolization.

Additionally, Indirect Purchaser Plaintiffs fail to allege that biosimilar competitors were forestalled from entering the infliximab market.  <u>See In re Wellbutrin</u>, 868 F.3d at 147 (dismissing sham litigation claims even where Plaintiffs did allege that delayed entry of generics stalled competition).  We

24

find Indirect Purchaser Plaintiffs' sham litigation allegation lacks "some reasonable particularity in pleading," <u>In re Neurontin Antitrust Litig.</u>, No. 1479, 2009 U.S. Dist. LEXIS 77475 at *36 (D.N.J. Aug. 27, 2009), and therefore dismiss it.

Defendants also argue that Plaintiffs' allegations are too vague to meet the Supreme Court's <u>Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.</u>, 382 U.S. 172, 86 S. Ct. 347 (1965) standard, under which "[f]raudulent procurement of a patent. . . . can provide the basis for antitrust liability" such as monopolization of a relevant market. <u>In re Lipitor Antitrust Litig.</u>, 868 F.3d 231, 266 (3d Cir. 2017).

A plaintiff alleging fraud must "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). <u>See</u> <u>United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC</u>, 812 F.3d 294, 307 (3d Cir. 2016) (quoting <u>In re Rockefeller Ctr. Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 217 (3d Cir. 2002)). ("A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue.'").

To establish a <u>Walker Process</u> fraud, "a plaintiff must, in part, demonstrate '(1) a false representation or deliberate

25

omission of a fact material to patentability, (2) made with the intent to deceive the patent examiner, (3) on which the examiner justifiably relied in granting the patent, and (4) but for which misrepresentation or deliberate omission the patent would not have been granted.'" In re Lipitor, 868 F.3d at 266 (quoting C.R. Bard, Inc. v. M3 Sys., 157 F.3d 1340, 1364 (Fed. Cir. 1998)).

Indirect Purchaser Plaintiffs' Walker Process patent fraud allegations lack the requisite specificity to allow us to draw a "reasonable inference" that J&J is liable for Walker Process fraud.  As the Third Circuit directed in In re Lipitor, "under Twombly, the question is actually whether the Complaint plausibly alleges [that Defendants materially misrepresented facts to a patent examiner, without which the patent would not have been granted]."'" 868 F.3d 231, 266 (3d Cir. 2017) (quoting Wyeth Holdings Corp., 2012 U.S. Dist. LEXIS 26912, at *11).  Submitting "affirmatively 'false' or 'misleading' CSI data to the PTO. . ., [where] that data was intended to, and did, deceive the PTO into issuing the '995 patent" constituted plausible a Walker Process claim in In re Lipitor Antitrust Litig., No. MDL No. 2332, 2013 U.S. Dist. LEXIS 126468 at *70 (D.N.J. Sep. 5, 2013) ("Lipitor I").

Here, by contrast, Indirect Purchaser Plaintiffs do not plead with specificity the substance of alleged "misleading

statements," Ind. CAC ¶196, or Janssen's specific "manipulative and deceptive practices" before the PTO, or how specifically Defendants "breached its duty of candor and engaged in inequitable conduct before the Patent Office to obtain its '396 patent.'" Id. ¶¶97-98. Furthermore, "[a] finding of inequitable conduct does not, by itself, suffice to support a finding of Walker Process fraud." King Drug Co. of Florence v. Cephalon, Inc., Civ. A. No. 2:06-cv-1797, 2014 U.S. Dist. LEXIS 32508 at *36 (E.D. Pa. March 12, 2014) (quoting Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1346 (Fed. Cir. 2007)).

For the aforesaid reasons, we grant Defendants' motion to dismiss Count VI of Indirect Purchaser Plaintiffs' Consolidated Amended Complaint, alleging Walker Process Fraud.

