UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re REMICADE ANTITRUST LITIGATION | ) ) ) | Civil Action No. 2:17-cv-04326-KSM **(Consolidated)** |
| This Document Relates To: INDIRECT PURCHASER ACTIONS. | ) ) ) ) ) ) ) | CLASS ACTION The Honorable Karen S. Marston DECLARATION OF CARLA A. PEAK IN SUPPORT OF SETTLEMENT NOTICE PLAN |

I, Carla A. Peak, declare as follows:

1. My name is Carla A. Peak. I have personal knowledge of the matters set forth herein, and if called as a witness I could and would testify competently to them.

2. I am a nationally recognized expert in the field of legal notice and I have served as an expert in dozens of federal and state cases involving class action notice plans.

3. I am the Vice President of Legal Notification Services for Gilardi & Co., LLC, KCC Class Action Services, LLC, and RicePoint Administration Inc. (collectively "Gilardi"), a firm that specializes in comprehensive class action services, including legal notification, email and postal mailing campaign implementation, website design, call center support, class member data management, claims processing, check and voucher disbursements, tax reporting, settlement fund escrow and reporting, and other related services critical to the effective administration of class action settlements. With more than 30 years of industry experience, Gilardi has developed efficient, secure and cost-effective methods to properly handle the voluminous data and mailings associated with the noticing, claims processing and disbursement requirements of these matters to ensure the orderly and fair treatment of class members and all parties in interest. Since 1984,

- 1 -

Gilardi has been retained to administer more than 6,000 class actions and distributed settlement payments totaling well over $20 billion in assets.

4. This Declaration describes my experience as well as Gilardi's experience. It also describes the proposed notice plan (the "Notice Plan" or "Notice Program") designed for this proposed class action settlement, including why I believe it will be effective and will constitute the best notice practicable under the circumstances of this Settlement, pursuant to Fed. R. Civ. P. 23(c)(2)(B) ("Rule 23").

## EXPERIENCE

5. Gilardi has administered class action settlements involving such defendants as HP-Compaq, Toyota, LensCrafters, United Parcel Service, Ford, Mitsubishi, Nissan, Whirlpool, ATI Video Cards, and Twentieth Century Fox. Further, Gilardi has been retained as the administrator in a variety of consumer matters. Some antitrust case examples which Gilardi has been involved with include: *Barba v. Shire U.S., Inc.*, No. 1:13-cv-21158 (S.D. Fla.); *Edwards v. National Milk Producers Federation*, No. 3:11-cv-04766 (N.D. Cal.); *Fond Du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Company, Ltd.*, No. 2:09-cv-00852 (E.D. Wis.); *Grand Strand Water & Sewer Authority v. Oltrin Solutions, LLC*, No. 4:14-cv-2800 (D. S.C.); *In re Aftermarket Filters Antitrust Litigation*, No. 1:08-cv-04883 (N.D. Ill.); *In re Asacol Antitrust Litigation*, No. 1:15-cv-12730 (D. Mass.); *In re Automotive Parts Antitrust Litigation IV*, No. 12-md-02311 (E.D. Mich.); *In re Blood Reagents Antitrust Litigation*, No. 09-md-2081 (E.D. Pa.); *In re Domestic Drywall Antitrust Litigation*, No. 2:13-md-02437 (E.D. Pa.); *In re Fresh and Process Potatoes Antitrust Litigation*, 4:10-md-02186 (D. Idaho); *In re Hypodermic Products Antitrust Litigation*, No. 05-cv-1602 (D. N.J.); *In re Korean Ramen Antitrust Litigation*, No. 13-cv-4115 (N.D. Cal.); *In re Lidoderm Antitrust Litigation*, No. 3:14-md-02521 (N.D. Cal.); *In re Lithium Ion Batteries Indirect Antitrust*

*Litigation*, No. 13-md-02420 (N.D. Cal.); *In re Optical Disk Drive Antitrust Litigation*, No. 3:10-md-02143 (D. Kan.); *In re NCAA Athletic Grant-In-Aid Antitrust Litigation*, No. 14-md-2541 (N.D. Cal.); *In re Nexium (Esomeprazole) Antitrust Litig*ation, No. 1:12-md-2409 (D. Mass.); *In re Potash Antitrust Litigation* (II), No. 1:08-cv-06910 (N.D. Ill.); *In re Processed Egg Products Antitrust Litigation*, No. 2:08-md-02002 (E.D. Penn.); *In re Skelaxin (Metaxalone) Antitrust Litigation*, No. 1:12-md-2343 (E.D. Tenn.); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 14-md-2503 (D. Mass.); *In re Thalomid and Revlimid Antitrust Litigation*, No. 14-cv-6997, (D. N.J.); *In re Titanium Dioxide Antitrust Litigation*, No. 10-cv-00318 (D. Md.); and *The Dial Corporation, et al. v. News Corporation.,* No. 1:13-cv-06802 (S.D.N.Y.). Attached as **Exhibit 1** is Gilardi's c.v.

