**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE REMICADE ANTITRUST LITIGATION** | **CIVIL ACTION**<br><br>**No. 17-cv-04326** |

**MEMORANDUM**

**MARSTON, J.**                                                   **August 2, 2022**

This is a consolidated, putative class indirect-purchaser antitrust action in which Named Plaintiffs Local 295 Employer Group Welfare Fund and National Employees Health Plan allege that Defendants Johnson & Johnson and Janssen Biotech, Inc. engaged in anticompetitive conduct related to their infliximab biologic, Remicade, in violation of federal and state antitrust laws and state consumer protection laws.  Presently before the Court is Plaintiffs' Uncontested Motion for an Order Certifying a Settlement Class; Granting Preliminary Approval of the Settlement Agreement; Appointing Class Counsel; Appointing a Settlement Administrator and Escrow Agent; and Approving the Form and Manner of Notice to the Settlement Class (the "Motion").  (Doc. No. 172.)  For the reasons below, the Motion is granted, and the Court will schedule a Final Approval Hearing.

I.    **Background**

   A.    *Background Litigation*

In 2017, three putative class indirect-purchaser antitrust actions were filed against Defendants, alleging that Defendants had violated an array of state and federal antitrust and state consumer protection laws and engaged in anticompetitive conduct in connection with the sale

1

and marketing of Remicade.[1]  (Doc. No. 172-4 at 3.)  On November 21, 2017, the actions were

consolidated under the caption *In re Remicade Antitrust Litigation,* No. 2:17-cv-04326.[2]

On January 23, 2018, the Court appointed Robbins Geller Rudman & Dowd LLP as

Interim Class Counsel and Jayne A. Goldstein of Shepherd, Finkelman, Miller & Shah LLP as

Interim Liaison Counsel.  (Doc. No. 50.)  On February 21, 2018, Plaintiffs filed a Consolidated

Amended Complaint ("CAC") on behalf of the class.  (Doc. No. 53.)  In the CAC, Plaintiffs

alleged that Defendants "worked to suppress competition and raise prices to purchases of

[Remicade] by imposing a web of exclusionary contracts on both health insurers and healthcare

providers" and "engaged in other anticompetitive conduct."  (*Id.* at ¶ 1; *see also* Doc. No. 172-4

at 4 ("Plaintiffs' central allegation is that Remicade had a dominant market position and that

Defendants abused that dominant position to suppress competition in the infliximab market

through exclusionary contracts with health insurers and healthcare providers, alongside

additional alleged anticompetitive conduct.").)  Plaintiffs asserted causes of action for  violations

of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (monopolization and attempted

monopolization of the relevant product market) (Counts I and II); violation of § 1 of the Sherman

Antitrust Act, 15 U.S.C. § 1 (unreasonable restraint of trade) (Count III); violation of § 1 of the

Clayton Act, 15 U.S.C. § 14 (unlawful exclusive dealing) (Count IV); violation of state antitrust

statutes (Count V); violation of state law for *Walker Process* fraud (Count VI); and violation of

---

[1] In 1998, the FDA approved Remicade to treat Crohn's disease.  (Doc. No. 172-4 at 3.)  Since then, Remicade has been approved to treat other autoimmune disorders, including ulcerative colitis and rheumatoid arthritis, among others.  (*Id.*; *see also* Doc. No. 172-1 at 11.)  For almost two decades, Remicade was patent-protected and the only infliximab product available in the United States.  (Doc. No. 172-1 at 11.)

[2] In July 2021, this case was reassigned from the calendar of the Honorable J. Curtis Joyner to the calendar of the Honorable Karen Spencer Marston.  (Doc. No. 150.)

state consumer protection statutes (Count VII).  (Doc. No. 53 at 42–95.)  On April 9, 2018, Defendants filed a motion to dismiss (Doc. No. 67), which the Court granted in part and denied in part on December 7, 2018 (Doc. Nos. 90, 91).[3]

Following over four years of litigation, including extensive fact and expert discovery[4] and several weeks' worth of arms-length settlement negotiations, the parties entered into a Stipulation of Class Action Settlement on April 15, 2022 (the "Settlement Agreement").  (Doc. No. 172-4 at 3–5.)  Plaintiffs filed this unopposed Motion that same day.  (*Id.*)  The Court held a hearing on the Motion on July 28, 2022.

### B. The Settlement Agreement

The Settlement Agreement contains the following provisions.

#### 1. Payments to Class Members

The Settlement Class[5] consists of "[a]ll persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Defendants' infliximab between April 5, 2016 and February 28, 2022."  (Doc. 172-4 at ¶ 1.6.)  However, certain groups are excluded from the Class:

> (a)  Defendants, their officers, directors, management, employees, subsidiaries and affiliates;
>
> (b)  all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans;

---

[3] The Court dismissed Plaintiffs' sham litigation and *Walker Process* claims and their claims under the consumer protection statutes of Rhode Island and New York.  (Doc. No. 91.)  With respect to all other claims, the Court denied the motion to dismiss.  (*Id.*)

[4] Discovery was consolidated with two related actions, *Pfizer Inc. v. Johnson & Johnson*, No. 2:17-cv-04180 (E.D. Pa.) (the "*Pfizer* Action"), and *Walgreen Co. v. Johnson & Jonson*, No. 2:18-cv-02357 (E.D. Pa.) (the "*Retailer* Action").  Both actions have been resolved.  (*See Pfizer* Action, Doc. No. 167 and *Retailer* Action, Doc. No. 103 (Stipulations of Dismissal).)

[5] Capitalized terms not defined herein have the same meaning as ascribed in the Settlement Agreement.

