**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE REMICADE ANTITRUST LITIGATION** | **CIVIL ACTION**<br><br>**No. 17-cv-04326** |

**MEMORANDUM**

**MARSTON, J.**                                                              **March 15, 2023**

This is a consolidated, putative class indirect-purchaser antitrust action in which Named

Plaintiffs Local 295 Employer Group Welfare Fund and National Employees Health Plan allege

that Defendants Johnson & Johnson and Janssen Biotech, Inc. engaged in anticompetitive

conduct related to their infliximab biologic, Remicade, in violation of federal and state antitrust

laws and state consumer protection laws.  Presently before the Court is Plaintiffs' Motion for

Final Approval of Settlement, Plan of Allocation and Distribution, Award of Attorneys' Fees and

Expenses, and Service Awards (the "Motion").  (Doc. No. 195.)  The Court held a final approval

hearing on February 27, 2023.  For the reasons below, the motion is granted.

I.      **Background**

The Court set forth the facts of the background litigation and Settlement Agreement at

length in its August 2, 2022 Memorandum preliminarily approving the Settlement (*see* Doc. No.

177) and therefore need not repeat them here.[1]  Below, the Court outlines the additional facts and

---

[1] In short:  Certain exclusions aside, the Settlement Class consists of "[a]ll persons and entities in the
United States and its territories who indirectly purchased, paid and/or provided reimbursement for some
or all of the purchase price of Defendants' infliximab between April 5, 2016 and February 28, 2022."
(Doc. No. 172-4 at ¶ 1.6.)  Defendants will deposit $25 million into a Settlement Fund for the benefit of
the Class.  (*Id.* at 5.)  The Net Settlement Fund (which is the Settlement Fund, less attorneys' fees and
expenses, service awards, settlement administration costs, and taxes) will be distributed to the Class
pursuant to the (now Amended) Plan of Allocation and Distribution.  (*See* Doc. No. 177 at 4–5; Doc. Nos.
202, 204.)

procedural history that have arisen since then.

### A. *Preliminary Approval and the Notice Period*

On August 2, 2022, the Court preliminarily approved the Settlement, the Notice Plan, and the Plan of Distribution and Allocation, and it appointed Gilardi & Co., LLC ("Gilardi") to serve as the Settlement Administrator.  (Doc. Nos. 177, 178.)

Gilardi commenced the Notice Plan on August 30, 2022.  (Doc. No. 195-2 at ¶ 10.)  "The Notice Plan used a combination of individual mailed notice and paid notice placements in industry-related trade media to reach the third-party payor ('TPP') portion of the Settlement Class, as well as a combination of notice placements in a well-read consumer publication and digital notices placed on a variety of websites to reach the consumer portion of the Settlement Class."  (Doc. No. 195-4 at ¶ 5.)  "The Notice Plan reached virtually all TPP Settlement Class members and approximately 80% of likely consumer Settlement Class members."  (*Id.*)

*TPP Mailing*.  On September 9, 2022, Gilardi mailed the Postcard Notice to 23,509 TPP entities contained in its proprietary database via the United States Postal Service ("USPS").  (*Id.* at ¶ 9.)  Before mailing the notice, the addresses were checked against the National Change of Address ("NCOA") database, certified via the Coding Accuracy Support System ("CASS"), and verified through Delivery Point Validation ("DPV").  (*Id.* at ¶ 10.)  Notices that were returned as undeliverable were re-mailed to any address available through postal service information.  (*Id.* at ¶ 11.)  Mailings that were returned and "did not contain an expired forwarding order with the new address indicated," were "researched through standard skip tracing" and notice was "re-mailed if a new address was obtained."  (*Id.*)

Gilardi also emailed the contents of the Postcard Notice to 1,797 TPP entities with available email addresses.  (*Id.* at ¶ 9.)

*TPP Paid Media*.  Gilardi also advertised on trade websites and in digital trade e-newsletters.  (*Id.* at ¶ 13.)  Specifically, Gilardi had "approximately 75,000 impressions" distributed on the Society for Human Resource Management ("SHRM") website for 30 days, from September 1 to 30, 2022.  (*Id.*)  During that same time frame, Giraldi also "caused approximately 60,000 impressions to be delivered on Think Advisor's Life/Health channel of their website."  (*Id.*)  Additionally, Giraldi arranged for digital notice to appear in SHRM's HR Daily e-newsletter[2] on August 30, 2022 and September 22, 2022, and in ThinkAdvisor Life/Health Daily's e-newsletter[3] on September 5, 6, 7, 8 and 9, 2022.  (*Id.* at ¶ 14.)  Further, on August 16, 2022, Gilardi distributed a press release to media outlets nationwide via PR Newswire.  (*Id.* at ¶ 15.)

*Consumer Media*.  As for the consumer portion of the Settlement Class, Gilardi arranged for the Summary Notice to be published in the nationwide print edition and online digital replica of the September 26, 2022 issue of *People* magazine.  (*Id.* at ¶ 16.)  In addition, Gilardi "purchased approximately 72,800,000[4] impressions programmatically to be distributed on desktop and mobile devices via various websites and on Facebook from August 16, 2022 through September 30, 2022."  (*Id.* at ¶ 17.)  These "were geographically targeted to adults 18 years of age and older nationwide and in Puerto Rico, Guam, the U.S. Virgin Islands, the Northern Mariana Islands, and in American Samoa."  (*Id.*)  Furthermore, Gilardi contacted several organizations and support groups for assistance in sharing information with their members and

---

[2] The SHRM HR Daily e-newsletter has approximately 458,000 subscribers.  (*See id.* at ¶ 14 (noting that the notice was "delivered to approximately 458,000 subscribers each weekday").)

[3] The ThinkAdvisor Life/Health Daily e-newsletter has 37,000 opt-in subscribers.  (*See id.* (noting that the notice was "sent to approximately 37,000 subscribers each weekday.").)

[4] Ultimately, 73,186,129 impressions were delivered, meaning an additional 386,129 impressions were delivered at no extra charge.  (*Id.* at ¶ 17.)

audiences.  (*Id.* at ¶ 18.)  The organizations included Crohn's & Colitis Foundation, The Arthritis Foundation, American Juvenile Arthritis Foundation, and Rheumatoid Arthritis Foundation, and the support groups included the REMICADE (infliximab) Users and Support and Remicade Moms groups on Facebook, as well as the Crohn's Forum, My Crohn's and Colitis Team, and My RATeam online groups.  (*Id.*)

*Response Mechanisms*.  On September 2, 2022, the informational settlement website www.RemicadeSettlement.com went live.  (*Id.* at ¶ 19.)  Consumer and TPP Settlement Class members were able to file claim forms online via that website and obtain additional information and court documents.  (*Id.*)  A week later, on September 9, the toll-free number went live.  (*Id.* at ¶ 21.)  Settlement Class members were able to call the number to learn more about the Settlement and ask questions.  (*Id.*)  As of October 27, 2022, the settlement website had received 80,064 hits, and the toll-free number had received a total of 116 calls.  (*Id.* at ¶¶ 20, 22.)  The toll-free line also received six requests for Consumer Notice Packets and two requests for TPP Notice Packets to be mailed.  (*Id.* at ¶ 22.)

*Responses*.  As of October 27, 2022, Gilardi had received 2,222 claims filed through the postal mail and the case website.  (*Id.* at ¶¶ 20, 23.)  195 claims were submitted by TPPS and 2,027 were submitted by consumers.  (*Id.* at ¶ 23.)  As of January 9, 2023, Gilardi received approximately 160,227 claims filed through postal mail and the case website; 1,771 were submitted by TPPs and 158,506 were submitted by consumers.  (Doc. No. 207-11 at ¶ 9.)  Gilardi did not receive any exclusion requests.  (*Id.* at ¶ 10.)

### B.    *Illinois's and Massachusetts's Attorney General's Motion to Intervene*

On September 19, 2022, the Attorneys General for Massachusetts and Illinois filed a Motion to Intervene for a limited purpose.  (Doc. No. 183.)  Namely, the Attorneys General

objected to how their states were categorized in the Plan of Allocation and Distribution.

As outlined in the Notice and original Plan of Allocation and Distribution, a class

member's claim will be calculated based on which of the three categories they fall into:

> (1) Class Members who reside or have their principal place of business in a Selected State will have a claim on the Net Settlement Fund equal to that Class Member's total Remicade purchases and reimbursements;
>
> (2) Class Members who do <u>not</u> reside or have their principal place of business in a Selected State, but who <u>did</u> purchase or reimburse for Remicade in one or more of the Selected States, will have a claim on the Net Settlement Fund equal to the sum of that Class Members total Remicade purchases and reimbursements in the Selected States, plus 1% of that Class Member's total Remicade purchases and reimbursements outside of those states";
>
> (3) Class Members who do not reside or have their principal place of business in a Selected State and who did not purchase or reimburse for Remicade in any of the Selected States, will have a claim on the Net Settlement Fund equal to 1% of that Class Member's total Remicade purchases and reimbursements.

(Doc. No. 172-8 at 3–4 (emphasis in original).)[5]  The Settlement Agreement defined "Selected

States" as encompassing Arizona, Arkansas, California, District of Columbia, Florida, Hawaii,

Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New

---

[5] (*See also* Doc. No. 172-5 at 4–5 ("Settlement Class Members' Recognized Claims are subject to calculation under only one of ¶¶ 5(a), 5(b), or 5(c) below. . . . (a) The Recognized Claim of Class Members that reside or have their principal place of business in one of the Selected States shall be the total dollars spent by that member to indirectly purchase or provide reimbursement for some or all of the purchase price of Remicade. (b) The Recognized Claim of Class Members that do not reside or have their principal place of business in one of the Selected States but indirectly purchased or provided reimbursement for some or all of the purchase price of Remicade in one or more of the Selected States shall be the sum of: (i) The total dollars spent to indirectly purchase or provide reimbursement for some or all of the purchase price of Remicade in any of the Selected States; and (ii) The total dollars spent to indirectly purchase or provide reimbursement for some or all of the purchase price of Remicade outside of the Selected States multiplied by 0.1.  (c) The Recognized Claims of Class Members of [sic] that do not reside or have their principal place of business in one of the Selected States and did not indirectly purchase or provide reimbursement for some or all of the purchase price of Remicade in any of the Selected States shall be the total dollar spent to indirectly purchase or provide reimbursement for some or all of the purchase price of Remicade multiplied by 0.1.").)

Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.  (Doc. No. 172-4 at ¶ 1.31.)

Acting as *parens patriae* on behalf of indirect purchasers and reimbursers of Remicade in Illinois and Massachusetts, the Attorneys General argued that Illinois and Massachusetts should be included as Selected States because their respective state laws allow indirect purchasers to recover antitrust damages.  (Doc. No. 183.)  Plaintiffs and Defendants opposed the motion to intervene.  (Doc. Nos. 186, 187.)  The Court held oral argument on November 29, 2022, which was adjourned midway through so that the parties and Attorneys General could engage in negotiations.[6]

Following these discussions, on December 8, 2022, the parties filed an Amended Plan of Allocation and Distribution, which the Court approved that same day.[7]  (Doc. Nos. 202, 203.) The Court also directed Plaintiffs to post the Order and Amended Plan of Allocation and Distribution to the case website.  (Doc. No. 204.)  The following day, December 9, the Attorneys General withdrew their motion to intervene.  (Doc. No. 205.)

    **C.**    ***Amended Plan of Distribution and Allocation***

Under the Amended Plan of Allocation and Distribution (the "Amended Plan"), the Selected States were amended to also include Illinois and Massachusetts.  (*See* Doc. No. 202-1 at 4 n.2 ("'Selected States' include the states or commonwealths in the Settlement Agreement, but shall also include Illinois and Massachusetts.").)  Massachusetts, however, is only considered a

---

[6] As noted *infra* n.13, this was a public hearing.

[7] *Pro se* objector Gomez filed two motions for reconsiderations concerning the December 8, 2022 Order (*see* Doc. Nos. 211, 219), which the Court denied on February 8, 2023 (Doc. No. 220).

Selected State with respect to "claims filed by consumers whose Remicade purchases were made only for personal use." (*Id.*)  The three categories set forth in the Amended Plan for determining Class Members' *pro rata* allocations are identical to the categories set forth in the original Plan of Allocation and Distribution.  (*Compare* Doc. No. 172-5 at 4–5 & *supra* n.5, *with* Doc. No. 202-1 at 4 ¶ 5.)

Although the claims period ended for Settlement Class on November 30, 2022, the Amended Plan extended the Notice and claim filing period for Massachusetts consumer and Illinois Settlement Class members.  (*See* Doc. No. 202-1 at 3 n.1 ("With the exception of Settlement Class Members in Illinois and Massachusetts, the claims period for the Settlement Class ended on November 30, 2022.  For Massachusetts consumer Settlement Class Members and Illinois Settlement Class Members, however, this claim submission period shall be extended for an additional three weeks from the Notice Date, and any claims made before the last date of that period shall be considered timely.  The 'Notice Date' shall be the date on which Class Counsel initiates a new, targeted digital notice campaign targeted Massachusetts consumer Class Members and Illinois Class Members.  Such notice will be provided as soon as practicable after the date on which this Amended Plan of Allocation is filed with the Court.").)

**D.    *Additional Notice Plan Implementation***

In line with the Amended Plan, Gilardi caused additional notice to be issued to Massachusetts consumer and Illinois class members in December 2022.  (*See* Doc. No. 207-11.) Specifically, on December 6[8], Gilardi mailed additional Postcard Notices to 1,237 Illinois-based

---

[8] During the final approval hearing, Class Counsel explained that December 6 was a typographical error; because the Court did not issue its Order approving the Amended Plan until December 8, she believed that the notice to Illinois and Massachusetts class members commenced on December 9.  (*See* Feb. 27, 2023 Hr'g Tr. at 13:21–14:14.)