*B. Indirect Purchasers' State and Consumer Protection Antitrust Claims*

1. Standing to bring state antitrust claims

Indirect Purchaser Plaintiffs, employee benefit health plans covering and reimbursing health care for "thousands of beneficiaries in states throughout the country" (Opp. at 39), allege that Defendants violated state antitrust statutes in twenty-nine states. Ind. CAC ¶¶169-185. Defendants argue that these state antitrust and consumer protection claims should be dismissed because Plaintiffs lack Article III standing to sue under the laws of states where they have not yet paid or

reimbursed for Remicade. [4] Defendants concede Plaintiffs have
standing in Florida, Michigan, New York, and West Virginia,
where "plaintiffs either reside or allege that their members
purchased Remicade." (J&J Mot. at 32). Plaintiffs argue they do
have standing even where they have "not yet identified purchases
or reimbursements," because Defendants' alleged anticompetitive
scheme "makes it likely [Plaintiffs] will be required to
reimburse for purchases at higher prices for fewer choices of
drugs in all jurisdictions alleged." (Pls' Opp. at 39).

For Article III standing, a plaintiff must show "'(1) an
injury-in-fact, which is an invasion of a legally protected
interest that is (a) concrete and particularized, and (b) actual
or imminent, not conjectural or hypothetical; (2) a causal
connection between the injury and the conduct complained of; and
(3) that it must be likely, as opposed to merely speculative,
that the injury will be redressed by a favorable decision.'" In
re Wellbutrin XL Antitrust Litig., 260 F.R.D. 143, 157 (E.D. Pa.
2009) (quoting Winer Family Trust v. Queen, 503 F.3d 319, 325
(3d Cir. 2007)). "The injury-in-fact requirement is 'very
generous' to claimants, demanding only that the claimant

---

[4] Defendants argue that "[t]he Indirect Purchasers lack [Article III]
standing to bring claims under the antitrust and/or consumer protection
laws of the following states: Arizona, Arkansas, California, District of
Columbia, Hawaii, Iowa, Kansas, Maine, Montana, Minnesota, Mississippi,
Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota,
Oregon, Rhode Island, South Dakota, Tennessee, Utah, Wisconsin, Vermont,
and the Virgin Islands." (J&J Mot. at 33).

'allege[ ] some specific, "identifiable trifle" of injury.'" Bowman v. Wilson, 672 F.2d 1145, 1151 (3d Cir. 1982) (quoting SCRAP, 412 U.S. 669, 686-90 & 689 n.14). See Cottrell v. Alcon Labs., 874 F.3d 154, 162 (3d Cir. 2017). "'In the context of a motion to dismiss, we have held that the [i]njury-in-fact element is not Mount Everest." Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 278 (3d Cir. 2014) "'At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice.'" Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). "[T]he Supreme Court has repeatedly recognized that financial or economic interests are 'legally protected interests' for purposes of the standing doctrine." Cottrell v. Alcon Labs., 874 F.3d 154, 164 (3d Cir. 2017). "Both federal law and state law — including state statutes — 'can create interests that support standing in federal courts.'" Id. at 165 (quoting Cantrell v. City of Long Beach, 241 F.3d 674, 684 (9th Cir. 2001)(internal citations omitted)).

We find Indirect Purchaser Plaintiffs have Article III standing to bring their state law claims. Drawing 'all reasonable inferences in Plaintiffs' favor, Hartig Drug Co. Inc., 836 F.3d at 268, Defendants' alleged ongoing anticompetitive scheme resulting in overcharges to Plaintiffs makes it plausible that Plaintiffs are "imminently threatened

with a concrete and particularized 'injury in fact' that is
fairly traceable to the challenged action of the defendant and
likely to be redressed by a favorable judicial decision."
Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S.
Ct. 1377, 1386 (2014)). "That a suit may be a class action . . .
adds nothing to the question of standing, for even named
plaintiffs who represent a class must allege and show that they
personally have been injured, not that injury has been suffered
by other, unidentified members of the class to which they belong
and which they purport to represent." In re Niaspan Antitrust
Litig., 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014) (quoting Lewis
v. Casey, 518 U.S. 343, 357 (1996). "The Supreme Court has
repeatedly affirmed the ability of Congress to 'cast the
standing net broadly' and to grant individuals the ability to
sue to enforce their statutory rights." In re Horizon Healthcare
Servs. Data Breach Litig., 846 F.3d 625, 635 (3d Cir.
2017)(quoting FEC v. Akins, 524 U.S. 11, 19 (1998)).