6. I have personally been involved with creating and implementing notice programs in many large and significant class action settlements, including *In re Anthem, Inc. Data Breach Litig*., a national data breach class action involving approximately 79 million class members who had personally identifiable information exfiltrated from Anthem's databases; *In re: Skelaxin (Metaxalone) Antitrust Litig*., No. 1:12-md-02343 (E.D. Tenn.), a multi-state antitrust settlement involving both third-party payors and consumers that purchased or paid for brand and generic version of the prescription drug metaxalone; *Chambers v. Whirlpool Corp*., No. 8:11-cv-01733 (C.D. Cal.), a national product defect case involving class members who purchased allegedly defective dishwashers; *In re Trans Union Corp. Privacy Litig*., a $75 million data breach class action settlement requiring one of the largest discretionary class action notice campaigns to reach virtually every adult in the United States; and *In re Residential Schs. Litig*., No. 00-CV-192059 (Ont. S.C.J.), the largest and most complex class action in Canadian history incorporating a

groundbreaking notice program to disparate, remote aboriginal persons qualified to receive benefits in the multi-billion dollar settlement.

8. In forming my opinions, I draw from my in-depth class action settlement and notice experience. I have worked in the class action notification field for nearly 20 years. During that time, I have been involved in all aspects in the design and implementation of class action notice planning, as well as the drafting of plain language notice documents that satisfy the requirements of Rule 23 and adhere to the guidelines set forth in the Manual for Complex Litigation, Fourth and by the Federal Judicial Center ("FJC").

9. I have been involved with hundreds of cases, including the dissemination of notice around the globe in more than 35 languages. I have received numerous judicial comments citing cases I have worked on, as well as written articles and given presentations where I have discussed the adequacy and design of legal notice efforts.

## NOTICE PROGRAM DETAILS

### *Class Definition*

10. The proposed Class is defined as:

All persons and entities in the United States and its territories, as defined herein, who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Defendants' infliximab from April 5, 2016 through February 28, 2022 (the "Class Period")..

The following groups are excluded from the Class:

Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' infliximab for purposes of resale or who purchased infliximab directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' infliximab were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; (g) any judges or justices involved in this Action and any members of their immediate families; and (h) any providers (including but not limited to hospitals, clinics,

and physicians) who purchase Remicade and are later reimbursed for the provision of Remicade.

*TPP Notice*

11. Gilardi will send a notice via email or postal mail to all third party-payor (TPP) entities (approximately 26,000 contacts) contained in Gilardi's proprietary database. An email notice containing a summary of the litigation and settlement will be sent to all TPP entities for which Gilardi possesses an email address (approximately 2,000 contacts). The notice content will be included in the body of the email, rather than as an attachment, to avoid spam filters and improve deliverability. The email will contain a link to the settlement website. The email delivery will be attempted three times to maximize the probability that the Class member will receive it. The email campaign will return data regarding the number of emails successfully delivered, email open rates, and email bouncebacks. If an email bounces back or is known not to have successfully been delivered, Gilardi will send a single postcard notice via United States Postal Service (USPS) to the TPP's corresponding postal address.

12. In addition, a single-postcard notice will be mailed via USPS to all TPP entities for which Gilardi's possess a postal address (approximately 24,000 contacts). This database generally includes health insurance companies, fully and partially self-funded health and welfare groups, as well as third-party administration companies.

13. Prior to mailing, the addresses will be checked against the National Change of Address ("NCOA")[1] database maintained by the USPS; certified via the Coding Accuracy Support

---

[1] The NCOA database contains records of all permanent change of address submissions received by the USPS for the last four years. The USPS makes this data available to mailing firms and lists submitted to it are automatically updated with any reported move based on a comparison with the person's name and last known address.

System ("CASS");[2] and verified through Delivery Point Validation ("DPV").[3] Notices returned by USPS as undeliverable will be re-mailed to any address available through postal service forwarding order information. For any returned mailing that does not contain an expired forwarding order with a new address indicated, Gilardi may conduct further address searches using credit and other public source databases to attempt to locate new addresses and will re-mail these notices if applicable.