(c) all persons or entities who purchased Defendants' infliximab for purposes of resale or who purchased infliximab directly from Defendants;

(d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members);

(e) any "flat co-pay" consumers whose purchases of Defendants' infliximab were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

(f) pharmacy benefit managers;

(g) any judges or justices involved in this action and any members of their immediate families; and

(h) any providers (including but not limited to hospitals, clinics, and physicians) who purchase Remicade and are later reimbursed for the provision of Remicade.

(*Id.*)

Defendants will deposit $25 million into a Settlement Fund for the benefit of the Class.[6] (*See* Doc. No. 172-4 at 5 & ¶ 1.35; Doc. No. 172-8 at 3.)  The Net Settlement Fund amount will be determined by "subtracting any court-approved award of attorneys' fees and expenses, service awards, settlement administrators' costs, taxes and tax expenses, and any other Court-approved deduction from the total Settlement Fund of $25 million."  (Doc. No. 172-8 at 3; *see also* Doc. No. 172-4 at ¶ 1.20 ("'Net Settlement Fund' means the Settlement Fund less: (a) Attorneys' Fees and Expenses, including Service Awards, as awarded by the Court; (b) Notice and Administration Expenses; (c) Taxes and Tax Expenses; and (d) other Court-approved

---

[6] $25 million is the gross settlement amount.  (*See* Doc. No. 172-4 at ¶ 2.2 ("The Settlement Amount paid by Defendants is their sole monetary responsibility under this Settlement Agreement . . . The Defendants are not responsible for payment of Attorneys' Fees and Expenses, Notice and Administration Expenses, or any out-of-pocket expenses, other than out of the Settlement Amount."); *id.* at ¶ 5.2 ("The Settlement Fund shall be applied as follows: (a) to pay all Notice and Administration Expenses; (b) to pay the Taxes and Tax Expenses []; (c) to pay Attorneys' Fees and Expenses to Class Counsel, including to pay Service Awards to Named Plaintiffs, to the extent allowed by the Court; and (d) after the Effective Date, to distribute the Net Settlement Fund to Class Members[.]").)

deductions.").)[7]  The Net Settlement Fund will be distributed to Class Members pursuant to the Plan of Allocation and Distribution.  (*See* Doc. No. 172-4 at 5 & ¶¶ 5.4, 5.5, 5.8; *see also* Doc. No. 172-5 at ¶ 8 ("The Net Settlement Fund will be distributed to Authorized Claimants on a pro rata basis based on the relative size of their Recognized Claims."); Doc. No. 172-7 at 3 ("[T]he remainder of the Settlement Fund will be distributed to Class Members who file a valid Claim Form, with the amount that each Class Member might receive [will] vary[] based on where that Class Member purchased and/or paid for Remicade.  The precise amount that you might receive from the Net Settlement Fund will depend on how much you (and other Class Members) paid for Remicade.").)[8]

---

[7] Class Counsel will request attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses, and Service Award payments to the Named Plaintiffs.  (Doc. No. 172-7 at 3.)

[8] "Each Class Member's claim on the Settlement Fund will be determined under . . . one of . . . three categories below, based on whether the Class Member resides or has a principal place of business in a Selected State and whether the Class Member made purchases of, or reimbursements for, Remicade in a Selected State":

> (1) "Class Members who reside or have their principal place of business in a Selected State will have a claim on the Net Settlement Fund equal to that Class Member's total Remicade purchases and reimbursements";

> (2) "Class Members who do <u>not</u> reside or have their principal place of business in a Selected State, but who did purchase or reimburse for Remicade in one or more of the Selected States, will have a claim on the Net Settlement Fund equal to the sum of that Class Members total Remicade purchases and reimbursements in the Selected States, plus 1% of that Class Member's total Remicade purchases and reimbursements outside of those states";

> (3) "Class Members who do not reside or have their principal place of business in a Selected State and who did not purchase or reimburse for Remicade in any of the Selected States, will have a claim on the Net Settlement Fund equal to 1% of that Class Member's total Remicade purchases and reimbursements."

(Doc. No. 172-8 at 3–4; *see also* Doc. No. 172-1 at 29–30.)

To be eligible for a distribution, a Class Member must submit a Claim Form.  (Doc. No. 172-5 at ¶ 3.)  Claim Forms will be due 120 days after entry of the Preliminary Approval Order. (Doc. No. 172-1 at 33.)  If an Authorized Claimant's Distribution Amount is less than $25.00, no distribution will be made to that claimant.  (Doc. No. 172-5 at ¶ 9.)

After the Net Settlement Fund is distributed among the Class in accordance with the Plan of Allocation and Distribution,[9] any remaining balance will be reallocated among the Class Members and, afterwards, any *de minimis* balance of the Net Settlement Fund will be donated to the Crohn's & Colitis Foundation or another approved non-profit organization.  (*See* Doc. No. 172-4 at ¶ 5.8 ("If there is any balance remaining in the Settlement Fund after a reasonable period of time after the date of the initial Distribution . . . , Class Counsel shall, if feasible, reallocate . . . such balance among those Class Members, who cash their initial Distribution Check and who would receive a Distribution of at least $10.00, in an equitable and economic fashion.  Thereafter, any *de minimis* balance which still remains in the Net Settlement Fund shall be donated to the Crohn's & Colitis Foundation, or one or more other non-sectarian, non-profit, 501(c)(3) organization(s) to be determined by Class Counsel and approved by the Court.").)

### 2.  Notice to the Class

The parties have chosen Giraldi & Co., LLC ("Giraldi") to serve as the Settlement

---

"Selected States" include Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.  (Doc. No. 172-4 at ¶ 1.31.)  "The allocation method recognizes that some class members reside in or made reimbursements in the Selected States, which permit recovery of damages for indirect purchases in a manner that is precluded under the Sherman Antitrust Act under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)."  (Doc. No. 172-1 at 29.)