TPP entities that were contained in Gilardi's proprietary database.[9]  (*Id.* at ¶ 5.)  "To extend notice among the Illinois TPP and Illinois and Massachusetts consumer portions of the Settlement Class," Gilardi advertised on the *Chicago Tribune* and *Boston Globe* websites.  (*Id.* at ¶ 7; *see also id.* ("Gilardi caused 85,005 impressions on the Chicago Tribune and 161,720 impressions on the Boston Globe website from December 8, 2022 through December 24, 2022").)  In addition, Gilardi had 37,939,514 impressions programmatically distributed on desktop and mobile devices (e.g., tablets and smartphones) via various websites from December 7 to December 21, 2022; these were targeted to adults 18 years of age and older in Illinois and Massachusetts.  (*Id.*)

As noted *supra* Section I.A., as of January 9, 2023, Gilardi received "approximately 160,277 claims filed through both postal mail and the case website, of which 1,771 were submitted by TPPS and 158,506 were submitted by consumers."  (*Id.* at ¶ 9.)  "This number includes 41 Illinois TPP submissions, and 8,742 Illinois and Massachusetts consumer submissions.  Of those, 15 of the Illinois TPP submissions and 198 of the Illinois and Massachusetts consumer submissions were submitted during the December claim period."[10] (*Id.*)

### E.    *Gomez Files an Objection*

In November 2022,[11] Jose Gomez sent a letter to the Court in which he outlined nineteen

---

[9] As with prior notice efforts, the postcards were mailed via USPS, and the addresses were checked against the NCOA database, certified via CASS, and verified through DPV.  (*Id.* at ¶ 5.)

[10] Gilardi noted that several claims were submitted from outside of Illinois and Massachusetts in the December claim period.  (*Id.*)

[11] The letter is dated November 14 and was docketed on November 28.  (*See* Doc. No. 201.)  This letter was sent prior to the parties' filing, and the Court's approval of, the Amended Plan of Allocation and Distribution.

objections to the Settlement.  (Doc. No. 201.)  Gomez states that he is a member of the class

because he purchased Remicade in 2016[12] in Florida for chronic conditions.  (*Id.* at 1.)  Gomez

did not opt out of the class or file a claim by the respective November 30, 2022 deadlines.  (*Id.*

("I did not file a claim because I object to the content of the claim form as explained below and

the terms.  I also did not opt out because I want the settlement to change as stated below.  I will

file a claim or I will opt out after this Court renders final terms of the settlement and the payment

provisions."); Doc. No. 178 at ¶ 7 (August 2, 2022 Order stating "all claim forms, opt-out

requests and objections shall be due within 120 days after the date of this Order," i.e., November

30, 2022).)

      The Court briefly summaries each of Gomez's nineteen objections below.

- **Objection 1**.  Gomez objects to the November 30, 2022 opt-out deadline, arguing that it is improper to require class members to opt out before the Court grants final approval of the settlement.  (*See id.* at 2 ("The requirement that people opt out PRIOR to this Court setting the terms of the settlement is not appropriate.").

- **Objection 2**.  For similar reasons, Gomez objects to the November 30, 2022 deadline for filing a claim.  (*See id.* ("Claimants should not have to file a claim until the terms of the settlement are approved and they can decide if they want to participate or not.").)

- **Objection 3**.  Gomez objects to the claim form, alleging that it does not allow claimants to submit a claim with a foreign address.  (*See id.* at 2–3 ("I was unable to submit a claim because although I purchased Remicade in Florida, my address is in Costa Rica.  Therefore, I object to the requirement that a person list a United States address as their mailing address on the claim form[.]").)

- **Objection 4**.  Gomez objects to the manner in which the Net Settlement Fund will be distributed among class members, claiming that the payment amount is improperly determined based on which state the class member resides in.  (*See id.* at 3 ("The payment table appears to imply they are basing payment on the state of residency. . . .This is an antitrust case and the location of residence has no relevance—especially when the 'present' residence is considered and not the residence at the time of the purchase of the medication. . . . Therefore, I object on

---

[12] The class period is April 5, 2016 to February 28, 2022 (Doc. No. 172-4 at ¶ 1.6); however, Gomez does not specify *when* in 2016 he purchased Remicade or provide any documentation (*see* Doc. No. 201).

the basis that the present residence is used, not the residence at the time of treatment or the location of the purchase.").)

- **Objection 5**. Gomez objects to the requirement that a class member provide their social security number when completing the claim form.  (*See id.* at 3–4.)

- **Objection 6**.  Gomez objects to the lack of a privacy policy governing the data provided in the claim forms.  (*See id.* at 4.)

- **Objection 7**.  Gomez objects to the $25 million settlement figure, arguing that it is unreasonably low.  (*See id.*)

- **Objection 8**.  Gomez objects to the requirement that a person provide documentation to file a claim for purchases exceeding $1,000.  (*See id.* (arguing that the "$1000 claim limitation is arbitrary and capricious as it reflects only 1/5th of the cost of a single dose" of Remicade).)

- **Objection 9**.  Gomez appears to object on the basis that the checks will not remain valid for long enough, impeding the distribution of funds.  (*See id.* ("Validity of checks:  Any settlement by this Court should be approved with a requirement that checks be valid for the normal 180 day period.  Class action administrators have been placing low stale dates on the checks such as 60 or 90 days and by the time a person receives the check – especially if a forwarder is on the address, can exceed that period.  This results in funds not being distributed to the recipients and burdensome measures to have a check reissued.").)

- **Objection 10**.  Gomez's tenth objection pertains to the treatment of "unclaimed property."  (*See id.* at 4–5.)  He "object[s] to the claims administrator not properly administering uncashed checks or unclaimed funds through ordinary unclaimed property programs as required by the laws of almost every state."  (*Id.* at 5.)

- **Objection 11**.  Gomez objects to the claim form again, alleging that it did not permit him to request that his settlement check be sent via ACH direct deposit or Zelle, two of the payment options listed in the Plan of Distribution.  (*Id.*)

- **Objection 12**.  Gomez objects to the lack of clarity on how a class member can notify the Settlement Administrator of a change in address or preferred payment type.  (*See id.* ("There needs to be a simple way for claimants to change their address especially since I will most probably have to appeal this settlement and it could be years until a distribution.").)

- **Objection 13**.  Gomez appears to object on the basis that PayPal, Venmo, and Zelle (payment options) may reject payments and class members may not receive notification of that event.  (*See id.* ("Paypal, Venmo (and if they add it Zelle) sometimes reject payments. . . . The claims administrators have been doing nothing to notify claimants when Paypal etc. rejects a payment.  They simply act

like nothing happened and then keep or redistribute the funds.  The claimant often does not receive notification of this type of event.").)

- **Objection 14**.  Gomez objects on the basis that the settlement agreement is not on the website.  (*See id.*)

- **Objection 15**.  Gomez objects to the amount of expenses incurred in this litigation, arguing that it is excessive relative to the settlement amount and that there is no way for class members to discern what the expenses were.  (*See id.* at 6.)

- **Objection 16**.  Gomez objects to the amount of attorneys' fees requested, claiming that class counsel are receiving a "windfall."  (*See id.*; *see also id.* ("This Court should not award counsel this amount of fee considering the amount of hours spent and what appears to be bloat.").)

- **Objection 17**.  Gomez objects to the content of the short and long form notice, claiming neither "provides any real information to a potential objector."  (*See id.* ("The information provided to the public through these notifications are full of legalese without even providing basic information to inform a class member.  The website announcing the settlement contains basically no information and a class member has to dig through the incomplete court documents on the website to try to obtain more information.").)

- **Objection 18**.  Gomez objects to the requirement that class members file their objections with the Court and class counsel by mail, arguing that it is too burdensome, and objects to the alleged requirement that objectors appear at the final approval hearing.  (*See id.*)

- **Objection 19**.  Gomez objects to the *pro hac vice* requirements.  (*See id.* ("[T]this Court should have waived the pro hac vice requirements for class members to have attorneys appear on their behalf and file objections.  When I called attorneys, some were willing to file my objections for me, but stated that there is a $200 pro hac vice fee which simply is not appropriate in this type of nationwide case.  The fee for *pro hac vice* probably exceeds what I would receive through my claim.").)

### F.   *Gomez Amends His Objections*

On January 9, 2023, Gomez filed amended objections.  (Doc. No. 206-1.)  In this letter, Gomez raised new objections pertaining to the Court's December 8, 2022 Order approving the Amended Plan of Allocation and Distribution, clarified his original objections, and removed resolved objections.  (*Id.* at 2.)

*Withdrawn Objections*.  Gomez withdrew Objection 14.  (*Id.* at 7 n.6 ("Originally,
Objector could not locate the settlement agreement on the website.  Class Counsel advised
Objector that it is in the documents section.  Therefore, the objection is withdrawn.").)  As to
Objection 18, while he still objects to the requirement that class members file their objections by
mail, he withdraws the remainder of that objection, noting that class counsel advised him that
objectors need not appear at the final approval hearing.  (*Id.* at 8.)

*Modified Objections*.  Gomez modified Objections 3, 6, 11, 12, 15, and 19 based on
conversations he had with Class Counsel.

As to Objection 3, Gomez no longer objected on the basis of his mistaken belief to that
the claim form did not permit him to enter a foreign address.  (*Id.* at 4 & n.4 ("The original
objections stated there was no ability to enter a foreign address.  This was mistaken as there is a
drop down menu that Objector did not see during his attempt at filling out the form.").)  Instead,
he modified his objection to state, "While the claim form has a drop down box for foreign
addresses, it is unclear how a person will be paid if they bought the item from a repealer state but
presently live outside of the United States."  (*Id.* at 4.)

As to Objection 6, Gomez modified his objection to indicate that he spoke with Class
Counsel, who referred him to Gilardi's general privacy policy.  Gomez now objects on the basis
that the general privacy policy's terms are "not specific to [this] case, do not discuss how the
documents will be used, and contain no discussion of the sensitive medical documentation that is
involved in this case."  (*Id.* at 5; *see also id.* at 5 n.5 ("The original objections stated that there
was no privacy policy.  The general website privacy policy cited by Class Counsel does not
discuss the data submitted by a claimant in this case, chilling submissions.").)  He also appears to
have withdrawn his unsupported assertion that "claims administrators have been allowing

attorneys in other class actions to peruse the data from one case to another."  (*See* Doc. No. 207-1 at 9 n.7; Doc. No. 207-9 at 5–6.)

As to Objection 11, Gomez reiterates that the distinction between the payment options offered in the Plan Allocation and Distribution and the claim form persists with the Amended Plan.  (*See id.* at 6 ("NOTE: The revised terms of distribution [the Amended Plan] still state payment will be made by Zelle, Paypal, Venmo, or ACH direct deposit.  However, the claims website never offered Zelle or ACH.").)

As to Objection 12, Gomez continues to object on the basis that "[t]here is no simple method to change the address or paypal address or payment type."  (*Id.* at 7.)  Gomez notes that Class Counsel advised him that a claimant could contact the claims administrator to change their information.  (*Id.*)  However, Gomez maintains that there should be a way for a claimant to easily submit a form on the website to change their information.  (*See id.* ("In this case, Class Counsel's refusal to make a simple form has no rational basis other than laziness and a refusal to be flexible and improve their hectic, unclear website.").)

As to Objection 15, Gomez adds, "While Class Counsel advised Objector that the expenses are broken down on the website, he has yet to locate it."  (*Id.*)

As to Objection 19, Gomez continues to object to *pro hac vice* requirements.  (*Id.* at 8.)  He adds, "Class Counsel advised me that this is not under their control and a judicial decision. . . . [T]here usually exists a waiver of the fees and *pro hac vice* requirements.  This is because parties from all over the United States are being made to litigate in a Court that is outside their jurisdiction.  Nobody is going to pay a *pro hac vice* fee to advocate for their small payment, especially if they reside in a non-repealer state."  (*Id.*)

*New Objections*.  Gomez also raised two new objections in his January 9 letter.  (*Id.* at 2–3.)  First, Gomez objects to the Court's December 8, 2022 approval of the Amended Plan the parties submitted, by which the deadline for Illinois and Massachusetts class members was extended.  (*Id.* at 2.)  Gomez objects that class members were not provided notice and that the opportunity to file an objection was not extended for everyone.  (*Id.*)  Gomez writes, *inter alia*, "I object to the recent actions by the Court approving an extended deadline for Illinois and Massachusetts residents.  The Court took this action with no notice to class members.  Illinois and Massachusetts Attorney Generals had valid objections to the manner of notice and the deadlines.  Many of these objections apply to all claimants in most states.  These objections apply to all class members.  The deadlines should be extended for all class members."  (*Id.*)

Gomez also objects to the fact that the address to mail objections is "buried on page four of the PDF on the [settlement] website," stating this is "not fair or reasonable."[13]  (*Id.* at 2–3.)

* * *

On October 31, 2022, Plaintiffs filed their Motion for Final Approval of Settlement, Plan of Allocation and Distribution, and Award of Attorneys' Fees and Expenses and Service Awards.