Defendants try to argue that named, as distinct from
absent, Indirect Purchaser Plaintiffs have not alleged an injury
in fact in states where Remicade has not yet been paid for or
reimbursed.  This argument, however, cannot overcome the Third
Circuit's holding that so long as one named plaintiff has
established Article III standing, unidentified members of the
class will not block class standing on a motion to dismiss.  See

30

In re Horizon Healthcare Servs. Data Breach Litig., 846 F.3d 625, 634 (3d Cir. 2017) ("at least one of the four named Plaintiffs must have Article III standing in order to maintain this class action."). It plausible that named Plaintiffs suffered antitrust injury by paying overcharges for infliximab in four states where they paid for or reimbursed Remicade. Accordingly, since Plaintiffs cover beneficiaries in numerous other states, they face an imminent threat of injury in fact in those states as well. Therefore, under Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions), 148 F.3d 283, 306-07 (3d Cir. 1998), "[o]nce Article III standing 'is determined vis-à-vis the named parties ... there remains no further separate class standing requirement in the constitutional sense.'"

As in In re Chocolate Confectionary Antitrust Litig. and Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S. Ct. 2295 (1999) and Amchem Prods. v. Windsor, 521 U.S. 591 (1997), Indirect Purchaser Plaintiffs' "capacity to represent individuals from [states other than where Indirect Purchasers reside] depends upon obtaining class certification." Therefore, "[t]hese class certification issues are 'logically antecedent' to the standing concerns," and deferring ruling on them until class certification is appropriate. In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 579-80 (M.D. Pa. 2009).

2. Plausibility of Alleged State Antitrust Violations

Defendants also argue that Indirect Purchaser Plaintiffs fail to allege sufficient facts to make their state antitrust claims plausible under the requirements of various state laws. Plaintiffs withdraw their claims under the law of the Virgin Islands and Rhode Islands' consumer protection statute; therefore, those claims are dismissed with prejudice.

First, Defendants argue that Indirect Purchaser Plaintiffs fail to allege a "significant nexus to the state," as required by state antitrust laws in the District of Columbia, Mississippi, North Carolina, South Dakota, Tennessee, and West Virginia. (J&J Mot. at 46).

District of Columbia:

We find that under Sun Dun, Inc. of Wash. v. Coca-Cola Co., 740 F. Supp. 381 (D. Md. 1990), Indirect Purchaser Plaintiffs' allegations are sufficient to survive Defendants' motion. Plaintiffs allege that "District of Columbia Purchasers paid supracompetitive, artificially inflated prices for infliximab." Ind. CAC ¶167. As the Court held in Sun Dun, "[a]lthough the allegations in the Amended Complaint are vague in terms of the *situs* of harm, . . . they are sufficient to withstand defendants' motions to dismiss the claims based on the D.C. Code." 740 F. Supp. at 396. We apply Sun Dun's reasoning that the question whether Indirect Purchaser Plaintiffs' state

antitrust claims under D.C. Code are barred because they are
"interstate in nature," "must await discovery and any motions
for summary judgment which defendants choose to file." Id. at
397.