14. Notices returned by USPS as undeliverable will be re-mailed to any address available through postal service information. For example, such notices would be mailed to the address provided by the USPS on returned pieces for which the automatic forwarding order has expired but is still within the period that the USPS returns the piece with a new address provided on the forwarding order expiration sticker.

15. Coverage among the TPP portion of the Class will be further extended through the use of advertising on trade websites and in digital trade e-newsletters. Specifically, digital Notices will appear on ThinkAdvisor.com/Life-Health and SHRM.org. ThinkAdvisor's Life/Health Insurance channel provides insurance agents and investment advisors with comprehensive coverage of the products and services necessary to guide clients in developing life insurance strategies and informed decisions regarding health insurance, annuities, and their practice. ThinkAdvisor's audience includes 499,000 average monthly unique visitors and over 1,115,000 monthly page views. Digital Notices will appear on ThinkAdvisor.com/Life-Health for approximately one month. SHRM.org is the official website of the Society for Human Resource

---

[2] Coding Accuracy Support System is a certification system used by the USPS to ensure the quality of ZIP+4 coding systems.

[3] Records that are ZIP+4 coded are then sent through Delivery Point Validation to verify the address and identify Commercial Mail Receiving Agencies. DPV verifies the accuracy of addresses and reports exactly what is wrong with incorrect addresses.

Management. Its audience includes over 3.2 million monthly unique visitors and more than 12 million page views per month. Digital Notices will appear on SHRM.org for approximately one month.

16. Digital Notices will also appear in the *ThinkAdvisor Life/Health Daily* e-newsletter and the Society for Human Resource Management's *HR Daily* e-newsletter. *ThinkAdvisor Life/Health Daily* is the official daily e-newsletter of ThinkAdvisor's Life/Health Insurance channel. It provides up-to-the-minute news coverage, analysis, and trends. A top-banner logo, three 300x250 pixel banners, and an "About Us" ad placement that includes a 30-character headline, 400-character body text and 75x75 pixel logo image will appear in the *Life/Health Daily* e-newsletter for approximately one business week (a total of five sends). *Life/Health Daily* has over 37,000 opt-in subscribers. *HR Daily* is the official daily e-newsletter of the Society for Human Resource Management. A 580x110 pixel digital Notice will appear in *HR Daily* on two occasions. HR Daily delivers breaking news to approximately 458,000 each weekday.

*Consumer Notice*

17. According to Janssen Biotech, Inc., Remicade (a.k.a. infliximab) is designed to inhibit specific components of the immune system that play pivotal roles in fueling inflammation. Remicade (including its biosimilar competitors) is used to treat many afflictions, including rheumatoid arthritis, Crohn's disease, ulcerative colitis, psoriatic arthritis, active ankylosing spondylitis, and chronic severe plaque psoriasis in adults and in children. Remicade is administered via intravenous infusion and is available only through prescription. Each infusion takes about two hours at a doctor's office, infusion center, or hospital and therapy requires treatment several times a week.

18.     Based on this and other information from Janssen Biotech, Inc., MRI-Simmons[4] and Comscore[5] data was studied among adults who used a branded prescription remedy to treat arthritis, psoriatic arthritis, rheumatoid arthritis, Crohn's disease, ulcerative colitis, or psoriasis in the last 12 months. This data indicates that the target audience skews toward higher age brackets, speaks English most often, and tends to reside in small counties and rural areas.

19.     To ensure coverage, a multifaceted media plan was developed. The media plan was designed to reach the targeted audience through a leading consumer publication and a digital media campaign.

20.     More specifically, a summary notice will appear once in the national edition of *People* magazine. *People* is a weekly entertainment magazine featuring celebrity news, biographies and gossip. With a national circulation of more than 3.4 million and an audience of over 24.5 million, *People* reaches 11.6% of the target audience and the target audience is 19.9% more likely to be readers of the magazine, as compared to the adult population. The notice will appear in both the print and online edition of the magazine.

---

[4] MRI-Simmons is a nationally accredited joint-venture research firm that provides consumer demographics, product and brand usage, and audience/exposure in all forms of advertising media. Launched in 2019, MRI-Simmons combines the two largest consumer survey companies in the US (MRI and Simmons Research). MRI's Survey of the American Consumer™ is the primary source of audience data for the U.S. consumer magazine industry and the most comprehensive and reliable source of multi-media audience data available, measuring the usage of over 6,500 product and service brands across 600 categories, along with the readership of hundreds of magazines and newspapers, internet usage, television viewership, national and local radio listening, yellow page usage, and out-of-home exposure. Simmons has provided over 60 years of trusted demographic, psychographic, attitudinal, intent, and behavioral data to drive advertising buys, consumer product development, and media programming decisions. Together, MRI-Simmons provides data integrations that deliver a 360-degree view of the American consumer.