[9] At bottom, this is a "non-recapture" Settlement Agreement, meaning that it is not a claims-based settlement; once the Settlement is finalized, Defendants "shall have no ability to get back any of the Settlement Amount," including any amount remaining after all distributions are made pursuant to the Plan of Allocation and Distribution.  (*Id.* at ¶ 1.39.)

Administrator and Huntington Bank to serve as the Escrow Agent.  (Doc. No. 172-4 at ¶¶ 1.14, 1.34.)  Gilardi will establish a website and a toll-free number to allow Class Members to obtain information about the Settlement.  (Doc. No. 172-11 at ¶¶ 25–26.)  Notice shall be completed within 60 days after entry of the Preliminary Approval Order.  (Doc. No. 172-1 at 33; Doc. No. 172-6 at ¶ 14.)

Giraldi has outlined plans for notice to third-party payors ("TPPs") and to consumers. (*See* Doc. No. 172-11 at 5–9.)  As for notice to TPPs, Gilardi will send notice via email to all TPPs in its database, which is approximately 26,000 contacts.  (*Id.* at ¶ 11.)  The email will contain the notice in the body of the email and will also contain a link to the settlement website. (*Id.*)  "If an email bounces back or is known not to have successfully been delivered, Gilardi will send a single postcard notice via [the] United States Postal Service (USPS) to the TPP's corresponding postal address."  (*Id.*)  Further, Gilardi will send one postcard notice via USPS to all TPP entities for which it possesses a postal address (approximately 24,000 contacts).  (*Id.* at ¶ 12.)  The addresses will be checked against the National Change of Address database, and notices returned as undeliverable will be re-mailed to any address available through USPS's information.  (*Id.* at ¶¶ 13–14.)  Gilardi will also advertise digital notices on trade websites and in digital trade e-newsletters.  (*Id.* at ¶¶ 15–16.)  As for notice to consumers, a summary notice will appear in the national edition of *People* magazine, both online and print editions, which reaches 11.6% of the target audience.  (*Id.* at ¶ 20.)  Moreover, "over 67.2 million internet impressions will be purchased programmatically and distributed over various websites," including Facebook.  (*Id.* at ¶ 21.)  Gilardi's digital specialists will routinely monitor these digital media campaigns.  (*Id.* at ¶ 22.)

In addition to these TPP and consumer notice plans, Gilardi will also contact various organizations—including clinical and healthcare systems, the Chron's & Colitis Foundation, The Arthritis Foundation, the American Juvenile Arthritis Foundation, and the Rheumatoid Arthritis Foundation—and provide them with information regarding the settlement and ask them to share the information with their audiences.  (*Id.* at ¶ 23.)  Gilardi will also research support groups (e.g., the REMICADE (infliximab) Users and Support Group on Facebook) and post messages to their respective pages.  (*Id.*)  Further, Gilardi will issue a national press release.  (*Id.* at ¶ 24.)

Class Members will have an opportunity to either opt out[10] of the Settlement or to object and/or intervene by following the procedures set forth in the Settlement Agreement and Notice. (Doc. No. 172-4 at ¶¶ 8.1–8.2; Doc. No. 172-6 at ¶¶ 15–16; Doc. No. 172-8 at 5–6; Doc. No. 172-7 at 3–4.)  Objections and opt-outs are due 120 days after entry of the Preliminary Approval Order.  (Doc. No. 172-1 at 33.)

### 3.   Release

After the Settlement is finally approved, the Settlement Class will release Defendants from claims and causes of action arising before February 28, 2022 related to "any antitrust, unfair competition, consumer protection, Lanham Act or similar common law cause of action regarding Remicade, Inflectra, or any other infliximab product."  (Doc. No. 172-4 at ¶¶ 1.25, 4.1.)  Claims to enforce the terms of the Settlement Agreement are not released.  (*Id.* at ¶ 4.1.)

---

[10] Defendants may withdraw and terminate the Settlement in the event certain identified members of the Class opt out during the opt out period; the Court has reviewed this list *in camera*.  (*See* Doc. No. 172-4 at ¶ 7.2 ("Defendants have the right and option, in their sole discretion, to withdraw from and terminate the Settlement on or before the Opt-Out Deadline.  Named Plaintiffs must notify Defendants of any such opt-outs within 5 business days of receiving the opt-out request.  Defendants must exercise this optional termination right within 60 days following the Opt-Out Deadline.").)

**II.      Provisional Certification of the Settlement Class**

*A.      Legal Standard*

"The Court may certify class actions for the purpose of settlement."  *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 476 (E.D. Pa. 2010) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786 (3d Cir. 1995)).  In these situations, the court "approves preliminary certification of the class," but reserves "[f]inal certification" until it "rules on whether the final settlement agreement is to be approved."  *Id.* When a court certifies a class for settlement, "it must first find that the class satisfies all the requirements of Rule 23."  *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 300 (3d Cir. 2005).

Rule 23(a) and 23(b) of the Federal Rules of Civil Procedure give the requirements for certifying a class.  Under Rule 23(a), a class action is allowable only if:

(1)      the class is so numerous that joinder of all members is impracticable;

(2)      there are questions of law or fact common to the class;

(3)      the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)      the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 482 (3d Cir. 2015) ("All potential classes must initially satisfy four prerequisites to be certified:  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of the representation.").

If the Rule 23(a) conditions are met, then a case may proceed as a class action if one of the conditions of Rule 23(b) is also satisfied.  Here, Plaintiffs seek certification for a class under Rule 23(b)(3), which requires that "the court finds that the questions of law or fact common to

class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Reyes*, 802 F.3d at 482 (explaining that plaintiff must demonstrate "predominance and superiority" for certification under Rule 23(b)(3)).