---

[13] Although not raised as a formal objection, in his communications with counsel, Gomez voiced concerns about alleged sealing of "hearing notes."  (*See* Doc. No. 207-7 at 2 ("Furthermore, the Court sealed the hearing notes and the public cannot see it.  This is a brazen abuse of discretion.").)  The November 30, 2022 hearing to which Gomez is referring was open to the public.  Moreover, the Court never sealed the transcript for the hearing; although it is not on the docket, anyone can order a copy of the transcript.  Furthermore, Gomez has not cited to any authority that he is entitled to a free transcript.  *Cf. Walker v. People Exp. Airlines, Inc.*, 886 F.2d 598, 600 (3d Cir. 1989) ("By its express terms, section 753(f) allows litigants to receive transcripts at public expense only if they are proceeding *in forma pauperis*, regardless of whether their case involves criminal, habeas, section 2255, or 'other' proceedings.") (emphasis added); *cf. Schaeffer v. Consoli*, No. 91-CV-4274, 1991 WL 155290, at *1 (E.D. Pa. July 31, 1991) ("A request for a trial transcript is not a matter of right unless an individual is pursuing a direct appeal of his criminal conviction.  If a plaintiff is seeking these transcripts for a collateral attack on his conviction, he must demonstrate need.").  To the extent Gomez is referring to the minute entry for the hearing (Doc. No. 200), minute entries are administrative in nature and therefore not publicly accessible.

(Doc. No. 195.)  Plaintiffs supplemented their motion on January 9, 2023 in order to address

Gomez's objections.  (Doc. No. 207.)

## II.    The Settlement

### A.  *The Settlement Class Is Certified*

Before considering the merits of the Settlement, the Court must determine whether to

certify the Settlement Class.  "For a class action to have preclusive effect and bind absent class

members, a class must first be certified."  *In re Nat'l Football League Players' Concussion*

*Injury Litig.*, 307 F.R.D. 351, 370 (E.D. Pa. 2015).  A court may certify class actions for the sole

purpose of settlement.  *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D.

468, 476 (E.D. Pa. 2010) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab.*

*Litig.*, 55 F.3d 768, 786 (3d Cir. 1995)).  In these situations, the court "approves preliminary

certification of the class," but reserves "[f]inal certification" until it "rules on whether the final

settlement agreement is to be approved."  *Id.*  When a court certifies a class for settlement, "it

must first find that the class satisfies all the requirements of Rule 23."  *In re Cmty. Bank of N.*

*Va.*, 418 F.3d 277, 300 (3d Cir. 2005).  The "central inquiry . . . is the adequacy of

representation."  *Id.*

Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure set forth the requirements

for class certification.  Under Rule 23(a), a class action is allowable only if:

> (1)    the class is so numerous that joinder of all members is
>         impracticable;
>
> (2)    there are questions of law or fact common to the class;
>
> (3)    the claims or defenses of the representative parties are
>         typical of the claims or defenses of the class; and
>
> (4)    the representative parties will fairly and adequately protect
>         the interests of the class.

Fed. R. Civ. P. 23(a); *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 482 (3d Cir. 2015) ("All potential classes must initially satisfy four prerequisites to be certified: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.").

If the Rule 23(a) conditions are met, then a case may proceed as a class action if one of the conditions of Rule 23(b) is also satisfied.  Here, Class Counsel seek certification for a class under Rule 23(b)(3) (*see* Doc. No. 177 at 9–10; Feb. 27, 2023 Hr'g Tr. at 10), which requires that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); *see also Reyes*, 802 F.3d at 482 (explaining that the plaintiff must demonstrate "predominance and superiority" for certification under Rule 23(b)(3)).

The Settlement Class consists of "[a]ll persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Defendants' infliximab between April 5, 2016 and February 28, 2022."[14] (Doc. No. 172-4 at ¶ 1.6).  For the same reasons stated in this Court's August 2, 2022 Memorandum preliminarily approving the Settlement (*see* Doc. No. 177), which the Court finds are still applicable at this stage, the Court concludes that this Class continues to satisfy the requirement set forth in Rules 23(a) and 23(b).  Because the requirements of Rules 23(a) and 23(b)(3) are satisfied, we will certify the Settlement Class.

### 1.    Rule 23(a) Requirements

As noted above, Rule 23(a) sets forth four preliminary requirements for a class to be certified:  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.

---

[14] Certain identified groups are excluded from the Settlement Class.  (*See* Doc. No. 177 at 3–4.)

*See Reyes*, 802 F.3d at 482.  The Settlement Class satisfies all four requirements.

      *Numerosity*.  While "[t]here is no magic number of class members needed for a suit to proceed as a class action," the Third Circuit has held that "numerosity is generally satisfied if there are more than 40 class members."  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 426 (3d Cir. 2016); *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249–50 (3d Cir. 2016).  Here, Plaintiffs say that the class includes thousands of people.  (Doc. No. 172-1 at 15 ("The Settlement Class includes thousands of consumer and [third-party payor] TPP members who are geographically dispersed across the country."); Feb. 27, 2023 Hr'g Tr. at 9:17–19 ("Numerosity, there [are] many thousands of third-party payers and consumers.  We know this already from the number of claims we have received.").)  Accordingly, the Court finds that the Settlement Class is sufficiently large to satisfy Rule 23(a)'s numerosity requirement.

      *Commonality*.  "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  *In re Nat'l Football League Players*, 821 F.3d at 426–27 (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)).  It is "easy enough" to meet the requirement, provided all members of the class have claims that are capable of class-wide resolution.  *Id.*  This case presents sufficient commonality because each Class Member's claim depends on whether Defendants engaged in anticompetitive conduct with respect to Remicade.  (*See* Feb. 27, 2023 Hr'g Tr. at 9:21–24 ("Here every member of the class [indirectly] purchased Remicade, and they charged that they overpaid for the drug due to allegations of anticompetitive conduct by the Defendants.").)  Thus, the commonality requirement is met here.

      *Typicality*.  "To evaluate typicality, we ask whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs

are aligned with those of the class." *Beck v. Maximus*, 457 F.3d 291, 295–96 (3d Cir. 2006) (cleaned up).  There is a "'low threshold' for typicality"; provided "the interests of the class and the class representative are aligned," courts will find typicality even when class members' claims are only legally similar, and not factually similar.  *In re Nat'l Football League Players*, 821 F.3d at 427–28 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir. 2001)); *see also Beck*, 457 F.3d at 296 ("Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." (cleaned up)).

Here, the Named Plaintiffs' and Class Members' claims arise out of the exact same conduct (namely, Defendants' alleged anticompetitive behavior related to Remicade) and the same legal theories (specifically, whether Defendants violated antitrust and consumer protection laws by using their dominant market position to suppress competition in the infliximab market). (*See* Feb. 27, 2023 Hr'g Tr. at 10:1–3 (explaining that the claims are factually and legally similar because the Named Plaintiffs and Class Members "bought Remicade" and "claim they paid too much because of the practices of the Defendants")).  Thus, the Court concludes the typicality factor is satisfied.  *See In re Fasteners Antitrust Litig.*, Civil Action No. 08-md-1912, 2014 WL 285076, at *6 (E.D. Pa. Jan. 24, 2014) ("The claims of each of the class members arise from the alleged conspiracy to price-fix and allocate customers and markets in the United States for fasteners.  In a case like this one where it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members.  The typicality requirement is met here." (cleaned up)).

*Adequacy of the Representation*.  Courts considering adequacy of representation examine both "the qualifications of class counsel and the class representatives." *In re Nat'l Football League Players*, 821 F.3d at 428; *see also In re Viropharma Inc. Secs. Litig.*, Civil Action No. 12-2714, 2016 WL 312108, at *7 (E.D. Pa. Jan. 25, 2016) ("Adequacy of representation is met by a two-fold showing: that (1) class counsel is competent and qualified to conduct the litigation; and (2) class representatives have no conflicts of interests.")  The Court finds this requirement is met on both fronts.  "Where, as here, settlement precedes class certification, 'collusion, inadequate prosecution and attorney inexperience are the paramount concerns.'" *Rougvie v. Ascena Retail Grp., Inc.*, Civil Action No. 15-724, 2016 WL  4111320, at *12 (E.D. Pa. July 29, 2016) (citation omitted).

As to the class representatives, no conflicts of interests have been identified between Named Plaintiffs and the Settlement Class.  Named Plaintiffs have standing, and Named Plaintiffs and the rest of the Settlement Class all hold a common interest in establishing Defendants' liability for alleged anticompetitive conduct, as they are all indirect purchasers or reimbursers of Remicade.  (*See* Feb. 27, 2023 Hr'g Tr. at 10:4–8.)  *See In re Flonase Antitrust Litig.*, 284 F.R.D. at 218 ("'A class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'  Each class member purchased and/or reimbursed for FP at some point during the Class Period at a supracompetitive price.  Each class member holds a strong common interest in establishing GSK's liability for these alleged overcharges." (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 625–26 (1997))).

Named Plaintiffs have also represented the class capably and diligently.  Named Plaintiffs participated in regular conference calls and Board meetings with Class Counsel "concerning the status and direction of the case, the investigation and filing of the complaints,

discovery, class certification and summary-judgment related issues, and settlement. (Doc. No. 195-12 at ¶ 3; Doc. No. 195-13 at ¶ 3.) Named Plaintiffs also actively participated in extensive discovery. (Doc. No. 195-13 at ¶ 4 ("I and others acting at NEPH's direction . . . searched for and provided information and data in response to discovery requests from Defendants, and prepared for and sat for deposition [sic] on January 20, 2022.") Doc. No. 195-12 at ¶ 4 (same as to Local 295).) *See Wood v. Saroj & Manju Inves. Phila. LLC*, Civil Action No. 19-2820-KSM, 2020 WL 7711409, at *5 (E.D. Pa. Dec. 28, 2020) (finding that the class representative adequately represented the interests of his fellow members where he "provided counsel with the paperwork and information they needed to initiate [the] case and substantiate his claims" and was "'instrumental' in the mediation sessions that led to the settlement agreement").

As to class counsel, the important factors are whether the attorneys "(1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant." *In re Gen. Motors Corp.*, 55 F.3d at 801. The Third Circuit has indicated that courts should consider the non-exhaustive list of factors in Rule 23(g) for appointing counsel in determining the adequacy of representation. *See In re Nat'l Football League Players*, 821 F.3d at 429; *see also Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010). Those factors include counsel's work in the instant class action, experience in handling class actions or other kinds of complex litigation, knowledge of the applicable laws, and resources available for representing the class. Fed. R. Civ. P. 23(g)(1)(A). Additionally, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Under each of the Rule 23(g)(1)(A) factors, Class Counsel—Robbins Geller Rudman & Dowd LLP—is qualified to "fairly and adequately represent the interests of the class." Robbins

Geller has extensive expertise in the antitrust class action context (*see* Doc. No. 195-21) and has zealously pursued and litigated this class action lawsuit. Class Counsel engaged in extensive discovery, "analyzed a large quantity of complex, jargon-laden documents concerning pharmaceutical drug pricing and marketing, [and] secured key admissions in depositions of Defendants' executives." (Doc. No. 195-1 at 34.) Class Counsel also engaged in extensive arms-length negotiations with Defendants' counsel. (*Id.* at 20.)

In sum, the Settlement Class's interests have been advanced by experienced, dedicated counsel, working at arm's length from Defendants. The Court finds Rule 23(a)(4) is satisfied.

## 2. Rule 23(b) Requirements

In addition to meeting the requirements of Rule 23(a), a named plaintiff must also satisfy Rule 23(b)(3), which requires the Court find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

*Predominance.* The key issue under the predominance factor is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Windsor*, 521 U.S. at 623. Third Circuit "precedent provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011) (en banc). The Third Circuit has counseled that courts should be "more inclined to find the predominance test met in the settlement context."[15] *In re Nat'l*

---

[15] To be clear, the fact that all members of the proposed class have an interest in the settlement itself does not help establish predominance. *See Windsor*, 521 U.S. at 622–23. Nonetheless, the fact that Defendants have agreed to settle not just with the Named Plaintiffs, but with thousands of similarly

*Football League Players*, 821 F.3d at 434 (quoting *Sullivan*, 667 F.3d at 304 n.29).  Further, the

Supreme Court has stated that "predominance is a test readily met in certain cases alleging . . .

violations of the antitrust laws."  *Windsor*, 521 U.S. at 625; *see also In re Fasteners Antitrust

Litig.*, 2014 WL 285076, at *7 ("In antitrust cases, the requirement of predominance is often

easily met."); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 263 (E.D. Pa. 2012).

Predominance is satisfied here.  Each Class Member's claim involves similar operative

facts and legal theories.  Plaintiffs allege that Defendants took advantage of Remicade's

dominant market position and suppressed competition, resulting in a common injury to all Class

Members—the inflated price of Remicade—in violation of federal and state antitrust laws and

state consumer protection laws.  *See Sullivan*, 667 F.3d at 300 (finding predominance factor met

where the plaintiffs alleged that "De Beers engaged in anticompetitive conduct by exploiting its"

dominant position in the diamond market to "impose rigid constraints on the sale and resale of []

diamonds," "result[ing] in a common injury as to all class members—inflated diamond prices—

in violation of federal antitrust, consumer protection, or unjust enrichment laws of every state");

*see also In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 377

(E.D. Pa. 2019) ("Here, the allegation is that Comcast engaged in a common course of conduct—

it unlawfully tied the sale of its Premium Cable to the rental of a Comcast Set-Top Box—and

putative Class Members suffered the same injury—the payment of supracompetitive prices for

their Set-Top Boxes.  Accordingly, Plaintiffs satisfy the predominance requirement."); *In re

Fasteners Antitrust Litig.*, 2014 WL 285076, at *7 ("Here, the same operative facts and legal

arguments surrounding Defendants' conduct in conspiring to fix, raise, maintain, or stabilize

prices of fasteners in the United States, apply to each class member.  We are satisfied that

_____

situated indirect purchasers/third-party payors and consumers, is a strong signal of the predominance of
common factual and legal questions among the class members' claims.

questions of law or fact common to class members predominate over any questions affecting only individual members.").  These common issues of law and fact predominate over any individual differences, such as the amount of compensation that each member will be entitled to under the Amended Plan of Allocation and Distribution.