Mississippi:

We agree with Plaintiffs that Standard Oil Co. of Ky. v.
State, 107 Miss. 377, 65 So. 468 (1914) controls, and they are
not, as Defendants argue, required to plead "at least some
conduct by defendant which was performed wholly intrastate." In
re Microsoft Corp. Antitrust Litig., MDL No. 1332, 2003 WL
22070561 at *7 (D. Md. Aug. 22, 2003).  Here, Plaintiffs have
alleged more than the single factual allegation that warranted
dismissal in In re Microsoft Corp. Antitrust Litig., instead
alleging that Defendants acted in restraint of trade which
resulted in Mississippi purchasers paying supracompetitive,
artificially inflated prices for infliximab. Ind. CAC ¶174.

North Carolina:

Plaintiffs concede that the law is unsettled as to whether
indirect purchasers claiming violations of North Carolina
antitrust laws are required to allege "a substantial in-state
effect on North Carolina trade or commerce," Lawrence v. UMLIC-
Five Corp., No. 06 CVS 20643, 2007 NCBC LEXIS 20, at *51 (N.C.
Super. Ct. June 18, 2007).  We are persuaded that Plaintiffs'
allegations that Defendants restrained trade by monopolizing the

North Carolina infliximab market, resulting in North Carolina purchasers paying artificially inflated prices for infliximab, and substantially affecting North Carolina commerce, Ind. CAC ¶180, are sufficiently pled to survive this motion.  The fact-based inquiry can take place after discovery, at summary judgment. See In re Refrigerant Compressors Antitrust Litig., No. 2:09-md02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013); In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 540-41 (E.D. Pa. 2010).

South Dakota:

Under In re DRAM Antitrust Litigation, 516 F. Supp. 2d 1072, 1098-99 (N.D. Cal. 2007), directing that "South Dakota's antitrust statute should be read to cover unlawful anticompetitive conduct, . . . as long as any part of it takes place or has an effect within the state," here, Plaintiffs' claim may proceed because they allege that anticompetitive effects of Defendants' conduct took place within the state: "South Dakota purchasers paid supracompetitive, artificially inflated prices for infliximab." Ind. CAC ¶184.

Tennessee:

We find that Indirect Purchaser Plaintiffs have sufficiently alleged a violation of Tennessee's antitrust laws under the rule from Standard Oil Co. v. State, 100 S.W. 705 (Tenn. 1906) that challenged conduct is sufficiently

34

"intrastate" to proceed under Tennessee antitrust laws where "it
occurred after the product had been imported, not before. . .
.the products arrive in Tennessee." FTC v. Mylan Labs., Inc.,
62 F. Supp. 2d 25, 51 (D.D.C. 1999). Here, Plaintiffs allege
that the defendants engaged in anticompetitive behavior by
forcing providers and other companies to enter into
anticompetitive agreements on a state by state basis, and that
Remicade is administered in person – suggesting that the
anticompetitive conduct had not been completed by the time
Remicade was imported to Tennessee. Indir. CAC ¶¶122-123.
Therefore, their Tennessee state antitrust claims may proceed.

West Virginia:

We find that Plaintiffs have alleged a sufficient "causal
connection," In re Magnesium Oxide Antitrust Litig., No. 10-5943
(DRD), 2011 WL 5008090, at *8 n.10 (D.N.J. Oct. 20, 2011),
between Defendants' alleged anticompetitive conduct and the
resulting in-state effect. Here, Indirect Purchaser Plaintiffs
have pled that "Defendants agreed to, and did in fact, act in
restraint of trade or commerce by illegally monopolizing and
attempting to monopolize the market for infliximab in West
Virginia. West Virginia purchasers paid supracompetitive,
artificially inflated prices for infliximab." Indir. CAC ¶188.
Thus, where they have pled that anticompetitive conduct caused

purchasers in West Virginia to sustain overcharges for infliximab, their West Virginia antitrust claims may proceed.