[5] comScore, Inc. (Comscore) is a leading cross-platform measurement and analytics company that precisely measures audiences, brands and consumer behavior everywhere, capturing 1.9 trillion global interactions monthly. Comscore's proprietary digital audience measurement methodology allows marketers to calculate audience reach in a manner not affected by variables such as cookie deletion and cookie blocking/rejection, and invalid traffic (IVT) (also known as non-human traffic or bots), allowing these audiences to be reached more effectively. Comscore operates in more than 75 countries, serving over 3,200 clients worldwide.

21. In addition, over 67.2 million internet impressions will be purchased programmatically and distributed over various websites and the social media and entertainment platform Facebook. Among other strategies, the impressions will be targeted demographically, geographically, and behaviorally. Impressions will appear on both desktop and mobile devices, including smartphones and tablets, in display and native ad formats, and will include an embedded link to the case website.

22. All digital media campaigns will be routinely monitored by Gilardi's digital specialists to analyze key campaign performance indicators (KPIs), such as click-through rates (CTRs) and costs per action (CPAs). This knowledge will be leveraged to allocate placements to sites that have demonstrated successful KPIs throughout the duration of each campaign.

*Additional Notice*

23. To further extend coverage, Gilardi will contact various organizations, such as clinic and healthcare systems, Crohn's & Colitis Foundation, The Arthritis Foundation, American Juvenile Arthritis Foundation, and Rheumatoid Arthritis Foundation, and provide them with information regarding the settlement and ask them to share the information with their audiences. Gilardi will also research support groups via social media (e.g., the REMICADE (infliximab) Users and Support group on Facebook) and blogs and forums (e.g., Drugs.com Remicade Support Group and CrohnsForum.com Remicade Club Support Group), post messages to their respective pages and sites, and/or send private messages requesting assistance in sharing the information where direct page posting is not available.

24. In addition, Gilardi will issue a national press release. The press release will extend reach and provide broad nationwide coverage through earned media from locally recognized news and media outlets.

*Response Mechanisms*

25. Gilardi will establish and maintain a case-specific website to allow Class members to obtain additional information and documents about the Settlement. The settlement website will allow users to read, download, and print the Settlement Agreement, Preliminary Approval Order, and Long-Form Notice, as well as other important documents and deadlines. Class members will also be able to review a list of Frequently Asked Questions (FAQs) and Answers and file a claim online. The website address will be provided in all printed notice materials and accessible through an embedded link in the email notice and digital notices.

26. Gilardi will establish and host a case-specific toll-free number to allow Class members to learn more about the settlement in the form of frequently asked questions and answers, and to request to have long form notice and claim form mailed directly to them. The toll-free number will be included in all printed notice documents.

27. Gilardi will create and maintain a case-specific P.O. Box address to receive opt-out requests and other correspondence. Gilardi will process all opt-outs in accordance with the Settlement Agreement.

**CONCLUSION**

28. The Notice Program is expected to reach over 70% of Class members on average 1.9 times each via the paid consumer notice alone. The reach and frequency of the Notice Program will be further enhanced by the online outreach effort and press release. The expected reach of the Notice Program is consistent with other effective court-approved settlement notice programs and is designed to meet due process requirements. The FJC's Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (the "FJC Checklist") considers 70-95% reach among class members to be a "high percentage" and reasonable.

29. In my opinion, the Notice Plan proposed for this case is consistent with other effective settlement notice programs. It is the best notice practicable and meets the requirements of due process as found in *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). It provides the same reach and frequency evidence that courts have approved and that has withstood appellate scrutiny, other expert critiques, as well as collateral review. The Notice Plan and notice documents are consistent with the guidelines set forth in Rule 23, the Manual for Complex Litigation, Fourth, and the FJC Checklist. In addition, as cited above, the Notice Plan has been designed to comply with the amendments to Rule 23(c)(2) which expressly allows for notice by "electronic means, or other appropriate means."

30. At the conclusion of the Notice Plan, Gilardi will provide a final report verifying its effective implementation.

I, Carla A. Peak, declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of April 2022, at Sellersville, Pennsylvania.

*[signature: Carla Peak]*

CARLA A. PEAK