### B.    Analysis

Plaintiffs propose that the Settlement Class consist of "[a]ll persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Defendants' infliximab between April 5, 2016 and February 28, 2022."[11] (Doc. No. 172-4 at ¶ 1.6).  This class meets all six requirements of Rules 23(a) and 23(b).  The Court address each requirement in turn.

### 1.    Rule 23(a) Requirements

*Numerosity*.  While "[t]here is no magic number of class members needed for a suit to proceed as a class action," the Third Circuit has held that "numerosity is generally satisfied if there are more than 40 class members."  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 426 (3d Cir. 2016); *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249–50 (3d Cir. 2016).  Here, Plaintiffs say that the class includes thousands of people.  (Doc. No. 172-1 at 15 ("The Settlement Class includes thousands of consumer and [third-party payor] TPP members who are geographically dispersed across the country.").)  Accordingly, the Court finds that the Settlement Class is sufficiently large to satisfy Rule 23(a)'s numerosity requirement.

*Commonality*.  "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective

---

[11] As noted above, certain identified groups are excluded from the Settlement Class.

class." *In re Nat'l Football League Players*, 821 F.3d at 426–27 (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)).  It is "easy enough" to meet the requirement, provided all members of the class have claims that are capable of class-wide resolution.  *Id.*  Commonality is met in this case because each Class Member's claim depends on whether Defendants unlawfully engaged in anticompetitive behavior.  (*See* Doc. No. 172-1 at 16 (explaining that there are "numerous issues" common to the class, including "whether Defendants unlawfully excluded competition for biosimilar infliximab"; "whether the alleged conduct violated the Sherman Antitrust Act"; "whether the alleged scheme violated various state and federal antitrust and state consumer protection statutes"; and "the effect of the alleged scheme on the prices of infliximab in the United States during the Class Period").)  *See In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 137 (E.D. Pa. 2011) ("The Court finds that commonality is met here.  The plaintiffs allege that the defendants engaged in a scheme to delay the entry of less expensive generic versions of Wellbutrin XL into the market . . . Each class member's claims depends on whether or not the defendants unlawfully engaged in anticompetitive behavior to limit the entry of generic competitors in violation of each state's respective antitrust and/or consumer protection laws."); *see also In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 217 (E.D. Pa. 2012) ("Resolving the allegations surrounding GSK's alleged conduct in delaying generic entry will resolve issues that are central to the validity of each one of the claims in one stroke.  Therefore, I find the commonality requirement satisfied here.").  Thus, this case presents a sufficient degree of commonality, even if the distribution amount from the Net Settlement Fund that each Class Member will receive varies.

  *Typicality*.  "To evaluate typicality, we ask whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs

are aligned with those of the class." *Beck v. Maximus*, 457 F.3d 291, 295–96 (3d Cir. 2006)
(cleaned up); *see also In re Flonase Antitrust Litig.*, 284 F.R.D. at 217 ("The typicality
requirement is intended to preclude certification of those cases where the legal theories of the
named plaintiffs potentially conflict with those of the absentees.  This inquiry assesses whether
the named plaintiffs have incentives that align with those of the absent class members so that the
absentees' interests will be fairly represented." (quoting *Georgine v. Amchem Prods., Inc.*, 83
F.3d 610, 631 (3d Cir. 1996))).  There is a "'low threshold' for typicality"; provided "the
interests of the class and the class representative are aligned," courts will find typicality even
when class members' claims are only legally similar, and not factually similar.  *In re Nat'l
Football League Players*, 821 F.3d at 427–28 (quoting *Newton v. Merrill Lynch, Pierce, Fenner
& Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir. 2001)); *see also Beck*, 457 F.3d at 296 ("Factual
differences will not render a claim atypical if the claim arises from the same event or practice or
course of conduct that gives rise to the claims of the class members, and if it is based on the
same legal theory." (cleaned up)).

Here, because the Named Plaintiffs' and Class Members' claims arise out of the same
conduct and are based on the same legal theories—i.e., Defendants' alleged anticompetitive
behavior related to Remicade and whether Defendants violated antitrust and consumer protection
laws, resulting in suppressed competition and artificially inflated prices—the Court concludes
the typicality factor is satisfied.  *See In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. at 138 ("The
Court finds that the typicality requirement is met here because the representatives' claims arise
from the same course of conduct and are based on the same legal theories."); *see also In re
Fasteners Antitrust Litig.*, Civil Action No. 08-md-1912, 2014 WL 285076, at *6 (E.D. Pa. Jan.
24, 2014) ("The claims of each of the class members arise from the alleged conspiracy to price-

fix and allocate customers and markets in the United States for fasteners.  In a case like this one where it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members.  The typicality requirement is met here." (cleaned up)); *In re Flonase Antitrust Litig.*, 284 F.R.D. at 218 (finding the typicality requirement satisfied because the class representatives' and class members' claims arose from an "identical course of conduct—GSK's allegedly monopolistic 'brand maturation strategy,'" which GSK implemented across the board and without reference to individual purchasers, meaning that all members of the proposed class sought recovery for the same resulting injury).

*Adequacy of the Representation*.  Courts considering adequacy of representation examine both "the qualifications of class counsel and the class representatives."  *In re Nat'l Football League Players*, 821 F.3d at 428; *see also In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *6 ("The requirement has dual concerns: to ensure that class representatives do not have interests antagonistic to the class and that class counsel have the necessary skills and qualifications to adequately represent the class."); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa. 2001) ("The adequacy of the class representative is dependent on satisfying two factors:  1) that the plaintiffs' attorney is competent to conduct a class action; and 2) the class representatives do not have interests antagonistic to the interests of the class.").  "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class."  *In re Cmty. Bank of N. Va.*, 795 F.3d at 393 (quoting *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012)).