*Superiority*.  The last requirement for certifying a class is that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  When evaluating this requirement, courts consider "the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action."  *In re Nat'l Football League Players*, 821 F.3d at 435 (citing Rule 23(b)(3)(A)–(D)).  Superiority can be satisfied where the settlement prevents "duplicative lawsuits and enables fast processing of a multitude of claims."  *Id.* (quoting *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 382); *see also Sullivan*, 667 F.3d at 312.

The superiority factor weighs in favor of granting final class certification.  No Class Members have opted out of the Settlement, and only one has objected to it.  (*See* Doc. No. 207-11 at ¶ 10 ("The deadline for Settlement Class members to request to be excluded from the settlement was November 30, 2022.  As of today's date, Gilardi has not received any exclusion requests."); Doc. No. 207 at 5 (noting there is only one objector); *see also* Feb. 27, 2023 Hr'g Tr. at 11:4–8 ("Superiority is also easily met here.  No class members have tried to opt out in any way, and this indicates the class treatment is superior, because none of those sophisticated entities have shown any interest in individually controlling the litigation.").)  The lack of opt-outs illustrates the superiority of adjudicating this controversy through a class action.

* * *

Because the requirements of Rules 23(a) and 23(b)(3) are satisfied, the Court certifies the Settlement Class.

### B. *Notice to the Settlement Class Was Adequate*

Having certified the Settlement Class, we must now evaluate the adequacy of notice to the Class Members. *Fein v. Ditech Fin., LLC*, No. 5:16-cv-00660, 2017 WL 4284116, at *6 (E.D. Pa. Sept. 27, 2017). Rule 23(c)(2)(B) requires that the class receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Due process also requires that "notice be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Nat'l Football League Players*, 821 F.3d at 435 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

Notice may be delivered through United States mail, electronically, or other means and must "clearly and concisely state":

(i)    the nature of the action;

(ii)   the definition of the class certified;

(iii)   the claims, issues, or defenses;

(iv)   that a class member may enter an appearance through an attorney if the member so desires;

(v)   that the court will exclude from the class any member who requests exclusion;

(vi)   the time and manner for requesting exclusion; and

(vii)  the binding effect of a class judgment on members under Rule 23(c)(3).

*Id.*

In granting preliminary approval, the Court found that the parties' notice plan satisfied these requirements (Doc. No. 177 at 23–25), and we find no reason to change that conclusion following the plan's execution (Doc. No. 195-1 at 13–14; Doc. No. 218). As noted more extensively above, Gilardi mailed the Postcard Notices to 23,509 TPP entities via USPS and emailed the contents of the Postcard Notice to 1,797 TPP entities with available email addresses. (Doc. No. 195-4 at ¶ 9.) Gilardi also advertised on trade websites and in e-newsletters to reach TPPs and had a press release distributed on PR Newswire. (*Id.* at ¶¶ 13–15.) As for consumers, Gilardi had the Summary Notice published in an issue of *People* magazine in-print and online, had millions of impressions distributed on websites and Facebook that were targeted to adults over 18, and reached out to several organizations and support groups to share the information with their audiences. (*Id.* at ¶¶ 16–18.) In addition, the case website, www.RemicadeSettlement.com, provided the Consumer Notice and TPP Notice. (Doc. No. 195-4 at ¶ 19.)

As for Massachusetts and Illinois, Gilardi mailed 1,237 postcard notices to Illinois-based TPP entities, advertised on the *Chicago Tribune* and *Boston Globe* websites, and had impressions distributed via various websites that were targeted to adults 18 years of age and older in those states. (Doc. No. 207-11.)

During the final approval hearing, Class Counsel stated nearly all TPPs, and about 80% of consumers, were reached through the notice. (*See* Feb. 27, 2023 Hr'g Tr. at 15:12–16 ("They believed that nearly all of the third-party payer class was reached, and 80 percent of the consumer class, which is right in line, you know, with the 79 to 90 percent aim that the judicial council recommends.").)

The Court finds that the notice to Class Members was adequate and constitutes the best

notice practicable under Rule 23(c)(b)(2). *See In re Viropharma Inc. Secs. Litig.*, Civil Action No. 12-2714, 2016 WL 312108, at *5–6 (E.D. Pa. Jan. 25, 2016) (finding that notice met the requirements of Rule 23 where copies of the notice were mailed to potential settlement class members, a summary of the notice was published in Investor's Business Daily, a summary of the Notice was published over PR Newswire, and the notice and all relevant settlement documents were posted on a case-specific website).

### C.  The Settlement Is Fair, Reasonable, and Adequate

Under Rule 23, a court may approve a settlement "only on a finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). District courts have discretion to decide whether to grant final approval to a proposed settlement. *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975). Settlements are entitled to "an initial presumption of fairness" if "the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Gen. Motors Corp.*, 55 F.3d at 785. However, where, as here, the parties seek settlement approval and final class certification simultaneously, the Court must examine the fairness of the settlement agreement "even more scrupulous[ly] than usual." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004).

The Settlement is entitled to an initial presumption of fairness. The parties negotiated the settlement at arm's length. (Doc. No. 195-1 at 12 n.3, 20.) Class Counsel has experience with similar litigation. (*Id.* at 18 n.7.) And, critically, *only one* class member objects to the Settlement.[16] (*See* Doc. Nos. 201, 206, 207.)

Although the Settlement is entitled to an initial presumption of fairness, we must consider

---

[16] As discussed *infra* Section II.D, Gomez's objections lack merit.

the following *Girsh* factors to confirm that the settlement is fair, reasonable and adequate:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks of
> establishing liability; (5) the risk of establishing damages; (6) the
> risk of maintaining the class action through the trial; (7) the ability
> of the defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible
> recovery; and (9) the range of reasonableness of the settlement fund
> to a possible recovery in light of all the attendant risks of litigation.

*See Girsh*, 521 F.2d at 157.  We consider each of these factors in turn.

*Complexity, Expense, and Likely Duration of the Litigation.*  This is a complicated antitrust litigation that has been in the works for the past five years.  (Doc. No. 195-1 at 34; Doc. No. 195-2 at ¶ 32.)  Plaintiffs faced obstacles in terms of "overcoming a challenging motion to dismiss and extensive discovery practice, including massive document discovery and dozens of depositions."  (Doc. No. 195-1 at 34; *see also* Doc. No. 195-2 at ¶ 32.)  As to factual complexity, Plaintiffs' counsel "analyzed a large quantity of complex, jargon-laden documents concerning pharmaceutical drug pricing and marketing."  (*Id.*)  Courts routinely recognize that antitrust actions are particularly complex.  *See, e.g.*, *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 380 (E.D. Pa. 2019) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive.  An antitrust class action is arguably the most complex action to prosecute." (cleaned up)); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 99, 104 (E.D. Pa. 2013) (same).  This first factor weighs in favor of approval.

*Reaction of the Class to the Settlement.*  The Settlement Class reacted very favorably to the Settlement.  No Class Members opted out of the Settlement, and only one Class Member objected.  (Doc. No. 207 at 6.)  This factor weighs heavily in favor of approval.  *See, e.g.*, I*n re Cendent Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors

creates a strong presumption that this factor weighs in favor of the Settlement."); R*emick v. City of Philadelphia*, Civil Action No. 20-1959, 2022 WL 2703601, at *4 (E.D. Pa. July 12, 2022) (finding that the second factor weighed in favor of settlement approval because "[a] low number of objectors compared to the potential number of class members creates a strong presumption in favor of approving the settlement"); *In re Wawa, Inc. Data Security Litig.*, Civil Action No. 16-6019, 2022 WL 1173179, at *5 (E.D. Pa. Apr. 20, 2022) ("The Court finds that the low number of objections and the lack of strong arguments regarding a negative reaction weigh in favor of final approval.").

*Stage of Proceedings and Amount of Discovery Completed.*  This case has spanned five years.  (Doc. No. 195-1 at 21.)  The parties conducted substantial discovery.  (*See id.* at 19.) There is no doubt Class Counsel knew the case well before negotiating the Settlement with Defendants.  (*Id.* at 19–20.)  This factor weighs in favor of approving the Settlement.

*Risks of Establishing Liability and Damages.*  There are risks with establishing liability and damages.  Defendants contest liability and damages.  (*See* Doc. No. 172-4 at 4 ("Defendants contend that the claims and allegations of wrongdoing or liability by the Named Plaintiffs and the Class in the Action are without merit.  Defendants expressly deny all allegations of wrongdoing or liability."); *see also* Doc. No. 195-1 at 21–22; Feb. 27, 2023 Hr'g Tr. at 50:15–18 (defense counsel reiterating that the settlement agreement is not an admission of liability).) Given these risks, both of these factors weigh in favor of approving the Settlement.

*Risks of Maintaining a Class Action Through Trial.*  There are also risks with maintaining a class action through trial.  Were the Settlement rejected, Defendants would hotly contest the propriety of certification.  (*See* Doc. No. 172-4 at 4–5; Doc. No. 195-1 at 21–24.)  Even if the Court were to certify a class, Defendants would have almost certainly appealed, which would

have further extended the litigation.  (Doc. No. 195-1 at 24.)  Given the risks of achieving

certification and maintaining a class throughout trial (and given the likelihood that the fight over

class certification would further delay the resolution of this case), this factor also weighs in favor

of approval.

       *Ability of Defendants to Withstand a Greater Judgment.*  "This factor assesses the ability

of defendants to withstand a greater judgment, and is 'most clearly relevant where a settlement in

a given case is less than would ordinarily be awarded but the defendant's financial circumstances

do not permit a greater settlement.'"  *In re Nat'l Football League Players*, 307 F.R.D. at 394

(quoting *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011)).  "However,

when there is no 'reason to believe that [d]efendants face any financial instability[,] . . . this

factor is largely irrelevant.'"  *Id.*  There is no reason to believe Defendants are financially

unstable, but the fact that it could withstand a larger judgment weighs neither in favor of nor

against approving the Settlement.

       *The Reasonableness of the Settlement in Light of the Best Possible Recovery and All the*

*Attendant Risks of Litigation.*  The Settlement is reasonable in light of the best possible recovery

and attendant risks of litigation.  Defendants will pay the Settlement Class $25,000,000.  As

discussed above, there is no guarantee the Settlement Class would be awarded the maximum

possible recovery.[17]  There are a number of risks attendant with continuing the litigation,

---

[17] On August 1, 2022, Plaintiffs submitted for *in camera* review a letter detailing an expected range of Class-wide potential damages, as well as information regarding what percentage of damages the proposed Settlement represented based on preliminary figures.  (Doc. No. 195-1 at 24; Doc. No. 224.)  Following a telephonic conference on March 15, 2023, the parties agreed that the letter could be filed on the docket. (Doc. No. 224.)  At the outset of the litigation, "Plaintiffs estimated damages to range from approximately $33.6 million to $89.7 million annually, which would be expected to decrease annually with any increase in competitive price pressure in the following years."  (I*d.*)  The letter continued, "Over the course of litigation, with the assistance of expert analysis that was, at settlement, still preliminary, these figures were generally in line with prior expectations."  (*Id.*)  The letter also explains the total potential damages range and what percentage of the $25 million settlement recovery represented of those estimates.  (*Id.*)

including the chance the class would not be certified and obstacles to proving liability and damages.  Given the possibility that the Class would attain less than the settlement amount (and perhaps even nothing), and the likelihood that the Settlement Class would not receive the maximum amount of recovery, the Court finds that the monetary value of the Settlement falls well within the range of reasonableness.

Given the value of the Settlement and the undeniable risks with continuing the litigation, the final two factors both weigh in favor of approval.

\* \* \*

The Settlement is fair, reasonable, and adequate.  It is entitled to a presumption of fairness, and that presumption is supported by the *Girsh* factors, eight of which weigh in favor of approval and one of which is neutral.

### D.  *Gomez's Objections to the Settlement are Overruled*

The Court addresses each of Gomez's objections, as amended,[18] in turn below.[19]

*Objections 1 and 2.*  In Objections 1 and 2, Gomez takes issue with the deadlines set for opting out of the Settlement Class and for filing claim forms.  Namely, Gomez objects to the fact that class members must opt out of the Class or file a claim form prior to final approval of the Settlement.  (*See* Doc. No. 206-1 at 3–4.)  But this is how class actions are commonly structured.

---

The Court agrees that those preliminary figures support a finding that the $25 million settlement is reasonable in light of the best possible recovery.

[18] The Court does not address Objection 14, which Gomez withdrew in his amendments.  (*See* Doc. No. 206-1.)

[19] The Court notes that Gomez did not follow the requirements the Notice delineated for objecting.  *See* https://www.remicadesettlement.com/media/4003442/notice.pdf.  Specifically, Gomez did not provide "documentation sufficient to prove [his] membership in the Settlement Class (such as evidence of [his] Remicade purchases or payments)" nor did he provide "a list of all class action settlements to which [he] and/or [his] counsel have previously objected."  *Id.*  (*See also* Feb. 27, 2023 Hr'g Tr. at 40:3–19.)