Second, Defendants argue that Indirect Purchaser Plaintiffs fail to allege requisite concerted activity under the laws of California, Kansas, New York, and Tennessee.[5]  We find Plaintiffs have sufficiently pled allegations that Defendants "engaged in a vertical price-fixing scheme and attempted and conspired to monopolize the respective markets by coercing major insurers into exclusive agreements."  Indir. CAC ¶¶51-58.  See Dimidowich v. Bell & Howell, 803 F.2d 1473, 1478 (9th Cir. 1986), opinion modified on denial of reh'g, 810 F.2d 1517 (conspiracy based on coercion actionable under California law). Therefore, Plaintiffs' state antitrust claims under California, Kansas, New York, and Tennessee may proceed.

3. Consumer Protection Claims

Defendants move to dismiss Indirect Purchaser Plaintiffs' allegations that J&J violated state consumer protection statutes of Arkansas, California, District of Columbia, Florida, Hawaii, Montana, Nevada, New Hampshire, New Mexico, New York, North

---

[5] See Cal. Bus. & Prof. Code § 16720 ("A trust is a combination of capital, skill, or acts by two or more persons") (emphasis added); See Kan. Stat. Ann. § 50-101 (prohibiting participation in trusts); See N.Y. Gen. Bus. Law § 340(1) (declaring a "contract, agreement, arrangement, or combination" in restraint of trade to be illegal) (emphasis added); See Tenn. Code Ann. § 47-25-101 (outlawing "arrangements, contracts, agreements, trusts, or combinations" in restraint of trade) (emphasis added).  (J&J Mot. at 50).

Carolina, Rhode Island, Utah, Vermont, and West Virginia. Ind.
CAC ¶¶225-242.

First, Defendants argue that District of Columbia consumer
protection claims can only be asserted by consumers, not
indirect purchaser plaintiffs. (J&J Mot. at 47).

District of Columbia:

"'[A valid claim for relief under the [D.C. Consumer
Protection Procedures Act, D.C. Code §28-3901 to -3913] CPPA
must originate out of a consumer transaction.'" In re Cast Iron
Soil Pipe & Fittings Antitrust Litig., No. 1:14-md-2508, 2015 WL
5166014, at *30 (E.D. Tenn. June 24, 2015). The CPPA defines a
consumer transaction as a "purchase . . . for personal,
household, or family purposes," D.C. Code §28-3901(a)(2)(B)(i).
Under Adam A. Weschler & Son, Inc. v. Klank, 561 A.2d 1003, 1005
(1989), a "consumer transaction" will be covered by the CPPA if
it involves "the ultimate retail customer," a "purchaser not
engaged in the regular business of purchasing this type of goods
or service and reselling it." Here, where health-plan members'
use of Remicade is "personal" (the drug is used to treat chronic
autoimmune diseases), and where the Indirect Purchasers
(employee benefit plans) do not resell the drug to their
members, the sale of Remicade falls within the protection of the
CPPA because it involves the "ultimate retail customer, . . .
the individual member of the consuming public." Id. at 1005.

Additionally, we find Indirect Purchasers are "non-profit" organizations under the CPPA, and therefore may "on behalf of itself or any of its members, . . . bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code §28-3901(a)(14), D.C. Code §28-3905(k)(1)(C).

Second, Defendants' argument that Indirect Purchaser Plaintiffs' state consumer protection claims are insufficiently pled under the "substantial nexus" requirement of California, New York and North Carolina fails because Plaintiffs allege that Defendants' exclusionary scheme resulted in Remicade and other infliximab products being sold at artificially inflated prices and caused overcharges in those states. See <u>Cast Iron</u>, 2015 WL 5166014 at *31; <u>In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.</u>, 64 F. Supp. 3d 665, 669 (E.D. Pa. 2014) 699, 702 ("The End Payors have alleged that overcharges occurred in California, which is sufficient to establish an intrastate nexus." "As with California, the End Payors have pleaded that overcharges occurred in New York. Therefore, I do not agree with Reckitt's argument that this claim should be dismissed."). See <u>In re Auto. Parts Antitrust Litig.</u>, 50 F. Supp. 3d 869 (E.D. Mich. 2014) (finding a sufficiently alleged nexus with North Carolina where indirect purchaser plaintiffs

pled they were "were harmed by paying supracompetitive, artificially inflated prices.").