As to the class representatives, the Court finds that Named Plaintiffs have standing and do not have interests antagonistic to the Settlement Class.  *See In re Fasteners Antitrust Litig.*,

2014 WL 285076, at *7 ("The interest of the proposed class representatives are the same as the other class members in that their injury arose from the same alleged price fixing conspiracy in the United States fastener market . . . Plaintiffs' interests appear to be completely aligned with the interests of the other class members."); *In re Flonase Antitrust Litig.*, 284 F.R.D. at 218 ("'A class representative must be part of the class and possess the same interest and suffer the same injury as the class members.' Each class member purchased and/or reimbursed for FP at some point during the Class Period at a supracompetitive price. Each class member holds a strong common interest in establishing GSK's liability for these alleged overcharges." (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 625–26 (1997))). Named Plaintiffs, like the other Class Members, indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of Remicade during the Class Period and have a common interest in establishing Defendants' liability for alleged anticompetitive conduct that resulted in inflated pricing of Remicade. (*See, e.g.*, Doc. No. 53 at ¶¶ 18–19 (alleging that Named Plaintiffs are both employee welfare benefit plans under ERISA and that their Plan participants in various states were dispensed Remicade and paid or had paid on their behalf the required copayment).)

Named Plaintiffs have represented the class capably and diligently. In addition to retaining competent counsel, Named Plaintiffs actively participated in extensive discovery and routinely communicated with counsel regarding the status of the action, and they were reportedly involved in important litigation decisions. (Doc. No. 172-1 at 18.) *See Wood v. Saroj & Manju Inves. Phila. LLC*, Civil Action No. 19-2820-KSM, 2020 WL 7711409, at *5 (E.D. Pa. Dec. 28, 2020) (finding that the class representative adequately represented the interests of his fellow members where he "provided counsel with the paperwork and information they needed to initiate

[the] case and substantiate his claims" and was "'instrumental' in the mediation sessions that led to the settlement agreement").

With respect to class counsel, the important factors are whether the attorneys "(1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant." *In re Gen. Motors Corp.*, 55 F.3d at 801.  The Third Circuit has indicated that courts should consider the non-exhaustive list of factors in Rule 23(g) for appointing counsel in determining the adequacy of representation.  *See In re Nat'l Football League Players*, 821 F.3d at 429; *see also Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010) ("Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure, those questions have, since 2003, been governed by Rule 23(g).").  Those factors include counsel's work in the instant class action, experience in handling class actions or other kinds of complex litigation, knowledge of the applicable laws, and resources available for representing the class.  Fed. R. Civ. P. 23(g)(1)(A).  Additionally, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).

Under each of the Rule 23(g)(1)(A) factors, the proposed Class Counsel—Robbins Geller Rudman & Dowd LLP—is qualified to "fairly and adequately represent the interests of the class."  Robbins Geller has extensive experience handling complex class action litigation generally, and cases in the antitrust class action context specifically.  (*See* Doc. No. 178-1 at 22; Doc. No. 172-3 at ¶ 3 ("Counsel for Plaintiffs . . . have decades of experience litigating antitrust class actions[.]"); *see also* Doc. No. 172-10 (the firm's Global Antitrust and Unfair Competition Practice Resume); *id.* at 4 (stating that the "Firm's record of success includes some of the largest

recoveries in history, including the largest antitrust class action settlement: $5.5 billion"); *id.* at 5 ("Robbins Geller has been appointed lead counsel in numerous federal antitrust class actions, and has achieved some of the largest recoveries on behalf of antitrust plaintiffs.").)

Not only is Robbins Geller well qualified to pursue this suit, but the firm has done so with vigor.  Following their initial investigation and commencement of the action, proposed class counsel engaged in extensive discovery, took part in over 30 depositions, and reviewed "millions of pages of documents."  (Doc. No. 172-3 at ¶ 6.)  Throughout the various phases of the suit, proposed class counsel "researched, analyzed, and evaluated many contested legal and factual issues."  (*Id.* at ¶ 7.)  Proposed class counsel also engaged in "numerous rounds of [settlement] discussions," which were "conducted at arm's-length and in good faith, and were informed and approved by Plaintiffs."  (*Id.* at ¶ 6.)

In sum, the proposed class's interests have been advanced by experienced, dedicated counsel, working at arm's length from Defendants.  The Court finds Rule 23(a)(4) is satisfied.

## 2.    Rule 23(b) Requirements

In addition to meeting the requirements of Rule 23(a), a named plaintiff must also satisfy Rule 23(b)(3), which requires the Court find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

*Predominance*.  The key issue under the predominance factor is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Windsor*, 521 U.S. at 623.  Third Circuit "precedent provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of

the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011) (en banc).  The Third Circuit has counseled that courts should be "more inclined to find the predominance test met in the settlement context."[12]  *In re Nat'l Football League Players*, 821 F.3d at 434 (quoting *Sullivan*, 667 F.3d at 304 n.29).  Further, the Supreme Court has stated that "predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."  *Windsor*, 521 U.S. at 625; *see also In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *7 ("In antitrust cases, the requirement of predominance is often easily met.");  *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 263 (E.D. Pa. 2012) ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws. This is because these types of claims typically arise from an alleged common course of conduct on the part of the defendant, and depend upon common proof of liability, such as evidence of the defendants' conduct." (cleaned up)).