*See, e.g.*, generally *Erby v. Allstate Fire & Cas. Ins. Co.*, Civil Action No. 18-4944-KSM, 2022 WL 14103669 (E.D. Pa. Oct. 24, 2022) (reflecting that the opt out and claiming file deadlines occurred prior to final approval); *Stechert v. Travelers Home & Marine Ins. Co.*, Civil Action No. 17-0784-KSM, 2022 WL 2304306 (E.D. Pa. June 27, 2022) (same).  Further, he does not identify any serious fault with this process.[20]  *See In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 998 (N.D. Ohio 2016) ("Andrews also challenges the requirements for opting-out.  For example, Andrews asks (1) Why can't opt-outs file their form online instead of having to mail it in?; and (2) Why are opt-outs asked to provide 'unnecessary' information, such as which particular settlements they want to opt out of, and what foam-products they bought?  It suffices to say, again, there are good answers to these questions and Andrews does not identify any serious faults in the opt-out process.  Indeed, even if the occasional suggestion Andrews offers is reasonable, he does not show the existing format is *unreasonable*.  And, so long as the settlement agreements and the processes used to effectuate them are 'fair, reasonable, and adequate,' this Court has not reason to disapprove them." (citation omitted)).  Accordingly, the Court overrules Gomez's objections as to the timing of opting out and filing claims.[21]

*Objections 3 and 4.*  In amended Objection 3, Gomez argues that it is unclear how "a person will be paid if they bought the item from a repealer state but presently live outside of the United States," (Doc. No. 206-1 at 4), and in Objection 4, Gomez claims it is "unclear how the

---

[20] Gomez's contention that a class member cannot choose whether to opt out or file a claim form until final approval undermines principles of finality and ignores the analysis a court must undergo in determining whether to grant final approval of a settlement.  For example, a court would have much difficulty evaluating whether a class has responded favorably to the settlement if the deadline for opting out or filing a claim had not already passed.

[21] The Court also notes that neither Class Counsel nor the Claims Administrator received any complaints from Class Members about needing more time to file their claims.  (*See* Feb. 27, 2023 Hr'g Tr. at 42:16–19, 43:9–10.)

claims are calculated based on state" (*id.*).  A plain reading of the Amended Plan of Allocation and Distribution shows that these are meritless challenges.  (*See* Doc. No. 201-1 at ¶ 5 (The Amended Plan of Allocation, which states:  "The Recognized Claims of Settlement Class Members that have indirectly purchased or provided reimbursement for some or all of the purchase price of Remicade and that reside or have their principal place of business in one of the Selected States shall be calculated entirely and solely under ¶ 5(a), the Recognized Claims of Settlement Class Members that have indirectly purchased or provided reimbursement for some or all of the purchase price of Remicade in one or more of the Selected States, but do not reside or have their principal place of business in one of the Selected States shall be calculated entirely and solely under ¶ 5(b), and the Recognized Claims of Settlement Class Members that have not indirectly purchased or provided reimbursement for some or all of the purchase price of Remicade in one of the Selected States, and neither reside nor have their principal place of business in one of the Selected States shall be calculated entirely and solely under ¶ 5(c)."); *see also* Doc. No. 207 at 11 ("The Amended Plan of Allocation, [sic] explains that . . . Class Members who do not reside or have a principal place of business in a Selected State but who did indirectly purchase Remicade in a Selected State will be in a second category.  A Class Member who does not reside or have a principal place of business in a Selected State and did not purchase Remicade in a Selected State will be in a third category.  Assuming Mr. Gomez accurately described his purchases in Florida and assuming the purchases were made during the Class Period, his claim would likely have fallen under the second category.").)

*Objection 5*.  Gomez challenges "the requirement on the claim form that a person list their Social Security Number."  (Doc. No. 206-1 at 5.)  But this is largely a standard practice. *See In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d at 998 (overruling objections and

finding that none of the issues the objector raised, including his question about the social security

number requirement, "suggest[ed] the design of the claim forms or the claims administration

process carrie[d] any meaningful or serious faults"); *see also Schulte v. Fifth Third Bank*, 805 F.

Supp. 2d 560, 568, 601 (N.D. Ill. July 29, 2011) (granting final approval of settlement where the

claim form required class members to provide their social security number or tax identification

number).  And, as at least one court has recognized, there is a "good answer" as to why claimants

have to provide their social security number during the claims process and on claim forms—"to

prevent fraud and comply with potential tax requirements."[22]  *In re Polyurethane Foam Antitrust

Litig.*, 168 F. Supp. 3d at 998.  Thus, the Court also rejects Objection 5.[23]

*Objection 6*.  In Objection 6, Gomez takes issue with the terms of Gilardi's privacy

policy, arguing that they are not sufficiently specific to this case.  (*See* Doc. No. 206-1 at 5

("[T]hese terms are not specific to the case, do not discuss how the documents submitted will be

used, and contain no discussion of the sensitive medical documentation that is involved in this

case.  There exists no discussion of HIPPA or the rights of a claimant to privacy."); *see also id.*

at 5 n.5 ("The original objections stated that there was no privacy policy.  The general website

privacy policy cited by Class Counsel does not discuss the data submitted by a claimant in this

case, chilling submissions.").)

In response to this objection, Plaintiffs provided a declaration from Gilardi's Director of

---

[22] As Class Counsel noted during the final approval hearing, Gilardi has strict data protections in place, which would protect sensitive information such as social security numbers (*see* Feb. 27, 2023 Hr'g Tr. at 44:14–15), and to the extent Gomez did want to include his social security number, he could have asked the Class Administrator for an exception (*see id.* at 44:12–14 ("He could have probably asked to not use his social security number.  There is no evidence he did.")).

[23] Gommez relies upon 5 U.S.C. § 552(a) for in support of his argument.  But this statute involves agencies and is inapplicable here.  (*See* Doc. No. 206-1 at 5.)

Class Action Services, Derek Smith.  (*See* Doc. No. 207-11 at ¶¶ 12–14.)  Gilardi's privacy policy is publicly available on its website and the Remicade Settlement website.  (*Id.* at ¶ 12.)  Gilardi "maintains extensive data security and privacy safeguards in its operations, including when serving as a class action settlement claims administrator."  (*Id.* at ¶ 13.)  Gilardi uses "settlement-related data only as necessary to effectuate its settlement administrative service consistent with federal and state law."  (*Id.*)  Gilardi does not perform any procedures on personal data provided or obtained as part of its services as Claims Administrator, nor does it use "information provided by Class Members for any purpose other than Settlement Class administration."  (*Id.*; *see also id.* ("Specifically, "no such information is used, disseminated, or disclosed by or to any other person or entity for any other purpose.").)  Gilardi also maintains controls to comply with array of privacy regulations, including HIPPA.  (*Id.* at ¶ 14.)  These controls are designed to ensure that information is available only to authorized employees, class member data is segregated and protected via encryption, private information is not modified or disclosed without modification, among other things.  (*Id.*)  Given these privacy safeguards, the Court finds that Gomez's objection is unfounded.

*Objection 7.*  Next, Gomez argues that the settlement amount is unreasonable in light of Remicade's annual sales.  (*See* Doc. No. 206-1 at 5 ("The annual sales of Remicade are over $4,000,000 (4 billion dollars) and this settlement spans six years, yet the payment is only $25,000,000.  That is about $1 per $1000 in sales of the product, but the antitrust damages was [sic] much more.  Therefore, the settlement appears unreasonable and meant solely to enrich legal counsel.").)  As Plaintiffs point out, however, the "total sales figure [is] not the proper measure of damages" (Doc. No. 207 at 12; *see also* Feb. 27, 2023 Hr'g Tr. at 45:6–10), and the $25 million settlement amount is congruent with the settlement amounts in other indirect

purchaser actions in this Circuit and beyond (*see* Doc. No. 207 at 12; Doc. No. 172-2; Feb. 27,

2023 Hr'g Tr. at 45:11–15).  For the reasons discussed above in Section II.C, and in light of the

risks attendant with pursuing this class action further into class certification, summary judgment,

and trial, the Court reiterates that the $25 settlement amount is reasonable.

*Objection 8*. Gomez argues that the requirement that class members provide

documentation to the extent they file a claim for over $1,000 amounts to a claim limitation and

"arbitrary and capricious."  (Doc. No. 206-1 at 5–6.)  The Court disagrees.  Courts have

overruled objections to settlements where the objector challenges a proof of purchase

requirement, citing fraud concerns.[24]  *See, e.g.*, *Yaeger v. Subaru of Am., Inc.*, No. 1:14-cv-4490

(JBS-KMW), 2016 WL 4541861, at *13 (D.N.J. Aug. 31, 2016) ("[S]everal objectors oppose the

requirement for documentation of past repairs for which reimbursement is sought. . . . The

settlement's requirement for documentation 'Proof of Purchase must be submitted,' is reasonable

to prevent fraudulent claims. . . . The proof can be 'anything that can be used to corroborate that

an individual paid for a repair.'  This is a reasonable requirement for documentation triggering

compensation, and this objection is overruled." (citations omitted)); *cf. Rougvie v. Ascena Retail

Grp., Inc.*, Civil Action No. 15-724, 2016 WL 4111320, at *15 (E.D. Pa. July 29, 2016)

(overruling objection as to the adequacy of class counsel's representation to those without proof

of purchase, noting "It is a patently difficult to award damages to cash purchasers without proof

of purchase, as these claims would be ripe for abuse.  Given a significant potential for fraud in

submitting cash claims by affidavit, we find Class Counsel addressed the subclass of cash

---

[24] As to fraud concerns, Class Counsel explained that based on her review of the claims, which "has been somewhat extensive," "it seems . . . that the $1,000 [threshold] has been a dividing line in terms of claims that, at least to [her] eye, look a little bit fishy, and those that seem plainly to be from people who bought the drug."  (Feb. 27, 2023 Hr'g Tr. at 20:2–7.)

purchasers in a fair manner").

Documentation is defined in the Amended Plan as "itemized receipts, cancelled checks, invoices, statements, or other business or transaction records documenting payment for purchases or reimbursement paid for Remicade during the settlement Class Period." (Doc. No. 202-1 at ¶ 7.)  Class Counsel has explained this list is not exhaustive.  (*See* Feb. 28, 2023 Ltr. to Ct.  *Cf.* Feb. 27, 2023 Hr'g at 18:17–19:4 (explaining that the Class Administrator has discretion as to whether to accept a claim and could find other proof sufficient and "[f]or example, somebody could get note from their doctor saying yes, this person did 12 rounds of Remicade during the class period" and that "could be sufficient" proof); *id.* at 19:11–13 ("[T]here's a list, but they are not – there is no hard and fast this is what we must require from you.").)  Class Counsel has also explained that the drug costs $5,000, which played into their decision to require documentation for claims above $1,000.  (*See id.* at 17:14–24 ("In our view, if somebody is outlaying $5,000, we think that it is likely that they would keep receipts or be able to get receipts if it was something quite that large.  So it's not an arbitrary number. . . . [I]t is our understanding that for the most part, the this drug cost[s] about $5,000."), 18:6–11.)  Significantly, this is an infusion drug, meaning it is not self-administered; rather, the class members would have had to go to a hospital or a clinic for the infusion.  (*Id.* at 50:22–51:10.)  Therefore, not only would there be records of the infusion from the class member's prescribing physician, but also from the hospital or clinic at which it was administered.  (*Id.*)

Finally, any claims for less than $1,000 do not require documentation, unless "the Settlement Administrator disputes a material fact concerning the Claim Form."  (Doc. No. 202-1 at ¶ 6.)

The Court concludes that the $1,000 threshold is reasonable, particularly given the cost of

the drug, the non-exhaustive ways in which a class member can show documentation, and the fact that the drug is an infusion drug and therefore there must be clinic and hospital records of a class member receiving the drug.[25]

*Objection 9.*  Gomez argues that that the settlement should include a requirement that checks are valid for 180 days.  (Doc. No. 206-1 at 6.)  In their reply, "Plaintiffs agree that 180 days is a reasonable time period for any settlement check to remain valid."  (Doc. No. 207 at 10; *see also id.* (noting that this would be consistent with other methods of distribution, where the settlement contemplates that payment would be valid for 180 days); Doc. No. 202-1 at ¶ 10 ("Authorized Claimants choosing Zelle, PayPal or Venmo shall be provided 180 days from issuance to take custody of the funds.").)

*Objection 10.*  Gomez makes an objection about "unclaimed property."  (Doc. No. 206-1 at 6.)  He "object[s] to the claims administrator not properly administering uncashed checks or unclaimed funds through ordinary unclaimed property programs as required by the laws of almost every state."  (*Id.*; *see also id.* (stating that unclaimed checks "are to be turned over to state unclaimed property administrators, not 'redistributed' or given for *cy pres* or for attorney fees").)  Gomez cites no support for his contention that the class action administrator will not

---

[25] In making this determination, the Court notes that this case is distinguishable from the Third Circuit's decision *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013).  There, the Third Circuit remanded the case back to the district court to reconsider the fairness of the settlement where the settlement required a valid proof of purchase and the claimants without a valid proof of purchase would only receive a $5 payout.  *Id.* at 174–76. As a result of the proof of purchase requirement, only a small percent of the settlement would actually be distributed to class members, with the remainder going to cy pres recipients.  *Id.*  The Court noted that on remand, the parties may wish to alter the terms of the settlement by increasing the $5 payout or by lowering the evidentiary bar in order to receive a higher award.  *Id.*  Here, the threshold is much higher (claimants without a valid proof of purchase may still file a claim for under $1,000) and there is no evidence that the majority of the settlement would go to *cy pres* recipients.  To the contrary, the TPP claims submitted are "large and significant and from well-known healthcare entities and health and welfare funds, like Local 295, that are quite large."  (Feb. 27, 2023 Hr'g Tr. at 38:23–39:8.)  Thus, a large percentage of the settlement will directly be distributed to class members.  (*See id.*)

properly administer unclaimed funds or uncashed checks.  The Court finds this objection baseless.