Third, Defendants argue that Indirect Purchaser Plaintiffs fail to state a claim under consumer protection laws of New Mexico, New York, and Utah, which require an unconscionable, unfair or deceptive act.[6] Defendants' argument here is essentially that made by defendants in In re Dynamic Random Access Memory Antitrust Litig., that the consumer protection statutes "are not meant to cover, and cannot be interpreted to cover, antitrust violations brought by indirect purchasers of goods." 516 F. Supp. 2d 1072, 1106 (N.D. Cal. 2007).

Nevertheless, although we find Plaintiffs' allegations fail to establish "deceptive" conduct (we have dismissed their sham patent litigation and Walker Process patent fraud claims), they have sufficiently alleged "unconscionable" or "unfair" acts under the consumer protection statutes of New Mexico and Utah. See In re Dynamic Random Access Memory Antitrust Litig., 516 F. Supp. 2d 1072, 1118 (N.D. Cal. 2007) (finding "a single

---

[6] See "N.M. Stat. Ann. § 57-12-2(E) (2009) (unconscionable conduct constitutes acts or practices that "take[] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree" or "result[] in a gross disparity between the value received by a person and the price paid"). See New York General Business Law § 349(h) (conferring a private right of action only to a "person who has been injured by reason of" a deceptive act or practice)." (MTD at 53). See Utah Code Ann. § 13-11-1 et seq. (requiring deceptive and unconscionable acts).

Case 2:17-cv-04326-JCJ Document 67-1 Filed 04/09/18 Page 52 of 56 42 10300721

39

statement" alleging that "defendants' publicly provided pre-textual and false justifications regarding their price increases'. . . .insufficient" to qualify as "deceptive" conduct under the [Utah] Consumer Sales Practice Act.).

Here, in contrast to the DRAM plaintiffs' "bare allegation" of deception, Plaintiffs have pled "unconscionable" conduct by alleging Defendants coerced insurers and providers into covering or buying only Remicade, to the exclusion of lower-priced biosimilars, resulting in overcharges to purchasers in, among other states, Utah. Ind. CAC ¶¶236 (a), 237 (a), 240 (c)). See In re Packaged Seafood Prods. Antitrust Litig., 242 F. Supp. 3d 1033, 1081 (S.D. Cal. 2017 (holding that allegations of "'significant artificial increases' to product price and even allegations solely of 'pa[ying] more for' products as validly pled for purposes of the [New Mexico Unfair Trade Practices Act ("NMUTPA")]; finding Plaintiffs' allegations of "price increases, sales tactics, and refusal to offer certain products under flagship labels that, taken together, plausibly allege a gross disparity in pricing.").

However, Plaintiffs' New York consumer protection claim (under General Business Law §349) must fail because New York's law requires a plaintiff to "allege *both* a deceptive act or practice directed toward consumers and that such act or practice resulted in actual injury to a plaintiff." Blue Cross & Blue Shield of

40

N.J., Inc. v. Philip Morris USA Inc., 3 N.Y.3d 200, 785 N.Y.S.2d 399, 818 N.E.2d 1140, 1143 (2004) (emphasis added).

Fourth, Defendants argue that Indirect Purchaser Plaintiffs are barred from bringing claims under West Virginia's Consumer Credit and Protection Act because they failed to provide pre-suit written notice under W. Va. Code § 46A-6-101 *et seq*. The 2015 amendment to the statute added the provision that an action may only be brought once a seller has been given "ten days [from receipt of the notice of violation] *in the case a cause of action has already been filed* to make a cure offer" (emphasis added). W. Va. Code §46A-6- 106(c). Plaintiffs argue that the 2015 amendment evidences an intent not to bar actions where a plaintiff has sent notice post-suit so long as notice was eventually sent and provided seller with ten days to make a cure offer. Although "courts have interpreted this statute as a 'mandatory prerequisite[ ]' to commencing a consumer protection claim under the Act," In re Effexor Antitrust Litig., Civil Action No. 3:11-cv-5661 (PGS)(LHG), 2018 U.S. Dist. LEXIS 158904, at *11 (D.N.J. Sep. 18, 2018), we agree with Plaintiffs that those courts have relied on pre-amendment reasoning.[7]