Here, the predominance requirement is satisfied.  Each Class Member's claim raises similar operative facts and legal arguments surrounding Defendants' alleged anticompetitive conduct.  Named Plaintiffs allege that Defendants took advantage of Remicade's dominant market position and suppressed competition, resulting in a common injury to all Class Members—the inflated price of Remicade—in violation of federal and state antitrust laws and state consumer protection laws.  *See Sullivan*, 667 F.3d at 300 (finding predominance factor met where the plaintiffs alleged that "De Beers engaged in anticompetitive conduct by exploiting its" dominant position in the diamond market to "impose rigid constraints on the sale and resale of []

---

[12] To be clear, the fact that all members of the proposed class have an interest in the settlement itself does not help establish predominance.  *See Windsor*, 521 U.S. at 622–23.  Nonetheless, the fact that Defendants have agreed to settle not just with the Named Plaintiffs, but with thousands of similarly situated indirect purchasers/third-party payors and consumers, is a strong signal of the predominance of common factual and legal questions among the policyholders' claims.

diamonds," "result[ing] in a common injury as to all class members—inflated diamond prices—

in violation of federal antitrust, consumer protection, or unjust enrichment laws of every state");

*see also In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 377

(E.D. Pa. 2019) ("Here, the allegation is that Comcast engaged in a common course of conduct—

it unlawfully tied the sale of its Premium Cable to the rental of a Comcast Set-Top Box—and

putative Class Members suffered the same injury—the payment of supracompetitive prices for

their Set-Top Boxes.  Accordingly, Plaintiffs satisfy the predominance requirement."); *In re*

*Fasteners Antitrust Litig.*, 2014 WL 285076, at *7 ("Here, the same operative facts and legal

arguments surrounding Defendants' conduct in conspiring to fix, raise, maintain, or stabilize

prices of fasteners in the United States, apply to each class member.  We are satisfied that

questions of law or fact common to class members predominate over any questions affecting

only individual members.").  These common issues of law and fact predominate over any

individual differences, such as the amount of compensation that each member will be entitled to

under the settlement's distribution plan.

    *Superiority*.  The last requirement for certifying a class is that "a class action is superior

to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ.

P. 23(b)(3).  When evaluating this requirement, courts consider "the class members' interests in

individually controlling litigation, the extent and nature of any litigation, the desirability or

undesirability of concentrating the litigation, and the likely difficulties in managing a class

action."  *In re Nat'l Football League Players*, 821 F.3d at 435 (citing Rule 23(b)(3)(A)–(D)).

Superiority can be satisfied where the settlement prevents "duplicative lawsuits and enables fast

processing of a multitude of claims."  *Id.* (quoting *In re Nat'l Football League Players'*

*Concussion Injury Litig.*, 307 F.R.D. 351, 382 (E.D. Pa. 2015)); *see also Sullivan*, 667 F.3d at

312.

In this case, an analysis of superiority weighs towards granting the provisional class

certification. At this stage, it is somewhat difficult to assess the extent to which individual Class

Members' interest in controlling litigation would be harmed by class certification. Pre-notice,

we are unable to evaluate whether individual members care strongly enough about the suit to, for

instance, opt out of it. *See In re Nat'l Football League Players*, 307 F.R.D. at 382 (finding

superiority in part because relatively few class members had opted out of the class).

Plaintiffs represent that the Settlement Class is composed of potentially thousands of

consumer and TPP members. Class-wide adjudication is superior because individual consumer

class members are likely to have small claims in relation to the cost of litigating the lawsuit.

(*See* Doc. No. 172-1 at 21 ("Without the Settlement these consumers and small plans would very

likely get nothing.").) *See In re Wafarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir.

2004) (finding superiority requirement satisfied in antitrust class action where there were a

"potentially large number of class members [], including some 2 million consumers and

potentially thousands of TPPs" and reasoning in part that "individual consumer members have

little interest in individually controlling the prosecution or defense of separate actions because

each consumer has a very small claim in relation to the cost of prosecuting a lawsuit"); *In re

Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. at 378 (finding

superiority requirement met in antitrust class action for similar reasons, i.e., that there were

millions of class members with low-dollar-value claims). Moreover, "[i]ndividual treatment of

each class members' claims would require duplicative, expensive litigation, which would come

at enormous expense to the parties and judicial economy. Class resolution would also avoid

problems of inconsistent resolution." *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. at 145; *see also In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *8 ("Proceeding as a class action is the superior course not only because it will avoid unnecessarily wasting judicial resources, but also because it avoids the possibility of contradictory results.").

Accordingly, superiority is met in this case.

\*     \*     \*

For these reasons, the Court finds that the requirements of Rules 23(a) and 23(b)(3) are satisfied, and the Court will conditionally certify the class.

## III.   Appointing Class Representatives

Appointment of class representatives is governed by Rule 23(a) of the Federal Rules of Civil Procedure, which requires that their claims be "typical of the claims . . . of the class" and that they "will fairly and adequately protect the interests of the class." For the reasons previously discussed in Part II.B.1, those requirements are met here, and the Court will appoint Local 295 Employer Group Welfare Fund and National Employees Health Plan as representatives of the Settlement Class.

## IV.   Appointing Class Counsel

Rule 23(g) of the Federal Rules of Civil Procedure provides the standard for the appointment of class counsel. Class counsel are responsible not only for representing the interests of the class representative, but also for "fairly and adequately represent[ing] the interests of the class." Fed. R. Civ. P. 23(g)(4). As discussed above in Part II.B.1, Rule 23(g) provides a non-exclusive list of factors courts should consider when appointing class counsel. For the reasons previously discussed, the Court finds that Robbins Geller has the ability and

resources to "fairly and adequately represent the interests of the class."  Accordingly, Robbins Geller will be appointed as Class Counsel.