The Court also notes that the settlement agreement provides that excess funds after distribution (and additional re-distributions) "will be contributed to the Crohn's & Colitis Foundation, or one or more other non-sectarian, not-for-profit, 501(c)(3) organization(s) to be determined by Class Counsel and approved by the Court."  (Doc. No. 202-1 at ¶ 10; *see also* Doc. No. 207 at 9 n.7 ("He also makes an objection regarding unclaimed property.  Here, there is a specific *cy pres* recipient (the Crohn's & Colitis Foundation, or one or more other non-sectarian, not-for-profit, 501(c)(3) organization(s) approved by the Court) should there be funds remaining after distribution.").)  To the extent that Gomez argues that the court may not finally approve a settlement that includes a *cy pres* component for excess settlement funds, he is mistaken.[26]  *See In re Baby Prods. Antitrust Litig.*, 708 F.3d at 172–73 ("We join other courts of appeals in holding that a district court does not abuse its discretion by approving a class action

---

[26] The Court is mindful that "direct distributions to the class are preferred over *cy pres* distributions," *In re Baby Prods. Antitrust Litig.*, 708 F.3d at 173, and notes that here the Amended Plan of Allocation provides for a *cy pres* distribution only after additional re-distributions have been made to Class Members (so long as it is cost effective to do so), which in turn occurs only after a certain amount of time has passed (which ensure that Class Members have received their initial distributions).  (*See* Doc. No. 202-1 at ¶ 10 ("After the initial Distribution of the Net Settlement Fund, to the extent any monies remain in the Net Settlement Fund after the initial Distribution, if Class Counsel, in consultation with the Settlement Administrator, determines that it is cost-effective to do so, the Settlement Administrator, no less than 7 months after the initial Distribution, will conduct a redistribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such re-distribution, to the Authorized Claimants who have received initial distributions and would receive at least $10.00 from such re-distribution.  Additional re-distributions to Authorized Claimants who have received re-distributions and who would receive at least $10.00 on such additional re-distributions may occur thereafter if Class Counsel, in consultation with the Settlement Administrator, determines that additional re-distributions, after the deduction of any additional fees and expenses incurred in administering the Settlement, including for such re-distributions, would be cost-effective.  At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance will be contributed to the Crohn's & Colitis Foundation, or one or more other non-sectarian, not-for-profit, 501(c)(3) organization(s) to be determined by Class Counsel and approved by the Court.").)

settlement agreement that includes a *cy pres* component directing the distribution of excess settlement funds to a third party to be used for a purpose related to the class injury. . . . That approval is warranted when the court finds that the settlement, taken as a whole, is fair, reasonable, and adequate from the perspective of the class.  Inclusion of a *cy pres* provision by itself does not render a settlement unfair, unreasonable, or inadequate." (cleaned up)).

*Objection 11.* Next, Gomez lodges an objection as to how payments will be made and alleges there are discrepancies between the Plan of Distribution, claims website, and claim form. (Doc. No. 206-1 at 6.)  He also argues that checks are "not feasible because [when] the claims administrators mail them to foreign addresses by regular mail that takes between six weeks and three months to receive" and that "Paypal and Venmo . . . are not banks, have burdensome requirements, and often block payments."  (*Id.*)  As to the mailing of settlement checks, the Court notes that the Amended Plan of Allocation contemplates electronic distribution.  (*See* Doc. No. 202-1 at ¶ 10 ("Settlement Benefits shall be paid via Zelle, PayPal, Venmo, or other direct deposit via ACH, as selected by the Authorized Claimant when submitting a claim.").)  Further, Gomez does not cite any support for his assertion that it may take up to three months for a Class Member to receive their check if they have a foreign address.  To the contrary, the USPS website shows that the lowest mail class for international mail (first class mail international (letters)) has a delivery speed of 6 to 20 business days.  *See* USPS Delivery Times, USPS, https://www.stamps.com/usps/usps-delivery-times/ (last visited Feb. 15, 2023).  To the extent Gomez rests his objection on mailing delays, the Court finds this is not a valid objection. Gomez's objection that Paypal and Venmo "often block payments" is also unsupported.

Further, at the final approval hearing, Class Counsel clarified that the fact that the claim form did not ask for a Zelle e-mail address or bank routing account number for ACH distribution

does not mean that those methods of distribution (e.g., Zelle and ACH) are unavailable or off limits; rather, at this early stage, the administrator does not seek specifics. (Feb. 27, 2023 Hr'g Tr. at 36:11–37:3.)

*Objection 12*. Gomez claims there is no easy way for a Class Member to change their address or preferred payment method. (Doc. No. 206-1 at 6–7.) This objection lacks merit. Although the website does not have a change of address form *per se*,[27] *see* https://www.remicadesettlement.com/, the website provides three different means by which to contact the Settlement Administrator with any questions or concerns, which would reasonably include requests on updating an address.[28] *See* https://www.remicadesettlement.com/contact-us.aspx ("Contact Us" page of the settlement website, providing Gilardi's mailing address, email address, and a toll free phone number). (*See also* Doc. No. 207 at 8 ("The website provides three methods to contact the claims administrator including by mail, email, and telephone. . . . Through any of these avenues, a Class Member is able to update their mailing address, if necessary.").)

*Objection 13*. Gomez claims that PayPal, Venmo, and Zelle "sometimes reject payments" and that claims administrators "do[] nothing" to notify claimants" when this happens. (Doc. No. 206-1 at 7.) Gomez cites no support for this assertion (*see id.*), and the Court finds it entirely

---

[27] Gomez claims that Class Counsel refused to add a change of address form. (Doc. No. 206-1 at 7 ("In this case, Class Counsel's refusal to make a simple form has no rational basis other than laziness and a refusal to be flexible and improve their hectic, unclear website.").) Class Counsel states they did not refuse. (Doc. No. 207 at 8 ("Contrary to his assertion, Counsel never 'refused' to add a form for changes of address (although no such form is required).").)

[28] In his amended objection, Gomez writes, "While Class Counsel aver that the claimant can contact the claims administrator, this type of requirement discourages contact." (Doc. No. 206-1 at 7.) To the extent Gomez means a change of address form on the website would "discourage contact" between Gilardi and Class Members, Gomez fails to show why such contact needs to be discouraged, or that there would be so many change of address requests as to overwhelm the administrator. The Court finds it unnecessary to eradicate contact between the Gilardi, the administrator, and class members.

theoretical at this point.  The mere fact that something could potentially happen in the claims administration process does not mean it will happen, or that it is even likely to happen.  The Court overrules this objection as lacking in support and merit.

*Objection 15*. Next, Gomez objects to the amount of expenses, arguing that $2,288,388.90 in expenses appears quite excessive where the settlement is only for $25 million settlement.  (Doc. No. 206-1 at 7.)  He also objects on the basis that he is unable to locate a breakdown of the expenses.[29]  (*Id.*)  For the reasons discussed *infra* Section III, the Court finds the expenses, while high, to still be reasonable and overrules this objection.

*Objection 16*. Gomez objects to the attorneys' fees Class Counsel seeks, arguing that it "appears to be a windfall" and that the hours are "bloat[ed]."  (Doc. No. 206-1 at 7.)  For the reasons discussed *infra* Section III, the Court finds the attorneys' fees to be reasonable and overrules this objection.

*Objection 17*. Gomez objects that the notices did not "provide[] any real information" about the amount of attorneys' fees, how much claimants would receive, or the potential number of claimants.  (Doc. No. 206-1 at 7–8.)  This objection also lacks merit.  First, the notice on the website makes clear that "Class Counsel will ask the Court to award attorneys' fees in an amount not to exceed one-third of the Settlement Fund."  *See* https://www.remicadesettlement.com/media/4003442/notice.pdf at 1.  Given that the notice also states that the Settlement Fund is $25 million, *see id.*, it can plainly be deduced that the amount of attorneys' fees sought will be no greater than approximately $8.3 million.  Further, Plaintiffs'

---

[29] Gomez is mistaken.  Plaintiffs' motion for attorneys' fees and expenses, which includes the categories for which expenses are sought and affidavits breaking down the various expenses, is publicly available on the Court's docket (*see* Doc. No. 195) as well as the settlement website, *see* https://www.remicadesettlement.com/case-documents.aspx.

motion for attorneys' fees, which includes a precise breakdown of attorneys' fees sought, is

publicly available on the Court's docket (*see* Doc. No. 195) as well as the settlement website, *see*

https://www.remicadesettlement.com/case-documents.aspx.  (*See also* Doc. No. 207 ("The notice

explains the maximum amount of fees that could be sought and the settlement website contains

declarations from Plaintiffs' counsel explaining and detailing the work done in this case.").)

Second, although the notice does not include precise amounts that claimants may receive (which

is impossible to do prior to processing all claim forms), it does clearly explain how each Class

Member's payment will be determined and provides an equation to that effect.  *See*

https://www.remicadesettlement.com/media/4003442/notice.pdf at 2.  To the extent that Gomez

complains that the notice does not state the potential number of claimants, the Court finds that

objection meritless, as the administrator would not have a precise estimate available before the

claims process began and Plaintiffs stated in their motion for preliminary approval (which is

available on the settlement website) that the class includes thousands of consumers and TPPs.[30]

 *Objection 18*. Gomez objects to the requirement that class members filed objections by

mail, arguing it is too burdensome.  (Doc. No. 206-1 at 8.)  The Court does not find the mailing

requirement burdensome and overrules this objection.  *See McDermid v. Inovio Pharma., Inc.*,

Civil Action No. 20-01402, 2023 WL 227355, at *10 (E.D. Pa. Jan. 18, 2023) ("Green claims

that the objection procedures were overly burdensome . . . he complains that the objectors were

required to mail their objections and could use the PACER electronic filing system . . . Each of

---

[30] For the same reasons, it would have been impossible to inform Class Members at this point (or earlier)
the amount of money each claimant will receive.  (*See* Feb. 27, 2023 Hr'g Tr. at 47:25–48:8 ("We can't
yet know the amounts that class members will receive . . . There's multiple inputs into that math problem,
right?  You have to say you said you lost this much money, we had 5,000 claims and divided by the pot of
money that's there.  So we were unable to determine that.  We have to look at where do they fit under the
three-part allocation standard, et cetera.").)

these objections is frivolous. . . . As a specific example of an overly burdensome procedure, Green cites the requirement that objectors mail their objections instead of using PACER.  Using the postal system does not burden potential objectors."); *Wright v. Nationstar Mortgage LLC*, No. 14 C 10457, 2016 WL 4505169, at *13 (N.D. Ill. Aug. 29, 2016) ("Youngblood also contends that the exclusion process was burdensome because requests had to be submitted by mail rather than through the website.  But the opt-out requirements were minimal: the request had to be signed, and include the individual's name, address, telephone number, case caption, and a statement that the individual is a class member who wishes to opt-out.  Gathering these documents and paying for postage requires minimal time and financial burden, and courts have approved even more cumbersome requirements, including submitting proof of class membership.").

*Objection 19*. Gomez objects that there was no waiver of *pro hac vice* requirements and fees.  (Doc. No. 206-1 at 8.)

The Court notes that *pro hac vice* requirements in this District are set by the Local Rules of Civil Procedure.  Under Local Rule 83.5.2, "[a]n attorney who is not a member of the bar of this Court shall not actively participate in the conduct of any trial or pre-trial or post-trial proceeding before this Court unless, upon motion of a member of the bar of this Court containing a verified application, leave to do so shall have been granted.  A fee established by this court shall be assessed for all such applications.  No admission shall be effective until such time as the fee has been paid[.]"  E.D. Pa. Local Civ. R. 85.3.2.

Gomez claims that in this type of nationwide case, the *pro hac vice* requirements are not appropriate, since the fee an attorney must pay to proceed *pro hac vice* could exceed the payout a class member receives on their claim.  (*See id.* at 8 ("[T]his Court should have waived the *pro*

43

*hac vice* requirements for class members to have attorneys appear on their behalf and file objections.  When I called attorneys, some were willing to file my objections for me, but stated there is a $200 *pro hac vice* fee which simply is not appropriate in this type of nationwide case. The fee for *pro hac vice* probably exceeds what I would receive through my claim.").)  Gomez does not cite any authority for his position that the attorney *pro hac vice* requirements should be waived, nor does he specify the basis on which he is challenging the requirements (i.e., that they are unconstitutional).  And Gomez fails to even argue that he or his attorney (or anyone else) ever sought to have the *pro hac vice* requirements waived in this case.  As such, the Court is unpersuaded by the merit of this objection.

* * *

In sum, the Court finds that the Settlement is fair, reasonable, and adequate, overrules Gomez's objections, and approves the Settlement.

## III.   Attorneys' Fees, Costs, and Service Awards

Class Counsel requests the Court award attorneys' fees of $7 million and costs of $2,288,388.90, and Plaintiffs request the Court grant each Class Representative a service award. (Doc. No. 195-1 at 30–39, Doc. No. 195-2 at ¶¶ 38, 40, 47.)  We consider each request in turn.

### A.   *Attorneys' Fees*

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h). Attorneys' fees may be calculated using either the percentage-of-recovery method or the lodestar method.  *See Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 496 (3d Cir. 2017).  Where, as here, the settlement funds come from a common fund, courts generally evaluate the attorneys' fees' reasonableness using the percentage-of-recovery method, with a lodestar crosscheck.  *Id.*; *see*

*also Glaberson v. Comcast Corp.*, Civil Action No. 03-6604, 2015 WL 5582251, at *11 (E.D. Pa. Sept. 22, 2016) ("The Third Circuit favors the percentage-of-recovery method of calculating fee awards in common fund cases.  Courts within the Third Circuit and elsewhere routinely use this method in antitrust class actions.") (collecting cases)).