---

[7] In re Effexor relied on Harrison v. Porsche Cars N. Am., Inc., No. 15-0381, 2016 W. Va. LEXIS 245, at *5 (W.Va. 2016), which relied on pre-amendment Stanley v. Huntington Nat'l Bank, No.11-54, 2012 U.S. Dist. LEXIS 9448, at *20-21 (N.D.W.Va. Jan. 27, 2012)). See Mullins v. Ethicon, No. 2:12-cv-02952, 2017 WL 319804, at *3 (S.D. W. Va. Jan. 20, 2017) (relying on two cases that predate the amendment:

Here, Plaintiffs sent Defendants notice on May 21, 2018, three months after filing their CAC, an instance contemplated by the amendment, where "a cause of action [had] already been filed". (J&J Reply at 29).  In keeping with the West Virginia Legislature's intention that the state's consumer protection laws as amended "not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest,"  W. Va. Code § 46A-6-101 (LexisNexis, Lexis Advance through all 2018 Regular Session Legislation),  we find Plaintiffs fulfilled their notice obligation.

Fifth, Defendants argue that Plaintiffs fail to meet the venue requirements[8] of Arizona's antitrust and the District of Columbia's consumer protection statutes.  We find federal case law persuasive that "[w]hether the state law that provides for the requisite state court jurisdiction is couched in permissive or mandatory terms has never been thought to affect the federal courts' jurisdiction."  D.C. ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co., 254 U.S. App. D.C. 374, 797 F.2d 1041, 1045 (1986).  Additionally, considering that the Arizona Supreme

---

Corp., 52 F. Supp. 3d 796, 812 (N.D. W. Va. 2014) and Stanley, No. 1:11-cv-54, 2012 WL 254135, at *8).

[8] See Ariz. Rev. Stat. § 44-1405 ("An action for violation of this article shall be brought in the superior court."). See D.C. Code § 28-3905(k)(2) ("Any claim under this chapter shall be brought in the Superior Court of the District of Columbia . . . ."). (J&J Mot. at 53).

Court "expressly declined to apply <u>Illinois Brick</u>" in an effort

to "afford greater protection to Arizona citizens" by broadening

instead of limiting the standing requirements for antitrust

claims, <u>Bunker's Glass Co. v. Pilkington PLC</u>, 206 Ariz. 9, 22

(2003), we decline to read Arizona's antitrust statute's

permissive language as a bar to federal jurisdiction.  <u>See</u> <u>id</u>.

(noting that the plain language of [Ariz. Rev. Stat.] § 44-1408

is "almost identical to its federal counterpart, section 4 of

the Clayton Act.").

Unless Congress has "expressly provide[d] that removal [to

federal court] is improper," <u>D.C. ex rel. Am. Combustion, Inc.</u>

<u>v. Transamerica Ins. Co.</u>, 254 U.S. App. D.C. 374, 797 F.2d 1041,

1047 (1986), federal jurisdiction may be upheld.  <u>See</u>

<u>also</u> <u>Eckert v. Fitzgerald</u>, 550 F. Supp. 88 (D.D.C. 1982) (action

brought in D.C. Superior Court under statute providing that suit

may be brought in D.C. Superior Court was removable to federal

district court)).

**V. CONCLUSION**

For the foregoing reasons, Indirect Purchaser Plaintiffs' sham

litigation and <u>Walker Process</u> claims, as well as their claims

under the consumer protection statutes of Rhode Island and New

York are dismissed.  For all other claims, J&J's Motion to

Dismiss is denied.

An appropriate Order will follow.