## V.      Appointing Settlement Administrator

Parties may use class notice experts or professional claims administrators to provide a class notice and otherwise administer a settlement.  Fed. R. Civ. P. 23 note(c)(2) (2018).  Gilardi, the proposed Settlement Administrator, has experience administering large class action settlements, such as this one.[13]  (Doc. No. 172-11 at ¶ 3 ("Since 1984, Gilardi has been retained to administer more than 6,000 class actions and distributed settlement payments totaling well over $20 billion in assets.").)  The Court appoints Gilardi to serve as the Settlement Administrator and administer the settlement in good faith in accordance with the terms of the Settlement Agreement.

## VI.     Preliminary Approval of the Class Settlement

Preliminary approval of a proposed class action settlement is left to the discretion of the trial court and is based on an examination of whether the proposed settlement is "likely" to be approved under Rule 23(e)(2).  Fed. R. Civ. P. 23(e)(1)(B)(i); *see In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 299 (3d Cir. 1998); *see also In re Traffic Exec. Ass'n-E. R.R.s*, 627 F.2d 631, 634 (2d Cir. 1980) ("[Preliminary approval] is at most a

---

[13] Gilardi has served as administrator in several other cases in this Circuit.  *See, e.g.*, *Rescigno v. Statoil USA Onshore Props. Inc.*, Civil Action No. 3:16-85, 2020 WL 3833030, at *6 (M.D. Pa. July 8, 2020) ("Lastly, the court will preliminarily approve Gilardi as the settlement administrator to proceed with the settlement process agreed to by the parties and as set forth in their proposed schedule for completing settlement."); *In re N.J. Tax Sales Certificates Antitrust Litig.*, Master Dkt. No. 2:12-CV-01893-MAS-TJB, 2015 WL 12910923, at *3 (D.N.J. Jan. 29, 2015) ("The Court appoints Gilardi & Co. LLC as the Class Administrator to assist Class Counsel in effectuating and administering notice to the class of all 14 Settlements, as well as to administer the exclusion process for those Settlement Class members who wish to opt-out of the Settlement Class."); *W. Pa. Elec. Emps. Pension Fund v. Alter*, Civil Action No. 2:09-cv-04730-CMR, 2014 WL 12608966, at *2 (E.D. Pa. Apr. 22, 2014) ("The Court appoints the firm of Gilardi & Co. LLC . . . to supervise and administer the notice procedure as well as the processing of claims[.]").

determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness.").  Preliminary approval is not a commitment to approve the final settlement.  "[R]ather, it is a determination that 'there are no obvious deficiencies and the settlement falls within the range of reason.'"  *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 438 (E.D. Pa. 2008) (quoting *Smith v. Prof'l Billing & Mgmt. Servs., Inc.*, Civil No. 06-4453 (JEI), 2007 WL 4191749, at *1 (D.N.J. Nov. 21, 2007)).  The settlement is entitled to "an initial presumption of fairness" if "the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  *In re Gen. Motors Corp.*, 55 F.3d at 785.

Despite the relatively low bar for preliminary approval, the court does not act as a mere rubber stamp for the parties' proposed agreement.  This is particularly true when a proposed settlement will impact the legal rights of individuals who are not yet represented in the litigation and likely are unaware the litigation exists.  In that situation, unscrupulous counsel, and, to some extent, representative plaintiffs, may seek disproportionately high fees by settling a case quickly, on terms unfavorable to absent class members and without having done much work on the case.  For these reasons, courts evaluating a settlement have a "fiduciary responsibility, as the guardian[s] of the rights of the absentee class members."  *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) ("[T]rial judges bear the important responsibility of protecting absent class members.").

After review of the proposed Settlement Agreement and the proposed Notice, the Court is satisfied that the proposed settlement meets the criteria for preliminary approval.  In the preliminary approval phase, the Court is tasked only with determining whether "the proposed

settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval." *In re Nat'l Football League Players' Concussion Injury Litig.*, 301 F.R.D. 191, 198 (E.D. Pa. 2014) (quoting *Mehling v. N.Y. Life Ins. Co.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007)). The proposed settlement at issue here does not raise any doubts as to fairness or otherwise reveal any deficiencies.

### A.      *Benefits to the Settlement Class*

Class Members will substantially benefit from the proposed settlement terms. Defendants will pay out $25 million to the overall Settlement Fund. This amount is within the range of other similar settlements. (*See generally* Doc. No. 172-2.) Given the risks (and costs) associated with litigating through class certification, trial, and appeal, and the monetary and nonmonetary relief afforded the Class Members, the settlement amount represents a substantial recovery.

### B.      *Notice*

The Court is also satisfied that the form and content of the notice to the settlement class is adequate. For class notice to be adequate in this case, it must meet two requirements. First, Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Additionally, principles of due process "require[] that notice be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players*, 821 F.3d at 435 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). The notice

documents must provide a detailed description of the settlement, the circumstances leading to it, and the consequences of objecting or opting out.  *See In re Diet Drugs Prods. Liab. Litig.*, 369 F.3d 293, 310–12 (3d Cir. 2004).

Here, the Court finds that the requirements of Rule 23 and due process are satisfied by the parties' proposed notice plan.  To notify the TPPs, Gilardi will send notice via email to all TPPs in its database, and if an email bounces back, Gilardi will send a postcard notice to the TPP's postal address.  (Doc. No. 172-11 at ¶ 11.)  Gilardi will also send a postcard notice to all TPP entities for which it possesses a postal address, and the addresses will be checked against the National Change of Address database.  (*Id.* at ¶¶ 12–14.)  Gilardi will also advertise digital notices on trade websites and in trade e-newsletters.  (*Id.* at ¶¶ 15–16.)  And to notify consumers, Gilardi will publish a notice in *People* magazine and purchase and distribute 67.2 million Internet impressions over various websites and Facebook.  (*Id.* at ¶¶ 20–21.)  Gilardi will also publish a national press release and reach out to organizations and support groups with information regarding the settlement.  (*Id.* at ¶¶ 23–24.)  Gilardi will also set up a toll-free number and a website that will include information on the Settlement.  (*Id.* at ¶¶ 25–26.)