### 1.   Percentage-of-Recovery Method

"The percentage-of-recovery approach compares the amount of attorneys' fees sought to the total size of the fund."  *Id.*  Courts consider the following factors in assessing the reasonableness of a request for attorneys' fees:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by counsel; and (7) awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).  Courts also generally consider three additional factors:

> (8) [T]he value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drug*, 582 F.3d 524, 541 (3d Cir. 2009) (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 338 (3d Cir. 1998)).

Class Counsel requests $7 million in attorneys' fees, representing approximately 28% of the monetary distribution to the Settlement Class.  (Doc. No. 195-1 at 30.)  Each of the *Gunter/Prudential* factors supports a finding that the requested fees are reasonable.

*Size of the Fund Created and Number of Beneficiaries.* "The first *Gunter* factor considers

the fee request in comparison to the size of the fund created and the number of class members to be benefited." *Harshbarger v. Penn Mutual Life Ins. Co.*, Civil Action No. 12-6172, 2017 WL 6525783, at *3 (E.D. Pa. Dec. 20, 2017) (cleaned up).  Here, the Settlement Fund is $25,00,000. This is a sizeable fund, which will benefit a large class likely consisting of thousands of TPPs and consumers.  (*See* Doc. No. 195-1 at 32; *see also* Doc. No. 207-11 at ¶ 9 (showing that over 160,000 claims were filed as of January 9, 2023).)  This factor supports the award of the requested fees.

     *Presence or Absence of Objections.*  As noted above, the Notice alerted the Settlement Class that Class Counsel would request attorneys' fees and expenses not to exceed one-third of the Settlement Fund.  Only one Class Member, Gomez, has objected to the Settlement, including to the carveout for attorneys' fees.  (*See* Doc. No. 206-1 at 7.)  This factor also weighs in favor of approval.  *See In re AremisSoft Corp. Secs. Litig.*, 210 F.R.D. 109, 131 (D.N.J. 2002) (holding that the "reaction of the Class confirm[ed] the reasonableness of the requested fee" where "only one member of the Class [] objected to Plaintiffs' Counsel's request for an award of attorney's fees or reimbursement of expenses" and the objection was "vague and conclusory"); *see also In re Schering-Plough Corp. Enhance Secs. Litig.*, Civil Action Nos. 08-397 (DMC)(JAD), 08-2177 (DMC)(JAD), 2013 WL 5505744, at *25 (D.N.J. Oct. 1, 2013) (finding that the "overwhelming positive reaction [of the class] . . . strongly support[ed] approval of the requested fee" where the court only received a single objection to the fee application).  *Cf. In re Veritas Software Corp. Secs. Litig.*, 396 F. App'x 815, 819 n.2 (3d Cir. 2010) (affirming approval of fee award of 30% and "not[ing] that, while certainly not dispositive, not a single other member out of the hundreds of thousands of known class members in this litigation objected to the award of attorneys' fees").

*Skill and Efficiency of Attorneys Involved.*  Class Counsel is skilled, efficient, and vigorously litigated this matter.  In preliminarily approving the Settlement, the Court found the law firm Robbins Geller Rudman & Dowd competent to serve as Class Counsel (*see* Doc. No. 177 at 15–16), and nothing has changed to undermine the Court's confidence in their ability.

In their motion, Class Counsel notes that they "worked with a group of other counsel appearing in the Action, 'Plaintiff's counsel[.]'" (Doc. No. 195-1 at 33.)  These firms include Freedman Hollander & Goldberg, PA, Gustafson Gluek PLLC, and Miller Shah, LLP.[31]  (Doc. No. 195-2 at n.3.)  As with Robbins Geller, these firms and their attorneys have experience litigating similar complex antitrust class actions.  (*See* Doc. No. 195-27 (Freedman Boyd Hollander Goldberg Urias & Ward P.A. resume, which shows that David A. Freedman's practice "includes significant class action litigation across the country, principally involving antitrust, securities, and contract matters"); Feb. 27, 2023 Hr'g Tr. at 27:8–17 (representing that Joe Goldberg of the Boyd Hollander firm is "one of the leading antitrust authorities, particularly related to expert issues" and has written textbooks regarding antitrust damages and expert issues); Doc. No. 195-31 (Gustafson Gluek resume, which shows that the firm specializes in "complex litigation" and was ranked as one of the Top 25 Lead Counsel in antitrust complaints in the 2020 Antitrust Annual Report and that Michelle Looby is Co-Chair of the firm's antitrust litigation team and has served as co-lead counsel in numerous class actions); Doc. No. 195-37 (Miller Shah resume, which states that its lawyers "have successfully represented plaintiffs and defendants in major civil antitrust matters throughout the United States" and that the firm has

---

[31] Freedman Hollander & Goldberg, P.A. is counsel of record for Named Plaintiff The Welfare Fund of Plumbers Local Union No. 200, and Gustafson Gluek PLLC is counsel of record for Named Plaintiff Local 295 IBT Employer Group Welfare Fund.  (*See* Doc. No. 195-22 at ¶ 2; Doc. No. 195-28 at ¶ 2.) Miller Shah, LLC is Liaison counsel of record for Plaintiffs.  (Doc. No. 195-32 at ¶ 2; *see also* Doc. No. 50 at 1–2 (January 23, 2018 Order appointing Miller Shah Liaison Counsel).)

been appointed lead counsel in over 75 cases in antitrust, competition, consumer protection and trade regulation cases).)  Alexandra Bernay of Robbins Geller oversaw the group to "ensure that work assignments were not duplicative and that resources were efficiently allocated."  (Doc. No. 195-2 at ¶ 38.)

Defendants were likewise represented by experienced counsel from high-quality and well-regarded law firms Ballard Spahr LLP, Patterson Belknap Webb & Tyler LLP, and Covington Burlington LLP.  (Doc. No. 195-2 at ¶ 44.)

The attorneys representing both parties are well-credentialed, highly qualified, and have years of experience litigating similar matters, so this factor weighs in favor of finding the requested fees reasonable.

*Complexity and Duration of Litigation.*  As discussed above, Class Counsel have been preparing for and litigating this case for five years.  (Doc. No. 195-2 at ¶ 32.)  They have investigated claims against Defendants, briefed a motion to dismiss, engaged in years of complex document and written discovery, and "deposed dozens of party and non-party witnesses."  (*Id.* at ¶¶ 32–33; *see also id.* at ¶ 10 (explaining that they have retained experts, reviewed and analyzed approximately 18 million party and non-party documents, took and defended 32 depositions, and underwent extensive motion practice).)  And courts acknowledge that antitrust class actions are among the most complex to litigate.  *See*, *e.g.*, *In re Flonase Antitrust Litig.*, 291 F.R.D. at 99, 104; *see also In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d at 1011 ("Antitrust class actions are inherently complex.  The legal and factual issues are complicated and highly uncertain in outcome.").  Given the length and complexity of this litigation, this factor weighs in favor of approving the fee request.

*Risk of Nonpayment.*  Class Counsel undertook this case on a contingent basis.  (Doc. No.

195-2 at ¶ 37.)  "Courts routinely recognize the risk created by undertaking an action on a contingency fee basis militates in favor of approval."  *Whiteley v. Zynerba Pharms., Inc.*, CIVIL ACTION NO. 19-4959, 2021 WL 4206696, at *12 (E.D. Pa. Sept. 16, 2021) (quoting *In re Schering-Plough Corp. Enhance ERISA Litig.*, Civil Action No. 08–1432 (DMC)(JAD), 2012 WL 1964451, at *7 (D.N.J. May 31, 2012)).  Class Counsel have worked on this litigation for five years but have not been paid a cent to date.  (*See* Doc. No. 195-2 at ¶ 37.)  They took the risk they would never be able to recoup fees for any of their efforts, so this factor weighs in favor of awarding the fees requested.

Time Devoted by Class Counsel.  Altogether, Class Counsel, together with Plaintiffs' Counsel, have devoted over 23,600 hours of attorney time to this litigation.  (*See* Doc. No. 195-2 at ¶ 38 (showing that Class Counsel billed 20,380.80 hours and that together with Plaintiffs' Counsel, they billed a total of 23,698.55 hours).)  As noted above, this is a complex antitrust litigation that involved lengthy discovery.  The amount of time Class Counsel put into this litigation also weighs in favor of approving the fee request.

Awards in Similar Cases.  "Courts within the Third Circuit often award fees of 25% to 33% of the recovery."  *In re Insurance Brokerage Antitrust Litig.*, 297 F.R.D. 136, 155 (D.N.J. 2013) (cleaned up); *see also In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. at 388 ("In this District, fee awards generally range between nineteen and forty-five percent of the common fund.").  "A one-third fee award is *standard in complex antitrust cases*."  *In re Flonase Antitrust Litig.*, 291 F.R.D. at 104 (emphasis added).  The fees Class Counsel have requested represent roughly 28% of the distribution to the Settlement Class, which is less than the one-third usually granted in complex antitrust cases and less than the amount Class Counsel were entitled to seek under the Settlement and pursuant to the Notice.  Courts regularly approve

fee awards around this size. *See, e.g.*, *In re Flonase Antitrust Litig.*, 291 F.R.D. at 103–04 (granting a one-third fee award where there was a $35 million settlement fund); *In re Insurance Brokerage Antitrust Litig.*, 297 F.R.D. at 155 (approving award of 33% of recovery in common fund antitrust action). *Cf. In re Veritas Software Corp. Secs. Litig.*, 396 F. App'x at 818 (affirming fee award of 30%, noting that the "District Court took into account that class counsel spent four years, and thousands of hours of attorneys' labor, litigating [the] case"). This factor weighs in favor of approval as well.

*Value of Benefits Attributable to Class Counsel's Efforts.*[32] There is no evidence that that class counsel was assisted by governmental investigation,[33] so this factor weighs in favor of awarding the fees requested. *See In re Flonase Antitrust Litig.*, 291 F.R.D. at 104–05 (finding the factor weighed in favor of approval where class counsel was not assisted by a government investigation).

*Percentage that Would Have Been Awarded in Private Contingency Arrangement.* Class Counsel requests fees that represent approximately 28% of the distribution to the class. (Doc. Nos. 195-1, 195-2.) 33%—which is higher than the requested 28%—is a standard contingency award. *See Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 714 (E.D. Pa. 2009) (explaining

---

[32] During the final approval hearing, Class Counsel explained the procedural history of this case. (*See* Feb. 27, 2023 Hr'g Tr. at 25:7–12 ("So in this case, it started with a case against Pfizer versus Johnson & Johnson and then we brought sort of what I guess would consider a follow-along case. Although we wound up litigating this case for at least another year after they settled and pushed the case forward on our own.").)

[33] Following the hearing, Defendants' counsel sent a letter to the Court, which stated that "[i]n July 2019, J&J disclosed in its second-quarter 10-Q that the FTC had issued a civil investigative demand ('CID') in connection with an investigation of contracting practices related to Remicade." (Doc. No. 222.) However, because the FTC's CID and J&J's disclosure "came nearly two years after the first class plaintiff filed its complaint in September 2017," class counsel "could not have relied on the existence of the CID in bringing claims." (*Id.*) During the hearing, Class Counsel represented that they were not aware of any governmental investigations. (*See* Feb. 27, 2023 Hr'g Tr. at 25:21–25; *see also* Doc. No. 222 (noting that "class counsel confirmed to the court that she was unaware of the investigation").)

that the median attorneys' fee award in class actions is one-third, or 33%); *see also In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. at 156 ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation.  Accordingly, Class Counsel's requested 33% fee amount is within the range of privately negotiated contingent fees." (cleaned up)).  (*See* Feb. 27, 2023 Hr'g Tr. at 26:1–9.)  This factor also weighs in favor of approval.

      *Innovative Terms of Settlement.*  Because there is no evidence here that the Settlement Terms are particularly innovative, the Court finds this factor to have a neutral effect.  *See, e.g.*, *Pinnell*, 2021 WL 5609864, at *1 n.2 ("There is no evidence that the Settlement Terms are remarkable.  In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request." (cleaned up)); *In re Flonase Antitrust Litig.*, 291 F.R.D at 105 ("The terms of this settlement are relatively standard.  In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request.").

                            \* \* \*

      Considering these factors together, the Court finds the requested attorneys' fees reasonable under the percentage-of-recovery method.

### 2.   Lodestar Crosscheck

      The Third Circuit has recommended that courts crosscheck the reasonableness of the attorneys' fees request using the lodestar method.  *Gunter*, 223 F.3d at 195 n.1.  "The purpose of the cross-check is to ensure that the percentage approach does not result in an 'extraordinary' lodestar multiple or windfall."  *Whiteley*, 2021 WL 4206696, at *13 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 285 (3d Cir. 2001)).  "The lodestar method 'multiplies the number of hours counsel worked on the case by a reasonable hourly billing rate for such services,' and

compares that amount to the attorneys' fees sought." *Halley*, 861 F.3d at 496 (quoting *Sullivan*, 667 F.3d at 330).

As detailed in the chart below, Class Counsel have expended 20,380.80 hours on this case, which correlates to a lodestar of $10,074,155.25.  (Doc. No. 195-15.)  Class Counsel, together with Plaintiffs' Counsel, have expended 23,698.55 hours on this case, which correlates to a lodestar of $11,811,010.25.  We include breakdowns for each of the firms below, which include attorney time and paraprofessional (e.g., paralegal) time.