The Court finds that the proposed Notice Program meets the Rule 23 and due process requirements.  *See In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 99 (E.D. Pa. 2013) (finding notice was sufficient where "a notice was published in a variety of national publications" and appeared in newspapers and periodicals, targeted Internet banner ads were published; and a TPP notice appeared in an industry trade journal); *see also Demmick v. Cellco Partnership*, Civil Action No. 06-2163 (JLL),  2015 WL 13643682, at *4–5 (D.N.J. May 1, 2015) (finding notice plan adequate where it used a combination of individual notice (i.e., email and postcards) to reach identifiable class members and publication notice (i.e., advertisements in *People* magazine

and on Facebook) to reach unknown class members).  *Cf. Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 702–03, 709 (E.D. Pa. 2009) (finding notice program adequate where notice forms were mailed to identified class members, notice was provided in local publications and through televisions advertisements, and there was a toll-free number and settlement website that provided information to the class).

Moreover, the Court is satisfied that the content of the short-form and long-form notices (Doc. Nos. 172-7, 172-8) satisfy Rule 23 and due process.  The notices explain, in plain language, who the interested parties are, how the suit came to be settled, how Class Members' claims will be calculated, the process for making a claim, the process for opting out of the settlement, the process for objecting to the settlement, and how to obtain additional information. (*See generally* Doc. Nos. 172-7, 172-8.)  *See Stechert v. Travelers Home & Marine Ins. Co.*, CIVIL ACTION NO. 17-0784-KSM, 2021 WL 5235221, at *10 (E.D. Pa. Nov. 9, 2021); *Wood*, 2020 WL 7711409, at *12.  As written, the proposed notice forms will ensure that "interested parties [are apprised] of the pendency of the action and afford them an opportunity to present their objections." *In re Nat'l Football League Players*, 821 F.3d at 435 (quoting *Mullane*, 339 U.S. at 314).

### C.    *Plan of Allocation and Distribution*

When assessing proposed plans of allocation, courts consider whether the proposed plan is "fair, reasonable, and adequate."  *See In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 248 (3d Cir. 2001)); *see also Sullivan*, 667 F.3d at 326 ("A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.'" (citation omitted)); *Bradburn Parent Teacher Store, Inc. v. 3M (Minn.*

*Mining & Mfg. Co.*), 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007) ("Approval of a plan of allocation

of a settlement fund in a class action is governed by the same standards of review applicable to

approval of a settlement as a whole:  the distribution must be fair, reasonable and adequate."

(cleaned up)).  "In general, a plan of allocation that reimburses class members based on the type

and extent of their injuries is reasonable."  *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d at 752

(quoting *In re Ikon Office Sols. Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000)).

Under the proposed Plan of Allocation and Distribution, a Class Member's recognized

claim will be determined in part by where the Class Members reside or maintain a principal place

of business is located and/or where the Class Member purchased or reimbursed for Remicade.[14]

(*See* Doc. No. 172-8 at 3–4; Doc. No. 172-1 at 29–30.)  The proposed Plan allocates the

Settlement Fund, less attorneys' fees and expenses, service awards, notice and administration

expenses, and tax-related expenses, among Class Members on a pro rata basis based on the

relative size of their recognized claims.  (*See* Doc. No. 172-5 at ¶ 8; Doc. No. 172-1 at 29; *see

also* Doc. No. 172-1 at 29–30 (noting that a Class Member's claims will be determined, in part,

by the total dollars spent by that member to purchase or provide reimbursement for Remicade).)

The Court finds this to be fair, adequate, and reasonable.  *See Mylan Pharma., Inc. v. Warner

Chilcott Pub. Ltd. Co.*, Civ. No. 12-3824, 2015 WL 12791433, at *6 (E.D. Pa. Jan. 28, 2015)

---

[14] "In *Illinois Brick*, the Supreme Court prohibited federal antitrust suits by indirect purchasers.
Following *Illinois Brick*, a number of statutes passed '*Illinois Brick* repealers,' which established the right
of an indirect purchaser to bring an antitrust claim under state law."  *In re Wellbutrin XL Antitrust Litig.*,
282 F.R.D. at 132 n.2 (cleaned up).  "As the ability of members of the Class to recover is tied primarily to
the laws of the Selected States, this Plan of Allocation and Distribution appropriately recognizes and
reflects each Class Members' likely ability to recover should the case have been litigated to resolution."
(Doc. No. 172-1 at 30; *see also id.* at 29 ("The allocation method recognizes that some class members
reside in or made reimbursements in the Selected States, which permit recovery of damages for indirect
purchases in a manner that is precluded under the Sherman Antitrust Act under *Illinois Brick Co. v.
Illinois*, 431 U.S. 720 (1977).  To the extent a Class Member resides outside of the Selected States, its
remedies for purchases made outside of the Selected States would likely be limited to equitable relief.").)

(approving the allocation plan where the plan "authorize[d] GCG to make fair and efficient distribution of the Net Settlement Fund proceeds *pro rata*, based on Class Members' aggregate share of the total Class' [sic] indirect purchases of Doryx during the Class Period").

\* \* \*

For these reasons, the Court preliminarily approves the parties' proposed settlement agreement.

## VII.   Conclusion

The Court is satisfied that preliminary approval is appropriate.  Accordingly, Plaintiffs' Motion is granted.  The Final Settlement Hearing is scheduled for **Monday, February 27, 2023 at 2:00 p.m.**

An appropriate Order follows.