**Robbins Geller**

| Attorney | Hours Worked | Hourly Rate | Individual Lodestar |
|---|---|---|---|
| Alexandra S. Bernay | 1,357.20 | $925 | $1,255,410.00 |
| Carmen Anthony Medici | 1,006.60 | $850 | $855,610.00 |
| David W. Mitchell | 89.60 | $955 | $855,568.00 |
| Lonnie A. Brown | 33.60 | $580 | $19,488.00 |
| Armen Zohrabian | 35.10 | $630 | $22,113.00 |
| Randi D. Bandman | 14.10 | $1,080 | $15,228.00 |
| Patrick J. Coughlin | 68.60 | $1,325 | $90,895.00 |
| Arthur L. Shingler | 2,364.50 | $1,025 | $2,423,612.50 |
| Jennifer E. Daniel-Duckering | 25.55 | $445 | $11,369.75 |
| Daniel Baig | 4,200.20 | $350 | $1,470,070.00 |
| Joseph S. Capobianco | 4,196.60 | $350 | $1,468,810.00 |
| Charles T. McCue | 167.00 | $445 | $74,315.00 |
| Joshua A. Youngkin | 4,283.70 | $350 | $1,499,295.00 |
| Litigation Support | 826.60 | $150-440 | $198,766.00 |
| Paralegals | 1,502.45 | $325-375 | $552,745.00 |
| Document Clerks | 209.40 | $100-150 | $30,745.00 |
| *Total* | 20,380.80 | | $10,074,155.25 |

(Doc. No. 195-15.)

**Freedman Boyd Hollander & Goldberg, P.A.**

| Attorney | Hours Worked | Hourly Rate | Individual Lodestar |
|---|---|---|---|
| Joseph Goldberg | 238.50 | $650 | $155,025.00 |
| Vincent Ward | 3.00 | $300 | $900.00 |
| Frank Davis | 7.80 | $225 | $1,755.00 |
| Nicholas Hart | 108.00 | $225 | $24,300.00 |
| Larissa Lozano | 99.50 | $225 | $22,387.50 |

| Attorney | Hours Worked | Hourly Rate | Individual Lodestar |
|---|---|---|---|
| Christopher Dodd | 17.70 | $225 | $3,982.50 |
| Deborah Tope | 75.45 | $115 | $8,676.75 |
| David Harrigan | .20 | $115 | $23.00 |
| Michael Goldberg | 87.15 | $450 | $39,217.50 |
| *Total* | 637.3 | | $256,267.25 |

(Doc. No. 195-23.)

## Gustafson Gluek PLLC

| Attorney | Hours Worked | Hourly Rate | Individual Lodestar |
|---|---|---|---|
| Daniel E. Gustafson | 2.00 | $1,200 | $2,400.00 |
| Dennis J. Stewart | 32.00 | $1,100 | $25,200.00 |
| Karla M. Gluek | 1.75 | $1,000 | $1,750.00 |
| Jason S. Kilene | 19.00 | $950 | $18,050.00 |
| Daniel C. Hedlund | 0.75 | $1,000 | $750.00 |
| Cathy K. Smith | 138.50 | $700 | $96,950.00 |
| Michelle J. Looby | 154.00 | $775 | $119,350.00 |
| Ling S. Wang | 288.75 | $500 | $144,375.00 |
| Abou B. Amara | 0.50 | $375 | $187.50 |
| Mickey L. Stevens | 190.75 | $525 | $100,143.75 |
| Gabrielle O. Sliwka | 212.75 | $315 | $67,016.25 |
| Sarah A. Moen | 1.25 | $325 | $406.25 |
| Diana Jakubauskiene | 27.75 | $300 | $8,325.00 |
| *Total* | 1,069.75 | | $594,903.75 |

(Doc. No. 195-29.)

## Miller Shah LLP

| Attorney | Hours Worked | Hourly Rate | Individual Lodestar |
|---|---|---|---|
| Alec Berin | 1.40 | $475 | $665.00 |
| Anna D'Agostino | 37.20 | $375 | $13,950.00 |
| Betsy Ferling | 1.60 | $250 | $400.00 |
| Emily Finestone | 37.40 | $475 | $17,765.00 |
| Natalie Finkelman | 336.30 | $950 | $319,485.00 |
| Jayne A. Goldstein | 166.10 | $950 | $157,795.00 |
| Henry Graney | 226.60 | $215 | $48,719.00 |
| Christine Mon | 33.60 | $225 | $7,560.00 |
| Sue Moss | 51.80 | $250 | $12,950.00 |
| Michael Ols | 434.80 | $475 | $206,530.00 |
| Casey Yamasaki | 10.00 | $400 | $4,000.00 |
| Pam Cholden | 273.90 | $350 | $95,865.00 |
| *Total* | 1,610.70 | | $885,684.00 |

(Doc. No. 195-33.)

The Court finds both the hourly rate and the number of hours worked reasonable. Plaintiffs' Counsel have many years of experience and are highly skilled in antitrust and other complex litigations such as this.  (*See, e.g.*, Feb. 27, 2023 Hr'g Tr. at 27:8–25, 32:5–17.)  And their hourly rates, which range from $115 to $1,325,[34] fall well within the range of rates charged by other attorneys in this market.  *See Whiteley*, 2021 WL 4206696, at *14 (finding that hourly rates ranging from $110 to $1,100 "well within the range of what is reasonable and appropriate in this market").  The number of hours worked was also reasonable, especially in light of the circumstances and complexity of this case.  *See In re Flonase Antitrust Litig.*, 291 F.R.D. at 105–06 (approving fee award and finding hours reasonable where class spent over 30,000 hours working on the case over five years).

The lodestar is $11,811,010.25, which results in a lodestar multiplier of 0.59 ($7,000,000 ÷ $11,811,010.25).  *See In re Flonase Antitrust Litig.*, 291 F.R.D. at 106 ("The lodestar multiplier is calculated by dividing the attorneys' fees sought by class counsel . . . by the total amount of hours class counsel devoted to the litigation times class counsel's hourly rates.").

"The Third Circuit has recognized that multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."  *Id.* (cleaned up); *see also Prudential*, 148 F.3d at 341 ("Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied . . . ." (internal citation omitted)).

---

[34] The Court inquired into the $1,325 rate for Patrick Coughlin during the final approval hearing.  (Feb. 27, 2023 Hr'g Tr. at 30:1–17.)  Class Counsel represented that the rate reflects his exceptionally high level of expertise, and the Court found this response to support the reasonableness of his rate.  (*Id.* ("He is one of the preeminent trial lawyers, antitrust trial lawyers.  He has done more than 50 trials.  I believe he has not that many hours in the case, and he was absolutely essential . . . in getting this case settled.  So I think that for him, obviously he is sort of an extraordinary outlier.").)

Where, as here, there is a negative multiplier (i.e., the multiplier is less than 1), it means that class counsel "receive *less* under a percentage fee award than their regular billing rates." *Id.*; *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 284 (3d Cir. 2009) ("The lodestar multiplier the District Court calculated was less than one and thus reveals that Class Counsel's fee request constitutes only a fraction of the work that they billed in conjunction with the Zurich Settlement."); *In re Fasteners Antitrust Litig.*, Civil Action No. 08-md-1912. 2014 WL 296954, at *8 (E.D. Pa. Jan. 27, 2014) ("A negative multiplier results when the aggregate lodestar value, or the amount of money spent by all the attorneys, is greater than the actual award of fees requested. . . . Since the multiplier here is less than one, which means that the requested fee is less than the amount that would be awarded using the lodestar method, we are satisfied that a lodestar cross-check confirms the reasonableness of Co-Lead Counsel's request for attorney's fees."). Thus, because the lodestar multiplier is 0.59, the lodestar crosscheck confirms the reasonableness Class Counsel's fee request.

\*     \*     \*

In sum, the requested attorneys' fees are reasonable under both the percentage-of-recovery method and the lodestar crosscheck, and the Court awards Class Counsel $7,000,000 in fees.

### B.     Expenses

Plaintiffs' Counsel have requested reimbursement for $2,288,388.90 in litigation expenses. (Doc. No. 195-2 at ¶ 38 (showing Plaintiffs' Counsel seeks reimbursement $2,288,388.90, where Class Counsel incurred $2,067,209.83 of that sum); Doc. No. 195-1 at 37.) These expenses include filing, witness, and service of process fees; travel fees; fees to pay a consultant, Info Tech, Inc.; legal and financial research fees; document hosting and production;

and administrative expenses such as making photocopies.  (*See, e.g.*, Doc. No. 195-1 at 37.)

These expenses are well documented.  (*See* Doc. Nos. 195-14 at ¶¶ 6(a)–(g); 195-16, 195-17,

195-18, 195-19, 195-20; *see also* Doc. Nos. 195-22 at ¶¶ 5–6; 195-24, 195-25, 195-26; 195-28 at

¶¶ 5–6; 195-30; 195-32 at ¶¶ 5–6; 195-34, 195-35, 195-36.)

      The Court notes that courts in this Circuit have routinely reimbursed similar fees.  *See,*

*e.g.*, *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085, 2005 WL 3008808, at

*17 (D.N.J. Nov. 9, 2005) (granting reimbursement of $1.93 million in expenses, which reflected

"costs expensed for purposes of prosecuting this litigation, including substantial fees for experts;

substantial costs associated with creating and maintaining an electronic document database;

travel and lodging expenses; copying costs; and the costs of court reporters and deposition

transcripts").  Further, only one Class Member objected to the reimbursement.  (*See* Doc. No.

206-1 at 7.)  The Court finds that these expenses are reasonable, and we will grant Class

Counsel's request for reimbursement.  *See In re Flonase Antitrust Litig.*, 291 F.R.D. at 106

(granting reimbursement request for $1,848,720.15 for expenses that included expert fees,

payments to the litigation fund co-counsel established for common expenses, etc. and noting that

counsel "had a strong incentive to conserve their expenses, given that they were incurred with no

guaranteed recovery"); *see also Lincoln Adventures LLC v. Those Certain Underwriters at*

*Lloyd's, London Members*, Civil Action No. 08-00235 (CCC), 2019 WL 4877563, at *8 (D.N.J.

Oct. 3, 2019) (finding $1.85 million in expenses to be reasonable).

### C.    *Class Representative Service Awards*

      Plaintiffs have also asked the Court to grant NEHP a $15,000 service award and Local

295 a $15,600 service award.  (Doc. No. 195-1 at 30.)  Service awards are regularly granted to

"compensate named plaintiffs for the services they provided and the risks they incurred during

the course of the class action litigation and [ ] reward the public service of contributing to the enforcement of mandatory laws." *Sullivan*, 667 F.3d at 333 n.65.

The proposed service awards are appropriate here. Local 295 and NEHP filed lawsuits against Defendants, both of which were eventually consolidated with related indirect-purchaser actions. (Doc. No. 195-12 at ¶ 2; Doc. No. 195-13 at ¶ 2.) NEHP and Local 295 have been involved in the case since its inception, including having "regular correspondence, conference calls, Board meetings, and in-person meetings" with counsel "concerning the status and direction of the case, the investigation and filing of the complaints, discovery, class certification and summary judgment-related issues, and settlement. (Doc. Nos. 195-12 at ¶¶ 2–3; Doc. No. 195-13 at ¶¶ 2–3.) They "searched for and provided significant information and data in response for discovery requests from Defendant" and reviewed major pleadings and filings in the case. (Doc. No. 195-12 at ¶¶ 4–5; Doc. No. 195-13 at ¶¶ 4–5; *see also* Feb. 27, 2023 Hr'g Tr. at 6:8–12 ("Ms. Kellner has encyclopedic knowledge of the Funds, so she was really able to direct in many ways the entire process of gathering documents, more than I at least have seen in other cases, very involved."); *id.* at 6:17–21 ("As I said, [they were] not only gathering documents, but also responding to the Defendant's [sic] interrogatories and document requests. Some of those were quite extensive and took quite a bit of time, more than I would say for many other cases.").) Linda Kellner "prepared for and sat for [a] deposition December 15, 2021" and attended the final approval hearing on behalf of Local 295; in addition, Local 295 "expended $600.00 in unreimbursed out-of-pocket expenses for legal services . . . from Local 295's outside fund counsel, Cary Kane PLLC." (Doc. No. 195-12 at ¶¶ 4–5; *see also* Feb. 27, 2023 H'rg Tr. at 5:16– 6:4 (stating that Kellner's deposition was "quite lengthy" and that Class Counsel considered it to be a full day deposition).) Steven Nobles prepared for and sat for a deposition on behalf of

NEHP January 20, 2022.  (Doc. No. 195-13 at ¶ 4 *see also* Feb. 27, 2023 H'rg Tr. at 5:16–6:4

(representing that Nobles sat for what a full day deposition).)

Accordingly, the Court grants the request to award NEHP $15,000 and Local 295

$15,600.  *See Lincoln Adventures*, 2019 WL 4877563, at *9 (finding the proposed service awards

of $15,000 to each of the two named plaintiffs "to be fair and reasonable, and not excessive"

where the class representatives "diligently and patiently monitored [the] case for over a decade,

provided documents and information requested by Defendants; reviewed with their counsel

important pleadings; sat for full-day depositions" and participated in mediation sessions); *see*

*also Vista Healthplan, Inc. v. Cephalon, Inc.*, CIVIL ACTION No. 2:06-cv-1833, 2020 WL

1922902, at *33 (E.D. Pa. Apr. 21, 2020) (granting $50,000 service awards to each of four TPP

plaintiffs and a $15,000 service award to the consumer plaintiff) (collecting cases).

## VII.    Conclusion

The Court is satisfied that final approval is appropriate.  Accordingly, Plaintiffs' motion

is granted.

An appropriate Order follows.